IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware limited liability company, | Civil Action No. 4:17-cv-11584 |
| Plaintiffs, | Honorable Terrence G. Berg |
| v. | |
| **INTERMOTIVE, INC.,** a California corporation, and **GREGORY E. SCHAFER**, an individual, | |
| Defendants. | |

Gregory D. Phillips (P80801)
Jared L. Cherry (P80800)
PHILLIPS RYTHER & WINCHESTER
600 East 124 South
Salt Lake City, Utah 84102
Tel: (801) 935-4935
Fax: (801) 935-4936
Attorneys for Plaintiffs

**FORD'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs Ford

Motor Company and Ford Global Technologies, LLC ("FGTL") (collectively

"Ford") respectfully submit this Motion for Summary Judgment.

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... ii

CONTROLLING AUTHORITIES ........................................................... iv

TABLE OF AUTHORITIES ...................................................................v

TABLE OF EXHIBITS ......................................................................... vi

I.      BACKGROUND ....................................................................................2

    a.   Ford and InterMotive had Discussions in 2011 and 2012 about InterMotive Producing an Upfitter Interface Module for Ford. .......................................2

    b.   InterMotive Licensed Two Technologies from Ford After the UIM Discussions Ended and Agreed not to Use the Ford Trademarks. ..............3

    c.   Ford Announced Its Own UIM in 2016, which InterMotive Alleged was a "Blatant Copy" of InterMotive's UIM Before Ford's UIM was Released...4

    d.   Ford Learned that InterMotive was Infringing Ford's Trademarks While Investigating InterMotive's Claims. ............................................................4

    e.   InterMotive's Claim that Ford's UIM is a "Blatant Copy" of InterMotive's Product is Refuted by InterMotive's Engineering Manager when Documents about Ford's UIM were Released. ..............................................5

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS...........................6

III.    STANDARD OF REVIEW .......................................................................7

IV.     ARGUMENT .........................................................................................8

    a.   Ford is Entitled to Summary Judgment on its Claims Related to Trademark Infringement Based on InterMotive's Precise Replicas of Ford's World-Famous Marks and InterMotive's Admitted Intent to Benefit from Ford's Goodwill in those Marks. .............................................................................8

    b.   This is an "Obvious Case" of Dilution under Supreme Court Precedent in which Ford is Entitled to Summary Judgement. .........................................15

    c.   Ford Is Entitled to Summary Judgment on its Claim for Non-Infringement of the Phrase "Upfitter Interface Module" Because the Phrase Describes a Category of Products Rather than Identifying a Source. ...........................17

    d.   Ford is Entitled to Summary Judgment on InterMotive's Claim for Breach of the NDA Because the Alleged Disclosure Occurred after the NDA Expired. ................................................................................................19

e.  Ford is Entitled to Summary Judgment on InterMotive's Claim for Misappropriation of Trade Secrets because the Alleged Trade Secret has been Publicly Known and Commercially Available Well Before Ford Began Using the Alleged Trade Secret......................................................21

f.  Ford is Entitled to Summary Judgment on InterMotive's Claim for False Advertising because the Challenged Statements Are Not Material, Not False, and Merely Constitute "Puffery."....................................................23

## CONTROLLING AUTHORITIES

**Issue 1:**

*Ford Motor Co. v. Lloyd Design*, 22 F. App'x 464 (6th Cir. 2001) ("likelihood of confusion is presumed when a defendant intentionally copies a trademark design 'with the intent to derive a benefit from the reputation of another.'")

**Issue 2:**

*Moseley v. V. Secret Catalogue,* 123 S.Ct. 1115, 1125 (2003) ("direct evidence of dilution … will not be necessary if actual dilution can reliably be proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical.")

**Issue 3:**

*Nartron v. STMicroelectronics,* 305 F.3d 397, 404 (6th Cir. 2002), *cert. denied,* 538 U.S. 907 (2003) ("If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark.")

**Issue 4:**

*Quality Prods. v. Nagel Precision*, 666 N.W.2d 251, 257 (Mich. 2003) (holding a party alleging modification of an agreement "must present clear and convincing evidence of conduct that overcomes not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in restrictive amendment clauses.")

**Issue 5:**

*Kubik, Inc. v. Hull*, 56 Mich. App. 335, 347 (1974) ("To be a trade secret, the information must, of necessity, be a secret.")

**Issue 6:**

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (requiring the allegedly false statement to be "material in that it will likely influence the deceived consumer's purchasing decisions").

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .......................................................8

*Audi AG v. D'Amato*, 469 F. 3d 534 (6th Cir. 2006) ................................................10

*Audi v. D'Amato*, 341 F.Supp.2d 734 (E.D. Mich., 2007) .......................................13

*Dura Global v. Magna,* 662 F. Supp.2d 855 (E.D. Mich. 2009) ...................... 21, 23

*Esercizio v. Roberts*, 944 F.2d 1235 (6th Cir. 1991) ..................................................8

*Everest Capital v. Everest Funds*, 393 F.3d 755 (8th Cir. 2005) ............................24

*Ford Motor Co. v. Heritage Mgmt. Grp.*, 911 F. Supp.2d 616 (E.D. Tenn. 2012).16

*Ford Motor Co. v. Lloyd Design,* 184 F. Supp.2d 665 (E.D. Mich. 2002) .............11

*Ford Motor Co. v. Lloyd Design*, 22 F. App'x. 464 (6th Cir. 2001) ........................8

*Frisch's Rest v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982) ................................12

*Frisch's Rest. v. Shoney's,* 759 F.2d 1261 (6th Cir. 1985) ........................................11

*General Motors v. Autovation Techs.*, 317 F. Supp.2d 756 (E.D. Mich. 2004) ........8

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298 .............24

*Kubik, Inc. v. Hull*, 56 Mich. App. 335 (1974) .........................................................21

*Liquid Glass Enter. v. Porsche AG*, 8 F. Supp.2d 398 (D.N.J. 1998) .....................12

*Moseley v. V. Secret Catalogue,* 123 S.Ct. 1115 (2003) ..........................................16

*Nartron v. STMicroelectronics,* 305 F.3d 397 (6th Cir. 2002) .................................17

*National Bus. Forms & Printing v. Ford Motor Co*., 671 F.3d 526 (5th Cir. 2012) ...............................................................................................................................11

*PACCAR v. Telescan*, 319 F.3d 243 (6th Cir. 2003) ...............................................13

*Quality Prods. v. Nagel Precision*, 666 N.W.2d 251 (Mich. 2003) ........................20

*Real Foods v. Frito-Lay*, 906 F.3d 965 (Fed. Cir. 2018).........................................18

*Sara Lee v. Kayser-Roth*, 81 F.3d 455 (4th Cir. 1996) ...........................................10

*Toyota Motor Sales v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) ...............................13

*Two Pesos v. Taco Cabana*, 505 U.S. 763 (1992) .....................................................9

*U.S. Healthcare v. Blue Cross*, 898 F.2d 914 (3d Cir. 1990) .................................25


**Statutes**

15 U.S.C. § 1125 ................................................................................................. 9, 16


**Rules**

Fed. R. Civ. P. 56 ........................................................................................................8

## TABLE OF EXHIBITS

Exhibit A          Email from R. Richardson to G. Schafer dated May 3, 2012, IM0000045-IM0000051

Exhibit B          Email Messages between K. Thomas, D. Mower, and G. Schafer dated April 4, 2012, IM0000019-IM0000022

Exhibit C          License Agreement No. 83336234 between InterMotive and FGTL, FORD007945-FORD007956

Exhibit D          License Agreement No. 83391142 between LGS Group and FGTL, FORD008089-FORD008110

Exhibit E          Guarantee of License Agreement No. 83391142 between LGS Group and FGTL, FORD008083-FORD008088

Exhibit F          Email from G. Schafer to W. Coughlin dated March 21, 2016, IM000482-IM0000484

Exhibit G          Ltr. from J. Cherry to G. Schafer dated July 15, 2016, IM0000476-000494
- Email from G. Schafer to W. Coughlin dated March 21, 2016, IM0000482-IM0000484 (Exhibit A to Ltr.)
- Confidential Disclosure Agreement effective November 29, 2011, IM0000486-IM0000489 (Exhibit B to Ltr.)
- Excerpt from 2012 NTEA Presentation, IM0000491 (Exhibit C to Ltr.)
- Email from R. Richardson to G. Shafer, R. Freiburger, and M. Cindric dated March 26, 2012, IM0000493-IM0000494 (Exhibit D to Ltr.)

Exhibit H          Email from D. Mower to M. Ellison dated May 26, 2017, IM0000145-IM0000146

Exhibit I          Email from D. Mower to G. Schafer dated August 26, 2016, IM0000299-IM0000300

Exhibit J          Ford's Upfitter Interface Module Owner's Manual IM0000302-IM0000330

Exhibit K            InterMotive's "Ford Upfitter Interface Module" Brochure created
                     on July 22, 2013, IM0000845

Exhibit L            InterMotive's UIM Programming Utility Splash Screens
                     IM0000842-IM0000843

Exhibit M            Advertisement for InterMotive Product offering "The

                     *Ford* Competitive Advantage," IM0000835-IM0000836

Exhibit N            Ranking of World's Most Valuable Brands

Exhibit O            Allegedly False Advertisement with only 258 views in seven (7)
                     months

Exhibit P            Email from G. Schafer to P. Tassie dated July 28, 2016,
                     IM0000455-IM0000458

Exhibit Q            Excerpts from InterMotive's Responses to Ford's First Set of
                     Interrogatories

Exhibit R            Email from A. Grove to G. Phillips dated July 26, 2018

Exhibit S            Declaration of Syed Monnan

Exhibit T            Declaration of Paul J. Manago

## ISSUES PRESENTED

1.      Is Ford entitled to summary judgment on its claims for trademark infringement, false designation of origin, and unfair competition where (A) InterMotive uses a precise replica of Ford's world-famous trademarks to promote its goods and services in direct competition with Ford, (B) InterMotive admits "[s]ure, we put OEM logo's [sic] on our literature to benefit" from the goodwill inherent in such logos, and (C) InterMotive and defendant Schaffer signed two separate agreements in which they agreed not to use Ford's trademarks?

Ford's Answer:     Yes

2.      Is Ford entitled to summary judgment on its claim for trademark dilution where (A) the fame and distinctiveness of the marks at issue are established by published opinions from this Court and others, (B) InterMotive's use of Ford's marks on, and to promote, InterMotive's goods and services constitutes use of the marks in commerce, and (C) Supreme Court precedent holds that when the "junior and senior marks are identical," use of the junior mark presents an "obvious case" of dilution?

Ford's Answer: Yes

3.      Is Ford entitled to summary judgment on its claim for a declaratory judgment that Ford has not infringed any cognizable right in the phrase "upfitter interface module," where (A) the phrase is used in connection with a "module" that

"interfaces" a vehicle and an "upfit," (B) where the United States Trademark Office ("USPTO") has repeatedly refused registration of the phrase because it is merely descriptive or generic as applied to such goods, and (C) InterMotive has provided no evidence of secondary meaning?

Ford's Answer: Yes

4.    Is Ford entitled to summary judgment on InterMotive's counterclaim for breach of a non-disclosure agreement ("NDA") and unfair competition where the alleged disclosure of the allegedly confidential information occurred after the expiration of the NDA?

Ford's Answer: Yes

5.    Is Ford entitled to summary judgment on InterMotive's counterclaim for misappropriation of trade secrets where (A) the functionality associated with the alleged trade secret is provided by an off-the-shelf component sold by a third party for use in automotive applications and (B) where the alleged trade secret was published on the Internet by the third party more than a decade ago?

Ford's Answer: Yes

6.    Is Ford entitled to summary judgment on InterMotive's counterclaim for false advertising where (A) one of the allegedly false advertisements has only been viewed 258 times in a period of more than 7 months, and (B) the other

allegedly false advertisement constitutes mere puffery and does not identify

InterMotive?

Ford's Answer: Yes

# **INTRODUCTION**

This lawsuit arises from Ford's decision to terminate discussions regarding InterMotive's proposed upfitter interface module ("UIM"),[1] and defendant Schafer's resulting decision to wrongfully accuse Ford of infringing InterMotive's rights based solely on the announcement of Ford's UIM that defendant Schafer had never seen.  Discovery has established that defendant Schafer's accusations were unsubstantiated, as evidenced by an analysis produced by InterMotive's own engineering manager. Rather than admitting their error, Defendants have tenaciously held to the positions they adopted in the absence of critical information, and thus unnecessarily prolonged this litigation.

Ford's Motion for Summary Judgement should be granted for six reasons. First, InterMotive has used counterfeits of Ford's world-famous trademarks to advertise and promote its products in direct competition with Ford, and InterMotive has admitted that it uses Ford's trademarks to benefit from the goodwill associated with those marks.  Second, InterMotive has diluted Ford's trademarks by using precise replicas of Ford's world-famous trademarks, which makes this an "obvious case" under Supreme Court precedent.  Third, InterMotive's claims that Ford is infringing upon its rights in the descriptive phrase

---

[1] An "upfit" is a component that may be added to a vehicle to perform a particular function.  For example, an "upfit" may consist of a bucket and robotic arm added to lift workers to repair overhead wires.

1

"upfitter interface module" fail because the phrase merely describes a category of products, and as such is ineligible for trademark protection, a conclusion that has been repeatedly stated by the USPTO. Fourth, InterMotive's claims that Ford breached a non-disclosure agreement fail because the disclosure of the allegedly confidential information occurred *after* the agreement expired. Fifth, InterMotive's claims for misappropriation of trade secrets fail because the alleged trade secrets have been publicly available on the Internet and included in products sold by a third-party for at least the past ten (10) years. Sixth, InterMotive's claims for false advertising fail because the allegedly false advertisements are not false, not material to purchasing decisions, and are unactionable puffery.

## I.   <u>BACKGROUND</u>

### a.  **Ford and InterMotive had Discussions in 2011 and 2012 about InterMotive Producing an Upfitter Interface Module for Ford.**

Ford and InterMotive explored the possibility of InterMotive supplying an UIM. Ultimately these discussions proved fruitless because InterMotive's proposal was too expensive and could not be supported by Ford's dealers.[2] At least part of the high cost was attributable to the fact that InterMotive did not want to comply with Ford's design standards which InterMotive deemed too onerous, as evidenced by InterMotive's senior product engineer warning defendant Schafer and

---

[2] Exhibit A, email from R. Richardson to G. to Schafer dated May 3, 2012.

2

InterMotive's engineering manager, Dan Mower, that they "may want to sit down" before reading the cost summary. Exhibit B. Mr. Mower responded that Ford's requirements were "obviously ridiculous" and urged InterMotive to "argue that this [*i.e.*, compliance with Ford's standards] is wholly unnecessary . . . ." *Id.* As a result, Ford notified InterMotive in writing that it was discontinuing the discussions on May 3, 2012. Exhibit A. Defendant Schaffer acknowledged Ford's decision and noted that he was "sorry to hear" of it.[3]

### b. InterMotive Licensed Two Technologies from Ford After the UIM Discussions Ended and Agreed not to Use the Ford Trademarks.

After Ford's termination of the UIM discussions, the business relationship between Ford and InterMotive continued and resulted in two separate license agreement in which InterMotive expressly agreed not to use Ford's trademarks. In 2013, Ford licensed to InterMotive technologies used in police vehicles. A copy of Patent License Agreement No. 83336234 is attached as Exhibit C. In 2014, InterMotive guaranteed "all the obligations" of InterMotive's related company, LGS Group, Inc.,[4] in connection with a license to use Ford's haptic pedal technology. A copy of License Agreement No. 83391142 is attached as Exhibit D, and a copy of a Guarantee executed by InterMotive is attached as Exhibit E.

---

[3] Exhibit A, email from G. Schafer to R. Richardson dated May 3, 2012.
[4] LGS Group, Inc. is the "master distributor" of InterMotive's products, and defendant Schafer acts as an officer of both entities.

### c. Ford Announced Its Own UIM in 2016, which InterMotive Alleged was a "Blatant Copy" of InterMotive's UIM Before Ford's UIM was Released.

After ending discussions with InterMotive in 2012, Ford engaged another vendor and developed an economically viable design for its UIM. Ford announced its UIM on April 2, 2016—nearly four years after ending discussions InterMotive. Within weeks of the announcement and before ever seeing Ford's UIM, defendant Schafer accused Ford of selling "a blatant copy of [InterMotive's] product."

### d. Ford Learned that InterMotive was Infringing Ford's Trademarks While Investigating InterMotive's Claims.

While investigating InterMotive's claims, Ford learned that InterMotive was infringing Ford's trademark rights by using counterfeits of Ford's trademarks to promote InterMotive's goods and services. In a letter dated July 15, 2016, Ford refuted InterMotive's claims of wrongdoing relating to Ford's UIM and also sought an agreement from InterMotive to cease and desist from its unauthorized use of Ford's trademarks. A copy of this letter is attached as Exhibit G.

InterMotive's internal documents show that InterMotive misappropriated Ford's trademarks with the specific intent of deriving a benefit from the goodwill associated with Ford's trademarks. In an email with the subject "Ford Complaint Notes," Mr. Mower responded to ¶ 49 of Ford's Complaint, which alleged "Defendants have acted with knowledge of Ford's ownership of the Ford Marks and with deliberate intention to unfairly benefit from the goodwill inherent in the

Ford Marks,"[5] by stating: "49 - Sure, we put OEM logo's [sic] on our literature to benefit, but I wouldn't use the term 'unfairly' benefit."[6]

Defendants have argued that Ford specifically authorized Defendants to use Ford's trademarks; however, even if true, any such defense is foreclosed by the specific and express terms of License Agreement No. 83336234, which provides:

> 11.8 Trademarks, etc. INTERMOTIVE agrees that it will not use, seek to register, or assert any rights in any FGTL Related Companies[7] trademarks, service marks, trade dress, copyrights, or in any goodwill associated with these rights with or with FGTL Related Companies' products or services, including without limitation, any trademark, service mark, trade dress, copyrights, or goodwill used or associated with FGTL Related Companies.

Exhibit C.[8]

### e. InterMotive's Claim that Ford's UIM is a "Blatant Copy" of InterMotive's Product is Refuted by InterMotive's Engineering Manager when Documents about Ford's UIM were Released.

InterMotive's documents demonstrate that Ford did not misappropriate InterMotive's UIM design.  On August 26, 2016, InterMotive's engineering manager Dan Mower, having reviewed Ford's recently-released User Manual for

---

[5] Dkt. No. 1 at ¶ 49, Pg ID 16.

[6] Exhibit H, email from D. Mower to M. Ellison dated May 26, 2017.

[7] "FGTL Related Companies" are defined as: "Ford Motor Company and any entity in which Ford Motor Company owns or controls, directly or indirectly, at least 13% of the stock or equity interest of such entity."  Exhibit E at ¶ 2.1.  The Ford trademarks at issue in this lawsuit are owned by Ford Motor Company.

[8] *See also*, Exhibit E (Defendant Schafer guaranteeing same terms on behalf of LGS in License Agreement No. 83391142).

the Ford UIM, sent an email[9] to defendant Schafer and eleven other employees of

InterMotive and LGS Group, Inc. in which he identified numerous, significant

differences between Ford's UIM and InterMotive's products, namely:

- "This UIM had a lot of resources behind its creation, in both h/w and s/w and documentation - as you would expect from a major OEM."
- "[Ford] clearly spent a LOT more$$ developing it and polishing it than we did years ago and it has 'real' online help screens."
- "Inputs 1 - 9, active high or low (programmable with pull ups or pull downs)"[10]
- "In summary, Ford's UIM has a lot more inputs and outputs, but we're not sure users need more than we provide. You can do the same sort of logic with either one. Ford has a few more vehicle PIDs than we currently provide - things that telematics users might want (crash info). Customers will get no help in config file creation from Ford, and more importantly, cannot buy UIM's preprogrammed with their custom config like we offer. Ford will raise UIM awareness with upfitters, which could actually benefit us."

*Id.* Mr. Mower's message attached the "Initial Release" of Ford's Upfitter Interface

Module Owner's Manual, a copy of which is attached as Exhibit J.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   Defendant Schafer, acting on behalf of InterMotive, executed License

Agreement No. 83336234 on June 4, 2013. *See* Exhibit C.

---

[9] Exhibit I, email from D. Mower to G. Schafer dated August 26, 2016.

[10] Two years after Mr. Mower reviewed Ford's User Manual, identified the "active high or low (programmable with pull ups or pull downs)" inputs, and sent the Ford User Manual to defendant Schafer via email, Defendants misrepresented on October 2, 2018 in paragraph 80 of their Second Amended Counterclaim that: "InterMotive discovered this misappropriation ***only recently***.  InterMotive recently obtained a copy of a Ford Motor Company User Guide for Ford's Upfitter Interface Module."  Dkt. No. 42 at ¶ 80, PageID 999 (emphasis added).

2.      InterMotive created a brochure including the FORD OVAL® trademark for its UIM product on July 22, 2013. *See* Exhibit K, IM0000845 (showing "Upfitter Interface Module brochure for Ford created 7/22/2013").

3.      InterMotive used the FORD OVAL® trademark on the "splash screen" of its UIM Programming Utility after June 4, 2013. Exhibit L, IM0000843.

4.      InterMotive has marketed its products as offering "The Competitive Advantage" after June 4, 2013. *See* Exhibit M, IM0000835-36.

5.      The UIM produced by Ford utilizes an MC33978 integrated circuit, which is produced and sold by NXP Semiconductor (NXP). Exhibit S, Dec. of Syed Monnan, at ¶ 4.

6.      The active high or active low functionality shown in Figures 3.1A, 3.1B, and 3.1C of Ford's Upfitter Interface Module Owner's Manual is implemented by the MC33978 integrated circuit. *Id.* at ¶ 5.

7.      NXP and its predecessors have sold products, such as MC33978 and MC33972, that include "programmable inputs (switches to battery or ground)" and that, according to NXP, are "ideal for automotive . . . products . . . ." Exhibit T, Dec. of Paul J. Manago, at ¶¶ 3, 6 (authenticating data sheets for and attesting to publication in August 2017 and April 2007, respectively).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between
the parties will not defeat an otherwise properly supported motion for summary
judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

### IV.   <u>ARGUMENT</u>

####  a. Ford is Entitled to Summary Judgment on its Claims Related to Trademark Infringement Based on InterMotive's Precise Replicas of Ford's World-Famous Marks and InterMotive's Admitted Intent to Benefit from Ford's Goodwill in those Marks.

#### 1. InterMotive's Use of a Precise Replica of the FORD OVAL® Trademark Gives Rise to a Presumption of Confusion.

Use of a precise replica of a trademark holder's logo constitutes trademark
infringement and gives rise to a presumption of confusion.  As the Sixth Circuit
has recognized, there "is no logical reason for the precise copying save an attempt
to realize upon a secondary meaning that is in existence." *Esercizio v. Roberts*, 944
F.2d 1235, 1239 (6th Cir. 1991). Accordingly, confusion is presumed where the
defendant misappropriates the plaintiff's precise trademarks on competing goods.[11]

In *Two Pesos v. Taco Cabana*, the Supreme Court held "[t]he ultimate test is
whether the public is likely to be deceived or confused by the similarity of the

---

[11] *See, e.g., Ford Motor Co. v. Lloyd Design*, 22 F. App'x 464, 467 (6th Cir. 2001)
("[L]ikelihood of confusion is presumed when a defendant intentionally copies a
trademark design 'with the intent to derive a benefit from the reputation of
another'"); *General Motors v. Autovation Techs.*, 317 F. Supp.2d 756, 761 (E.D.
Mich. 2004) (presuming confusion based on use of precise replicas of GM marks).

marks. . . . Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" 505 U.S. 763, 780 (1992). Accordingly, for the same reasons that Ford is entitled to summary judgment on its claim for trademark infringement, Ford is also entitled to summary judgment on its claims for False Designation of Origin under 15 U.S.C. § 1125(a) (Count II) and Unfair Competition (Count III).

InterMotive has used Ford's trademarks in its promotional materials to advertise goods that compete directly with Ford's own UIM products that bear identical marks, as shown in the examples included below.





InterMotive's use of precise replicas of Ford's trademarks, as shown above, will achieve InterMotive's admitted strategy "put[ting] OEM logo's [sic] on [their] literature to benefit . . . ."  Exhibit H.  In such cases, the result is clear: "we presume that the person who sets out to infringe on another's trademark has more brains than scruples, and will likely succeed." *Sara Lee v. Kayser-Roth*, 81 F.3d 455, 466 (4th Cir. 1996).

### 2. Ford is Entitled to Summary Judgment Under the Traditional Likelihood of Confusion Factors.

Even though the presumption of confusion entitles Ford to summary judgment on its claim for trademark infringement and the analysis of the traditional factors[12] used in analyzing the likelihood of confusion is unnecessary, the analysis

---

[12] The traditional factors used in determining the likelihood of confusion are succinctly stated in *Audi AG v. D'Amato*, 469 F. 3d 534, 542-543 (6th Cir. 2006) ("[I]n determining whether there is a likelihood of confusion, the following eight factors should be considered: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark.")

of the traditional factors nevertheless compels the same conclusion.

      ***1. Ford's Marks are Strong.*** The worldwide fame of FORD® and FORD OVAL® has been specifically recognized in judicial opinions and by independent assessments.[13] FORD® is recognized as one of the most valuable brands in the world. Exhibit N (ranking Ford's brand as 42nd most valuable brand in world with value of $14.1 billion).

      ***2. The Parties' Goods Are Related.*** Both Ford and InterMotive offer modules to interface a Ford vehicle with an upfit and use the FORD OVAL® trademark to promote their respective products.

      ***3. InterMotive Uses Ford's Identical Marks.*** As illustrated above, InterMotive uses precise counterfeits of Ford's world-famous marks.

      ***4. Evidence of Actual Confusion is not Required.*** Evidence of actual confusion is not required.[14]

      ***5. The Products are Sold through Similar Channels and to Similar Customers.*** The target market for both parties' products include those seeking a Ford vehicle with an "upfit," and the parties market their products in similar channels, including industry trade shows and through the Internet.

---

[13] *See, e.g., National Bus. Forms & Printing v. Ford Motor Co.,* 671 F.3d 526, 536 (5th Cir. 2012) ("the Ford Oval and the Ford Script logo are both famous marks"); *Ford Motor Co. v. Lloyd Design,* 184 F. Supp.2d 665, 679 (E.D. Mich. 2002) (finding FORD® famous for purposes of dilution claim).
[14] *Frisch's Rest. v. Shoney's,* 759 F.2d 1261, 1266 (6th Cir. 1985).

***6. Users of InterMotive's Products Will Not Look Beyond the Presence of Ford's Trademarks Regardless of the Level of Purchaser Care.*** Consumers seeing InterMotive's use of Ford's trademarks will erroneously believe that InterMotive is affiliated with, endorsed by, or licensed by Ford. Consumers rely on the presence of Ford's trademarks as indicators of source and quality and will not look beyond the presence of Ford's trademarks to determine whether goods are authorized before associating the product with Ford.

***7. InterMotive Uses Ford's Trademark to Benefit from Ford's Goodwill.***

InterMotive's intent to benefit from use of Ford's trademarks was acknowledged by Mr. Mower in response to Ford's Complaint: "Sure, we put OEM logo's [sic] on our literature to benefit, but I wouldn't use the term 'unfairly'[15] benefit." Exhibit H. Such intent is determinative.[16]

    InterMotive's intent is also established by InterMotive's breach of its

---

[15] Mr. Mower's contention that InterMotive did not unfairly benefit has no merit. Similar arguments have been soundly rejected. *See, e.g., Liquid Glass Enter. v. Porsche AG*, 8 F. Supp.2d 398, 406 (D.N.J. 1998) (rejecting defendant's argument that "Porsche will not be harmed because it is receiving 'an indefinite benefit' from the free 'favorable advertising'" because "'grounds for irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill,' regardless of whether the infringer is putting the mark to a good or favorable use").

[16] *Frisch's Rest. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir. 1982) (holding "intent of defendants in adopting (their mark) is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff,) that fact alone may be sufficient to justify the inference that there is confusing similarity").

agreement to cease and desist from infringing Ford's trademarks. Defendant

Schafer agreed to discontinue use of Ford's trademarks on July 28, 2016:

> Per the agreement on page 5 of the letter sent by Mr. Cherry to me
> (attached), I have no issue with paragraph 1 regarding the use of 'Ford
> Marks' and have already directed that my staff remove any Ford trademarks
> from our materials. This is already happening.

Exhibit P. In spite of this Agreement, Defendants reverted to their "scorched

Earth" strategy, arguing that they are entitled to use Ford's trademarks.

**8. *Likelihood of Expansion of Product Lines.*** Analysis of this factor is

unnecessary as the parties both sell UIM's.

### 3.   InterMotive's Use of Ford's Logos Goes Beyond "Fair" Use.

Use of another's trademarked logo goes beyond "fair" use.[17] In *Audi v.*

*D'Amato*, for example, the court ruled that the defendant's uses of Audi's

"trademarks as short hand symbols are designed to draw attention, not to describe

truthfully the attributes of Defendant's goods and services." 341 F.Supp.2d 734

(E.D. Mich., 2007). Just as in *Audi v. D'Amato* and *Toyota v. Tabari*, there is no

---

[17] *PACCAR v. Telescan*, 319 F.3d 243, 256 (6th Cir. 2003) ("mimicking the
distinctive fonts of the marks go beyond using the marks 'as is reasonably
necessary to identify'"); *Toyota Motor Sales v. Tabari*, 610 F.3d 1171, 1181 (9th
Cir. 2010) ("Toyota suggests that use of the stylized Lexus mark and 'Lexus L'
logo was more use of the mark than necessary and suggested sponsorship or
endorsement by Toyota.  This is true:  The Tabaris could adequately communicate
their message without using the visual trappings of the Lexus brand.").

need for InterMotive to use Ford's distinctive logos or "visual trappings" to communicate that InterMotive's products may be used with Ford vehicles.

### 4. Defendants' Agreements Not to Use Ford's Trademarks Precludes the Defenses of License, Latches, and Estoppel.

Ford did not authorize InterMotive to use Ford's trademarks, and InterMotive has expressly agreed not to use Ford's trademarks. According to InterMotive, any authorization it received to use Ford's trademarks was provided in 2012,[18] and as such, was superseded by License Agreement No. 83336234, which includes the following provisions:

> 11.1 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions between the parties, oral and written, with respect hereto.

> 11.2 <u>Modifications</u>. No alteration, amendment, modification, waiver or termination of this Agreement shall be valid or binding unless made pursuant to an instrument in writing signed by each of the parties.

> 11.8 <u>Trademarks. etc</u>. INTERMOTIVE agrees that it will ***not use, seek to register, or assert any rights in any FGTL Related Companies trademarks***, service marks, trade dress, copyrights or in any goodwill associated with these rights or with FGTL Related Companies products or services, including without limitation, any trademark, service mark, trade dress, copyrights, or goodwill used or associated with FGTL Related Companies.

Exhibit C (emphasis added). The acts in 2012, even if deemed true for purposes of

---

[18] Ford's Interrogatory No. 1 stated: "[i]dentify each and every document and fact that You allege supports Your contention that Ford authorized InterMotive to use any Ford trademark . . . ." Exhibit Q. The only alleged facts identified by InterMotive occurred in 2012.

this motion, were superseded pursuant to the above-quoted integration clause.

To the extent any doubt remains on this issue regarding InterMotive's *lack* of any right to use Ford's trademarks, defendant Schafer agreed twice more to _not_ infringement Ford's trademarks rights:

- On January 7, 2014, defendant Schafer agreed to the same terms on behalf of LGS Group, and defendant Schafer executed a guarantee of "all obligations of LGS" on behalf of InterMotive.[19]
- On July 28, 2016, defendant Schafer represented to Ford: "[p]er the agreement on page 5 of the letter sent by Mr. Cherry to me (attached), I have no issue with paragraph 1 regarding the use of 'Ford Marks' and have already directed that my staff remove any Ford trademarks from our materials. This is already happening." Exhibit P.

Defendants' refusal to honor their repeated agreements to _not_ infringe Ford's trademarks negates any defense based on license, latches, or estoppel.

### b. This is an "Obvious Case" of Dilution under Supreme Court Precedent in which Ford is Entitled to Summary Judgement.

InterMotive's use of the trademarks FORD® and FORD OVAL® dilutes Ford's trademark.  To prevail on this claim, Ford must show that (1) its marks are famous, (2) its marks are distinctive, (3) the defendant used the marks in commerce, (4) the defendant's use began after the marks became famous, and (5) the defendant's use is likely to cause dilution of the distinctive quality of the marks. 15 U.S.C. § 1125(c)(1); *Audi AG v. D'Amato,* 469 F. 3d at 547.

---

[19] *See* Exhibit F (including above-quoted provisions as §§ 14.1, 14.2, and 14.8 of Agreement No. 83391142); and Exhibit G (guarantee by InterMotive of "all obligations of LGS" under Agreement No. 83391142).

The fame and distinctiveness of Ford's FORD® and FORD OVAL® trademarks have been recognized by this Court and others in previous published decisions. *See* § IV(a)(i), *supra*.

InterMotive made commercial use of Ford's trademarks long after they became famous. Indeed, defendant Schafer was an employee of Ford until 1996—101 years after Ford began selling automobiles and related products under the FORD® trademark and 30 years after Ford began selling goods under the FORD OVAL®.[20] Further, this Court's finding that FORD® and the FORD OVAL® are famous in *Lloyd Design,* 184 F. Supp.2d at 679, predates InterMotive's earliest use of the mark, which InterMotive's documents show occurred in 2013.

Use of the identical mark on similar goods establishes the final element of likelihood of dilution as a matter of law. [21] As stated in *Moseley*, this is an "obvious case" of dilution.

---

[20] *See* Dkt. No. 26-2, Pg ID 341 (attaching U.S. Trademark Reg. No. 74,530, establishing use of FORD® trademark in 1895 and registration in 1909) and Pg ID 345 (attaching U.S. Trademark Reg. No. 1,399,080, establishing use of FORD OVAL® trademark in 1966 and registration in 1985).

[21] *Moseley v. V. Secret Catalogue,* 123 S.Ct. 1115, 1125 (2003) ("[D]irect evidence of dilution … will not be necessary if actual dilution can reliably be proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical.").  *See also Ford Motor Co. v. Heritage Mgmt.*, 911 F. Supp.2d 616, 629-30 (E.D. Tenn. 2012) (same; granting summary judgment ).

     **c. Ford Is Entitled to Summary Judgment on its Claim for Non-Infringement of the Phrase "Upfitter Interface Module" Because the Phrase Describes a Category of Products Rather than Identifying a Source.**

InterMotive has no cognizable trademark rights in the phrase "upfitter interface module" because the phrase merely describes a category of products (*i.e.*, "modules" that "interface" a vehicle and an "upfit"). "If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark."[22] A large number of such terms are used in the automotive industry, such as "power windows," "anti-lock brakes," etc.

The USPTO has repeatedly rejected InterMotive's attempts to register this phrase as a trademark because the phrase describes a category of products, not a source of a product. More specifically, the USPTO's final rejection stated:

> Applicant has claimed ownership of prior U.S. Registration No. 5201973 for the identical mark "UPFITTER INTERFACE MODULE", which is registered on the Supplemental Register with a disclaimer of "INTERFACE MODULE". (See attached registration copy.) The claimed prior registration identifies the same goods as those set forth in the instant application. ***As a result, Applicant's prior registration serves as evidence that the disclaimed wording "INTERFACE MODULE" is generic for the identified goods, while the mark as a whole merely describes the identified goods.***
> …
> In the present case, applicant's claim of acquired distinctiveness based on five years' use in commerce is insufficient to show acquired distinctiveness of the applied-for mark because ***the mark wording is highly descriptive, and it is not clear that Applicant's stated use is substantially exclusive***.

---

[22] *Nartron v. STMicroelectronics,* 305 F.3d 397, 404 (6th Cir. 2002), *cert. denied,* 538 U.S. 907 (2003) (internal quotations and citations omitted).

Dkt. No. 28-1, Pg ID 535 Final Action dated March 8, 2018 (emphasis added).

The USPTO's determination is correct and supported by two specific concessions made by InterMotive. First, InterMotive has conceded that it claims no rights in the terms "interface module" by specifically disclaiming these terms. *See* Dkt. No. 26-11 (showing disclaimer). The only term that InterMotive has not disclaimed is the term "Upfitter," which is a widely-used term in the industry.[23]

Second, InterMotive has conceded that the entire phrase is—at a minimum—"merely descriptive," and thus ineligible for protection absent a showing of secondary meaning, by registering the mark on the Supplemental Register. Dkt. No. 26-11 (showing disclaimer). The showing to establish "acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning." *Real Foods v. Frito-Lay*, 906 F.3d 965, 972 (Fed. Cir. 2018). Apart from the mere passage of time,[24] InterMotive has

---

[23] *See, e.g.*, Chrysler's "Upfit Guide" at https://www.fcausfleet.com/upfitguide/upfits.html; "GM's Upfitter Integration Group" at https://www.gmfleet.com/upfitters.html, Mercedes-Benz's "Upfit Solutions" at https://www.mbvans.com/sprinter/discover/upfitters-and-upfit-solutions.

[24] InterMotive has argued that the phrase has acquired distinctiveness by virtue of alleged use of the phrase in commerce for five years. InterMotive originally represented to the USPTO that it began using the phrase as a trademark on April 21, 2016. Dkt. No. 26-11, Pg ID 387 (showing use "in commerce" as April 21, 2016). Later, InterMotive claimed use "in commerce" on February 1, 2010, but InterMotive's website shows that it was using the name "CAN Vehicle Controllers (CVC) until at least September 29, 2011, for the product that it now describes using the phrase "Upfitter Interface Modules." Dkt. No. 26-13, Pg ID 394.

not offered any and cannot provide any evidence supporting its contention that the phrase has established secondary meaning.

### d. Ford is Entitled to Summary Judgment on InterMotive's Claim for Breach of the NDA Because the Alleged Disclosure Occurred after the NDA Expired.

Ford did not breach the NDA because any alleged disclosure occurred well after the expiration of the NDA.  InterMotive's current contention that Ford violated the NDA is contradicted by defendant Schafer's previous admission that the information in dispute "has been available on our web site for several years" and that InterMotive stated "we have no problem with releasing Ford of any current or future claim regarding this matter . . . ." Defendant Schafer admitted to Ford's in-house counsel on July 28, 2016, that no breach of the NDA occurred:

> [I]t has never been our intention to make a formal claim in regards to the Non-Disclosure Agreement from 11/29/11. I brought our concern to Ford and it has been reviewed. Mr. Cherry is correct in his letter in that there was not a Non-Compete Agreement in place and ***information regarding our product has been available on our web site for several years. None of this is in dispute***. With that, ***we have no problem with releasing Ford of any current or future claim regarding this matter*** and agree to sign the release.

Exhibit P (emphasis added). In spite of these statements, InterMotive now claims that Ford breached the NDA based on Ford's alleged disclosure of a prototype delivered to Ford months after the NDA expired. The NDA, which is dated November 29, 2011, provides: "[t]his agreement controls only Confidential Information disclosed during the ***six months term of this agreement***, unless

terminated earlier by the parties." Dkt. No. 26-1 (emphasis added). Moreover,

paragraph 17 of the NDA provides:

> 17. This agreement constitutes the sole and entire agreement of the parties with respect to the subject matter contained in this agreement, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter. ***All modifications to this agreement must be made in writing and signed by representatives of the parties***.

To attempt to circumvent the express provisions and the expiration of the

NDA in May 2012, InterMotive alleges that the parties agreed to extend the term

of the NDA. Rather than alleging a "modification" that was "made in writing and

signed by representatives of the parties," InterMotive merely alleges that the NDA

was extended by the course of conduct of the parties, which is contrary to the

express terms of the NDA, which includes a restrictive amendment clause.

It is well established under Michigan law that a party alleging modification

of a term in an agreement with a restrictive amendment clause "must present clear

and convincing evidence of conduct that overcomes not only the substantive

portions of the previous contract allegedly amended, but also the parties' express

statements regarding their own ground rules for modification or waiver as reflected

in restrictive amendment clauses." *Quality Prods. v. Nagel Precision*, 666 N.W.2d

251, 257 (Mich. 2003). In *Quality Prods.*, the court explained that a modification

must evidence a mutual agreement by the parties to "modify the *particular* original

contract, including its restrictive amendment clause[]." *Id.* at 258.

The only allegation by InterMotive in support of its claim that the NDA was extended is that certain engineers at Ford held a meeting with InterMotive relating to a prototype of the UIM in December 2012—six months after the NDA had expired. InterMotive alleges that its subjective intent in "mark[ing] the sample with a sticker that said 'PROTOTYPE/CONFIDENTIAL' because *InterMotive wanted Ford to keep the sample confidential under the terms of the NDA*" somehow revived the NDA, even though Ford never agreed in writing to revive or extend the NDA. Dkt. No. 38 at ¶ 54.

InterMotive has failed to provide clear and convincing evidence that Ford agreed in writing to extend the NDA, and Ford is entitled to summary judgment.

### e. Ford is Entitled to Summary Judgment on InterMotive's Claim for Misappropriation of Trade Secrets because the Alleged Trade Secret has been Publicly Known and Commercially Available Well Before Ford Began Using the Alleged Trade Secret.

InterMotive's trade secret claim cannot stand because InterMotive has admitted that its claim is based on a "circuit [that] already existed for general use," specifically including "some automotive applications."  Exhibit R.  "To be a trade secret, the information must, of necessity, be a secret." *Kubik, Inc. v. Hull*, 56 Mich. App. 335, 347 (1974).[25] Trade secrets do not "encompass information which

---

[25] *Dura Global v. Magna,* 662 F. Supp.2d 855, 859 (E.D. Mich. 2009) (same)

21

is readily ascertainable, *i.e.*, capable of being acquired by competitors or the general public without undue difficulty of hardship." *Id*.

InterMotive filed an amended counterclaim on October 2, 2018, alleging that it "recently" discovered Ford's alleged trade secret misappropriation by reviewing a "user guide" for Ford's UIM Product documenting the alleged trade secret.[26]

The functionality at issue in the alleged trade secret is implemented by an off-the-shelf component made by NXP Semiconductor, namely Product No. MC33978, which is incorporated into Ford's UIM. Exhibit S at ¶ 6. The "active high or low" functionality is described in the datasheet posted on NXP's website in August 2017.  Attached hereto as Exhibit T is a Declaration of Authenticity authenticating and attaching datasheets associated with NXP Semiconductor products demonstrating that NXP has publicly disclosed the alleged trade secret.

Active high and active low programmable inputs have long been utilized in the automotive industry, and Ford notified InterMotive of the inclusion of the "active high" and "active low" functionality associated with NXP Product No. MC33978 and of the publication of the alleged trade secret on NXP's website in order to demonstrate to InterMotive that its trade secret allegation was without

---

[26] *See* Dkt. No. 42, ¶¶ 80-81, PageID 999. Contrary to InterMotive's claim, Mr. Mower had forwarded a copy of the User Guide to defendant Schafer more than two years earlier (*i.e.*, on August 26, 2016), specifically noting the "active high or low" inputs that InterMotive now allege constitute its trade secrets.  *See* Exhibit I (email attaching "User Manual.pdf" and noting "active high or low" inputs).

merit. Moreover, Ford also identified another commercially available, Product No. MC33972, that incorporated this feature and was sold at least as early as 2007. See Exhibit T at ¶ 6. Product Nos. MC33978 and MC33972 are each intended for use in automotive products. The datasheets for each product state that the circuit is "ideal for automotive and industrial products. . . ."[27] Further, Product No. MC33978 is intended for communication with an "in-vehicle network."  Exhibit T, at page 4.  Despite Ford's demonstration to InterMotive that there was no trade secret, InterMotive continued to pursue its misappropriation claim.

The law is well settled that use of an off-the-shelf component from a third party used for the specific purpose for which it was intended and that is described in documentation available on the Internet (*i.e.*, "in-vehicle network" communication) cannot support a claim for misappropriation of trade secrets because such information is not "secret." *Dura Global,* 662 F. Supp.2d 855 at 859. Information relating to the "active high" and "active low" functionality included in NXP Semiconductor's products and described in publications posted to the Internet more than a decade ago is "readily ascertainable" and can be "acquired by competitors or the general public without undue difficulty or hardship."

> **f. Ford is Entitled to Summary Judgment on InterMotive's Claim for False Advertising because the Challenged Statements Are Not Material, Not False, and Merely Constitute "Puffery."**

---

[27] Exhibit S at page 4 (including statement regarding Product No. MC33978); Exhibit S at page 70 (including statement regarding Product No. 33972).

### i.   The Challenged Statement in the YouTube Video is Not Material and are Mere Puffery.

InterMotive's claim for false advertisement rests on a single sentence spoken in less than 6 seconds in a video that has been viewed only 258 times[28] in more than seven (7) months and that merely touts the benefits of the programmability of Ford's UIM for snow plows and salt spreaders.  The allegedly false statement is uttered 56 seconds into the 79 second video, where the speaker states: "Ford is the only product that is actually programmable in these upfitter interface modules."[29]

The allegedly false statement constitutes mere puffery that is not material to purchasing decisions made by consumers.[30]  This *de minimis* exposure cannot be material in purchasing decisions.[31]  Further, the challenged statement is simply an indication that Ford's product is superior to other products on the market because of its programming features, and, as such, is mere puffery. Highlighting the claimed superiority of a product is "the most innocuous kind of 'puffing,' common

---

[28] *See* Exhibit U. Many of the 258 views are likely associated with this lawsuit.

[29] The video in question is available at: https://youtu.be/qKwtzSoIPTg.

[30] *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (requiring the allegedly false statement to be "material in that it will likely influence the deceived consumer's purchasing decisions").

[31] *See, e.g., Everest Capital v. Everest Funds*, 393 F.3d 755, 764 (8th Cir. 2005) (upholding finding misrepresentation is not material when website where false statement was published had been visited by only 74 people).

24

to advertising and presenting no danger of misleading the consuming public." *U.S. Healthcare v. Blue Cross*, 898 F.2d 914, 926 (3d Cir. 1990).

### ii.    The Challenged Statement in the Brochure is not False.

InterMotive's claim of false advertising based on the brochure attached as Exhibit K cannot survive because the challenged statement is not false. The challenged statement is: "unlike aftermarket upfitter modules currently on the market, the Upfitter Interface Module (UIM) is warranted by Ford ***and*** will not interrupt the Computer Area Network (CAN) Data." Dkt. No. 42 at ¶ 109, PageID 1003 (emphasis added).  The conjunctive term "and" necessitates two distinct conditions for the identified statement to be false: (1) the module must be "warranted by Ford" and (2) must "not interrupt the Computer Area Network (CAN) Data."  InterMotive does not claim that its products are "warranted by Ford," and, as such, the first condition necessary for the statement to be false is not satisfied.  As such, the statement is not "literally false" as InterMotive contends.

In addition, the challenged statement is merely another indication that Ford's product is superior to other products on the market because it is specifically warranted by Ford not to interrupt the CAN network.  As stated above, highlighting the claimed superiority of one product over another is "the most innocuous kind of 'puffing,'" and cannot support InterMotive's claims.

Submitted January 11, 2019          /s/ Gregory D. Phillips
                                   Gregory D. Phillips (P80801)

**Certificate of Service**

I hereby certify that the above Ford's Motion for Summary Judgment was electronically submitted on January 11, 2019, using the CM/ECF system, which will serve this document upon all counsel of record above listed.

/s/ Jared L. Cherry

26