UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY, FORD GLOBAL TECHNOLOGIES, LLC,** | 4:17-CV-11584-TGB |
| Plaintiffs, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **INTERMOTIVE, INC., GREGORY E. SCHAFFER,** | |
| Defendants. | |

Plaintiffs/Counter-Defendants Ford Motor Company and Ford Global Technologies, LLC (together, "Ford") bring this action against Defendants/Counter-Plaintiffs InterMotive, Inc. and Gregory E. Schafer (together, "InterMotive") alleging trademark infringement, false designation of origin, trademark dilution, cancelation of trademark registration, and declaratory judgment. ECF No. 26. Ford claims that Defendants impermissibly used Ford's distinctive trademarks in various InterMotive advertisements and seeks a permanent injunction against Defendants prohibiting them from using Ford's trademarks as well as damages and a disgorgement of all revenues and profits realized by the infringement. The Court dismissed with prejudice Ford's cancelation of

1

trademark registration claim. *See* ECF No.35. Defendants responded to Plaintiffs' action by bringing counterclaims for trademark infringement, unfair competition under the Lanham Act, breach of contract, unfair competition under state law, trade secret misappropriation under the Michigan Uniform Trade Secrets Act, and false advertising. ECF No. 42. InterMotive claims that all its uses of Ford's marks are permissible because they do not attempt to show that Ford is the source of the product and many were made with Ford's approval. InterMotive also claims that Ford misappropriated InterMotive's trade secrets and infringed on an InterMotive trademark when Ford began selling a competing product of the same name.

Currently before the Court are the parties' cross motions for summary judgment (ECF Nos. 46, 47). The parties filed responses and replies to their respective motions. The Court heard oral argument on the motions on June 5, 2019. For the reasons stated below, the Court will **DENY IN PART** and **GRANT IN PART** Plaintiffs' motion for summary judgment and **DENY** Defendants' motion for summary judgment.

## I. Facts and Procedural History

In 2011 and early 2012, Ford and InterMotive explored a potential business relationship wherein InterMotive would design an "Upfitter Interface Module" ("UIM") for Ford to use on its vehicles. Plaintiffs' Motion for Summary Judgment, ECF No. 47, PageID.1187. The UIM, as described in the record, is a product that allows its user to modify a

vehicle for special applications such as in the police, fire, and utility truck market. ECF No. 42, PageID.987. For example, it can program a truck to flash a light if exceeds 65 miles per hour, or program a police vehicle to automatically lock its doors unless certain conditions are met.[1] The UIM does this by "interfacing" with a vehicle's Controller Area Network ("CAN") bus in order to permit information to travel between modules in the vehicle. Monnan Deposition, ECF No. 55, PageID.1655 (*sealed*).

The preliminary discussions between Ford and InterMotive were governed by a "Confidential Disclosure Agreement" ("NDA").[2] *See* ECF No. 26-1. The NDA, effective November 29, 2011, covered the sharing of information related to "gateway/interface component design and performance specifications." *Id.* at PageID.337. It contains three pertinent provisions. First, a clause stating that the "agreement controls only Confidential Information disclosed during the *six months term* of this agreement, unless terminated earlier by the parties." ¶ 6 of the NDA, ECF No. 26-1, PageID.337 (emphasis added). Second, a clause stating that "[a] Recipient's duty to protect Confidential Information disclosed under this agreement extends for a period of *two years* from the effective date." ¶ 8 of the NDA, ECF No. 26-1, PageID.337 (emphasis added).

---

[1] See one of InterMotive's current Upfitter Interface Module Installation Instructions: https://intermotive.net/wp-content/uploads/2019/05/UIM-B-052119.pdf

[2] While the agreement itself is titled "Confidential Disclosure Agreement," in their motions to the Court the parties refer to it as an "NDA," the typical abbreviation for a Nondisclosure Agreement. For clarity, the Court will use the same acronym as the parties.

Finally, a restrictive amendment clause stating that "[a]ll modifications to this agreement must be made in writing and signed by representatives of the parties." ¶ 17 of the NDA, ECF No. 26-1, PageID.338. In sum, the agreement controlled only confidential information disclosed from November 29, 2011 to May 29, 2012, and a recipient's duty to protect confidential information disclosed under the agreement extended to November 29, 2013.

InterMotive alleges it had already developed and sold a commercial version of the UIM product, and its relationship with Ford involved developing a "special performance-enhanced" version of the commercial UIM product specifically for Ford. Schafer Declaration, ECF No. 53-2, Page.ID.1499. Defendants call this version "Phase 1". *Id.* When InterMotive learned that Phase 1 did not comply with Ford's specifications, Defendants allege they agreed with Plaintiffs to develop a Phase 2 module to meet Ford's specifications. *Id.* at PageID.1500.[3]

---

[3] Ford's engineer, Randy Freiburger, testified in deposition to a similar effect. Under the preliminary talks between Ford and InterMotive, the plan was for InterMotive to design a module specifically to interface with Ford's CAN bus, and to build it in three phases. *See* ECF No. 54, PageID.1630 (*sealed*). "Phase one could have been just a very basic, hey, we can read – we can interface with your CAN bus and we can read vehicle speed or whatever, demonstrate the, you know, very basics. But phase two, they're indicating that they would need a new hardware platform, the first bullet under phase two." *Id.* Freiburger testified that the timeline involved phase two being complete and compatible with 2013 model year Ford vehicles. *Id.* Freiburger also testified that the "whole goal" of signing the NDA was for InterMotive to develop a module for Ford "that encompassed more features, more capability . . . [to] ultimately in the end wind up with something that met all of [Ford's] needs." *Id.* at PageID.1633; *see also* ECF No. 53-2, PageID.2538 (Marc Ellison of InterMotive discusses phases).

Defendants allege the Phase 2 module contains the trade secrets pertinent to their counterclaim: "the use of programmable inputs" in a UIM module. *Id.* at 1502. They allege Phase 2 contains a trade secret because its unique features were not included in the commercial version of the UIM or Phase 1 of the UIM project with Ford. *Id.* Defendants allege specifications for Phase 2 were shared with Ford marked as "confidential" and "proprietary"—as required under the NDA—"in March, but possibly in July, and certainly no later than December of 2012,"—after the expiration of the NDA on May 29, 2012. *Id.*

While Ford alleges its relationship with InterMotive ended in May 2012 because InterMotive's prices were too high, InterMotive alleges the business relationship continued well into 2012, 2013, and 2014 as InterMotive developed Phase 2 and Phase 3. ECF No. 53, PageID.1470-71. To support their position that the "UIM" relationship ended in May 2012, Plaintiffs rely on email communications between executives at Ford and InterMotive in April and May 2012 explaining that InterMotive's prices were too high and any potential business deal would have to be terminated, at least for the foreseeable future. ECF No. 47-1, PageID.1212 (email chain from Schafer to Rob Richardson: "Sorry to hear that you will not be pursuing a solution until 2014."); ECF No. 47-2. Ford alleges that after this notification, Ford engaged another vendor and developed a more economically viable design for its UIM. ECF No. 47,

PageID.1189. Ford later announced this design in March or April 2016. *Id.*

Defendants rebut this contention with declarations from president of InterMotive, and Defendant, Greg Schafer (ECF No. 53-2), and the former sales manager, operations manager and vice president of sales for InterMotive, Marc Ellison (ECF No. 53-3). First, they allege that Richardson, an employee of Ford of Europe, was interested in UIM technology in *Europe*. ECF No. 53-2 Page ID.1508-09; ECF No. 53-3, PageID.1578. Therefore, InterMotive "understood that [Richardson] was aware of what [InterMotive] was doing with Ford Motor Company in the U.S.A.," and viewed Richardson's interest as "independent" of what InterMotive was doing with Ford in the United States. *Id.* Schafer's declaration also alleges the parties agreed to extend the NDA as they discussed the development of Phase 2 and InterMotive shared the confidential and proprietary specifications of Phase 2. *See* ECF No. 53-2, PageID.1503.[4] He alleges Ford also shared confidential and proprietary information with InterMotive during this time—further evidence that the parties intended to extend the NDA. ECF No. 53-2, PageID.1503-04.

Defendants also allege that in July 2012, Ford engineer Randy Freiburger organized a meeting with InterMotive engineers to demonstrate "confidential" UIM technology and to discuss the Police

---

[4] InterMotive also developed a Surveillance Mode Module for Ford police vehicles, which InterMotive still sells for use on Ford vehicles. ECF No. 53-2, PageID.1504.

Surveillance System. ECF No. 53, PageID.1483 (containing computer screenshot of InterMotive's electronic calendar showing meeting between Ford and InterMotive to discuss the Upfitter Interface Module on July 27, 2012). An email from Freiburger to Marc Ellison of InterMotive in August 2012 demonstrates that Ford was inquiring about UIM pricing well after May 2012. *See* ECF No. 53-3, PageID.1578, 1587.

In December 2012, Defendants allege a meeting was organized by Freiburger[5] where InterMotive delivered a prototype of Phase 2 to Ford chief engineer Rob Stevens. Schafer Declaration, ECF No. 53-2, PageID.1506-07 (including computer screenshot of InterMotive's electronic calendar showing the meeting). Defendants allege the Phase 2 prototype included a "PROTOTYPE/ CONFIDENTIAL" sticker that was in line with the terms of the NDA. *Id.* at PageID.1507-08 (including photograph of Phase 2 prototype with sticker). They contend that Ford took this confidential prototype and shared it with another supplier who developed Ford's UIM that it later announced in 2016. ECF No. 42, PageID.995. Freiburger stated that he did not recall whether Schafer provided Ford with a UIM prototype at the meeting. Freiburger Deposition, ECF No. 54, PageID.1638 (*sealed*).

---

[5] Freiburger testified in deposition that he believed he saw the Phase 2 module on InterMotive's website and at various events. ECF No. 54, PageID.1629 (*sealed*). However, he also testified that pursuant to the NDA, Ford shared certain confidential information regarding Ford's CAN bus so that InterMotive could design a version of the UIM that would properly interface with it. *Id.* at PageID.1629.

Then in June 2013, Schafer of InterMotive and Coughlin of Ford executed a licensing agreement governing the Police Surveillance Mode Module. June 4, 2013 Licensing Agreement, ECF No. 49-1 (*sealed*). Plaintiffs assert that Defendants' signing of this licensing agreement was an express agreement not to use Ford's marks, regardless of Ford's alleged acquiescence to InterMotive's use throughout 2012. ECF No. 47, PageID.1199; Licensing Agreement, ECF No. 49-1, PageID.1428 (*sealed*). Defendants do not dispute that they executed the agreement, but they disagree with Plaintiffs over its scope and interpretation. ECF No. 53, PageID.1471. Schafer concedes he eventually signed a version of the agreement in 2013, "but it did not require InterMotive to pay anything, and it did not prevent [InterMotive] from selling [its] product to others. [Schafer] signed it to keep the customer – Ford – happy." Schafer Declaration, ECF No. 53-2, PageID.1505-06. Schafer states that he abided by the terms of the agreement stating that InterMotive would not use Ford marks on InterMotive products "*meaning the Surveillance Mode system.*" *Id.* (emphasis added). In this, Schafer argues the licensing agreement had nothing to do with the UIM product, but pertained only to the police surveillance module it had developed for Ford. *Id.* However, Schafer simultaneously argues the agreement contained a two-way confidentiality promise in Article 8, that was again a promise between Ford and InterMotive not to disclose confidential information about each other's technology, including the UIM. *Id.*

In January 2014, Schafer and Coughlin executed another licensing agreement, this time governing the "hepatic pedal and coaching method for improving vehicle fuel efficiency." ECF No. 49-2 (*sealed*) (agreement); ECF No. 49-3 (*sealed*) (guarantee). Ford argues that Schafer's execution of the agreement is another acknowledgement by InterMotive to not use Ford's trademarks, because it contains a trademark clause. ECF No. 47, PageID.1188; § 14.8 Trademarks, ECF No. 49-2, PageID.1447-1448 (*sealed*). Schafer argues the agreement is irrelevant because it deals with hepatic technology, and in any event InterMotive did not sign the agreement, emphasizing that the agreement contains his signature and initials on behalf of LGS Group, Inc., not InterMotive. *Id.*; ECF No. 49-2. Ford argues that LGS is the "master distributor" of InterMotive's products and therefore InterMotive, not just LGS, agreed not to use Ford's trademarks. ECF No. 47, PageID.1188.

Over two years later, in March 2016, Ford announced that several of its 2017 vehicles would include an "Upfitter Interface Module" that would better enable "upfitters" to interact with the electrical system of Ford vehicles for upfitting modifications. Announcement, ECF No. 26-4.[6] Defendants argue that Ford took InterMotive's confidential Phase 2 prototype that they shared with Ford engineers in December 2012 to another producer to develop Ford's UIM. ECF No. 42, PageID.999. After

---

[6] Plaintiffs allege they did not use the mark "Upfitter Interface Module" until April 4, 2016 when it announced its UIM-type product. ECF No. 26, PageID.315.

that announcement, Schafer on behalf of InterMotive, sent an email to Ford alleging it breached the 2011 NDA with InterMotive, duplicated features of Phase 2 of InterMotive's project for Ford by bringing the confidential prototype and specifications to the new supplier, and infringed on an InterMotive trademark by using the name "Upfitter Interface Module" to describe Ford's product. March 21, 2016 Schafer Email, ECF No. 26-5, PageID.362. Defendants argue that Ford began using the name "Upfitter Interface Module" with full knowledge of InterMotive's use of the same name to market its product, as evidenced by an email from a Ford engineer explaining that the name was already being used by an existing producer and recommending three alternative names. *See* Monnan Declaration, ECF No. 55, PageID.1663 (*sealed*).

In response, Ford sent a letter to InterMotive in July of 2016 refuting Schafer's claims and asserting for the first time that InterMotive was infringing on Ford's trademark rights by using Ford's marks on InterMotive products without Ford's consent. July 15, 2016 Ford Letter, ECF No. 47-7, PageID.1229. Ford contends that when it began investigating InterMotive's claims, it discovered InterMotive was "misappropriating the Ford Marks in several ways." ECF No. 26, PageID.297. Ford attached an agreement to the letter, seeking InterMotive's compliance to cease and desist using Ford's marks. ECF No. 47-4, PageID.1233.

Ford's investigation allegedly revealed that throughout June and July of 2013, and later in 2016, InterMotive used Ford trademarks when marketing the InterMotive UIM. Ford argues this was in violation of the two licensing agreements signed in June 2013, see ECF No. 49-1 (Police Surveillance Mode Module agreement) (*sealed*), and January 2014, see ECF No. 49-2 (Hepatic Pedal agreement) (*sealed*).

First, Ford alleges Defendants used the distinctive "Ford Oval" mark on the "splash screen" of InterMotive's UIM software. ECF No. 26, PageID.297; "Splash Screen", ECF No. 47-12.[7] Second, Ford alleges Defendants used the Ford Oval mark in a promotional and training video on InterMotive's website under the heading "The Ford Competitive Advantage." ECF No. 26, PageID.298-99; "Ford Competitive Advantage" Advertisement, ECF No. 47-13. Third, Ford argues Defendants used the Ford Oval and "Go Further" trademarks in a video on InterMotive's website describing the "Ford Police Interceptor Surveillance Mode." ECF No. 26, PageID.300. Fourth, Ford asserts Defendants used the Ford Oval trademark in a UIM brochure for Ford created on July 23, 2013. "Brochure," ECF No. 47-11.

---

[7] When Ford asked InterMotive to cease and desist using the Ford Oval trademark in InterMotive's UIM splash screen, InterMotive substituted another Ford trademark in place of the oval trademark. ECF No. 26, PageID.298. When Ford again objected to this use, InterMotive claims it removed Ford entirely from the splash screen. ECF No. 46, PageID.1086.

Ford contends some of these unauthorized uses of Ford trademarks continued well into 2016. ECF No. 26, PageID.301. For example, Ford alleges InterMotive used the Ford Oval trademark on InterMotive's website advertising the InterMotive UIM and the advertisement appeared after October 25, 2016. *Id.* at PageID.301-02; ECF No. 26-8. This advertisement appears similar to the "brochure", see ECF No. 47-11 (Plaintiff's Exh. K), and Defendants assert it shows that InterMotive is the source of the UIM product, as evidenced by InterMotive's logo, phone number and web address printed on the bottom of the brochure for prospective buyers, and merely shows that the product operates on Ford vehicles. ECF No. 53, PageID.1474-75.

Schafer responded to Ford's July 2016 email listing the alleged trademark infringements, stating that he had "no issue with paragraph 1 [of the attached agreement] regarding the use of "Ford Marks" and "ha[d] already directed that [his] staff remove any Ford trademarks from [InterMotive] materials."   ECF No. 47-16, PageID.1293-94. The email also stated that InterMotive had no intention to initiate a formal claim regarding the NDA from 2011 and conceded that "there was not a Non-Compete Agreement in place and information regarding [InterMotive's UIM] product has been available on [InterMotive's] web site for several years." *Id.* Schafer stated that InterMotive had "no problem with releasing Ford of any current or future claim regarding this matter and agree[d] to sign the release." *Id.* It is unclear from the record whether

Schafer actually signed the release or merely stated that he would be willing to sign the release. However, Schafer states that he was unrepresented by counsel at the time he sent the email and then believed that Ford may have found InterMotive's UIM technology from public sources – as Ford represented. Schafer Declaration, ECF No. 53-2, PageID.1511. InterMotive and Schafer now believe that Ford took that technology in 2012-2013 when InterMotive shared it with Ford under the promise of confidentiality. *Id.*

After Ford announced its UIM product in April 2016, Defendants filed an application to the United States Patent and Trademark Office ("USPTO") to place the term "Upfitter Interface Module" on the primary register. ECF No. 27-4 (showing a filing date of June 7, 2016). The USPTO rejected Defendants' application, and the mark was instead placed on the supplemental register. ECF No. 26-11 (showing a registration date of May 9, 2017). It appears Defendants filed a second application to the USPTO for placement on the primary register, but that application is not included in the record. Rather, Ford includes the USPTO's subsequent denial of primary register placement, explaining that that the term "Upfitter Interface Module" was merely descriptive of InterMotive's goods and therefore could not be placed on the primary register. ECF No. 28-1 (showing an issuing date of March 8, 2018). While the USPTO denied Defendants' application, it permitted InterMotive to respond to the refusal by submitting additional evidence and arguments

in support of registration. *Id.* at PageID.537. Schafer claims that InterMotive responded with additional arguments and evidence but the USPTO suspended proceedings on the application pending the resolution of this matter. ECF No. 53-2, Page.ID1546-71 (InterMotive's additional evidence); *id.* at PageID.1573-75 (USPTO suspension in September 2018).

In August 2016, InterMotive's engineering manager, Dan Mower, sent an email to Schafer and eleven other employees of InterMotive and LGS.[8] ECF No. 47-9. Having reviewed Ford's recently-released user manual for the Ford UIM, Mower identified differences and similarities between Ford's UIM and InterMotive's UIM. Of note, Mower states that the user manual "is pretty much a knock off of [InterMotive's], with different screen layouts." *Id.* at PageID.1250. Ford argues this shows that Ford's UIM is not a "blatant copy" of InterMotive's UIM. ECF No. 47, PageID.1190.

Then in a letter dated October 25, 2016 to InterMotive, Ford noted what it alleged were InterMotive's continuing violations of Ford's trademark rights. ECF No. 26-7. The letter notes that while Ford's "oval" trademark had been removed from InterMotive's UIM's "splash screen," the oval mark had been replaced by a different Ford trademark. *Id.* at PageID.370. Ford stated that it did not consent to InterMotive's use of

---

[8] As discussed above, LGS is InterMotive's distributor and Schafer is LGS's Executive Vice President. ECF No. 53-2, PageID.1498.

the Ford trademark and demanded that InterMotive remove it from the "splash screen." *Id.* The letter also demanded that InterMotive sign the agreement that Ford originally sent InterMotive in July 2016. *Id.*

Ford then brought the underlying complaint against InterMotive alleging: (1) Trademark Infringement pursuant to 15 U.S.C. § 1114, (2) False Designation of Origin pursuant to 15 U.S.C. § 1125(a), (3) Unfair Competition, (4) Trademark Dilution, (5) Cancelation of Trademark Registration pursuant to 15 U.S.C. § 1064, and (6) declaratory judgment. Plaintiffs' Amended Complaint, ECF No.26. Thereafter, InterMotive brought six counterclaims against Ford, alleging (1) Infringement of a Registered Trademark, (2) Unfair Competition under § 43(a) of the Lanham Act, (3) Breach of Contract, (4) Unfair Competition under state law, (5) Trade Secret Misappropriation under the Michigan Uniform Trade Secrets Act, and (6) False Advertising. ECF No. 42. The Court dismissed with prejudice Plaintiffs' Count V for Trademark Cancelation. *See* ECF No.35.

Ford moves for summary judgment on its and InterMotive's claims. ECF No. 47; InterMotive's Response, ECF No. 53. InterMotive only moves for summary judgment as to Ford's claims. ECF No. 46; Ford's Response, ECF No. 58. The Court held a hearing on the parties' competing motions on June 5, 2019.

## II. Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific

portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

### III. Analysis

### a. Ford's Claim for Trademark Infringement (Count I)

A trademark is "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to *indicate the source of the goods*, even if the source is unknown." 15 U.S.C. § 1127 (emphasis added). "To state a claim for trademark infringement under the Lanham Act, the plaintiff must allege facts establishing: (1) that it owns a registered trademark; (2) the defendant used the trademark in commerce; and (3) the use was likely to cause confusion." *Hensley Manuf. V. ProPride, Inc.*, 579 F.3d 603, 609-10 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)). Only the third factor—whether InterMotive's use of Ford's marks caused a likelihood of confusion—is at issue in this claim. The Sixth Circuit traditionally applies an eight-factor test to determine whether there is a likelihood of confusion. *Id.* at 610. Those factors are: "(1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels

used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark." *Audi AG v. D'Amato*, 469 F.3d 534, 542-43 (6th Cir. 2006). "But the likelihood of confusion analysis also involves a preliminary question: whether the defendants 'are using the challenged mark in a way that identifies the source of their goods.'" *Hensley*, 579 F.3d at 610 (quoting *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003)). "If they are not, then the mark is being used in a 'non-trademark way' and trademark infringement laws, along with the eight-factor analysis, do not even apply." *Id.* (internal quotations omitted). InterMotive argues that each time it used a Ford trademark, it did so to demonstrate that the InterMotive UIM is compatible on Ford vehicles, and therefore that *InterMotive* was the source of the product, and on many occasions the allegedly infringing advertisement was created with Ford's permission and assistance. ECF No. 46, PageID.1082, 1085. InterMotive also argues its use of the Ford marks was "minimal and discontinued when Ford objected." *Id.* at PageID.1082.[9]

Ford relies on three primary examples to argue that InterMotive used "precise replica[s]" of Ford's trademarks, directly competing with Ford's UIM[10] and creating a "presumption of confusion". ECF No. 47,

___

[9] Defendants have also stated on the record before the Court that it has stopped using Ford marks entirely and has no intention of using Ford marks again.
[10] Of course, most of the alleged infringements occurred in 2012 and 2013, many years before Ford began marketing its UIM in 2016.

PageID.1193. Those examples are: (1) the brochure (ECF No. 47-11), (2) the splash screen (ECF No. 47-12), and (3) the "Competitive Advantage" advertisement (ECF No. 47-13).[11] *See* ECF No. 47, PageID.1194-95. Plaintiffs assert these uses of Ford marks are likely to confuse the public as to whether InterMotive is "affiliated, sponsored, and/or licensed by Ford or have some other type of business relationship with Ford" when they see the Ford marks on InterMotive's advertisements and website. ECF No. 26, PageID.303-04. They also allege consumers will be more likely to purchase the advertised InterMotive products bearing Ford marks because they will erroneously believe Ford created the products or that Ford endorses the product. *Id.* at PageID.304-05. The Court considers each alleged infringement.

First, regarding the "splash screen," Ford's mark appears between the logos of Ram, Chevrolet, GMC and GM below the heading "InterMotive UIM." ECF No. 47-12. InterMotive argues that it had previous approval from Ford to use the Ford Oval mark and that it only used the mark to refer to Ford, not to assert that its product originated from Ford. ECF No. 42, PageID.949; *see also* ECF No. 46, PageID.1086 ("The Ford logo on the screen refers to Ford—and several other manufacturers—to show that the InterMotive Module can operate on Ford vehicles, just as it can also operate on vehicles from other vehicle

---

[11] A fourth example is also relevant: InterMotive's use of the "Go Further" mark, discussed below.

manufacturers."). InterMotive also argues that the "splash screen" only appears after the customer has downloaded *InterMotive's* UIM from the *InterMotive* website by clicking on an *InterMotive* software icon—none of which display Ford marks. *Id.* at PageID.1085-86. Ford argues this still creates "post-sale" or "marketplace" confusion, but does not explain how, apart from the conclusory argument that InterMotive ignores the concept of post-sale confusion. ECF No. 58, PageID.1699.

Second, Ford argues Defendants used the Ford Oval and "Go Further" trademarks in a video on InterMotive's website describing the "Ford Police Interceptor Surveillance Mode." ECF No. 26, PageID.300. InterMotive argues that Ford's claim is baseless because "Ford made and hosts the video," which highlights InterMotive's UIM product. ECF No. 42, PageID.952. InterMotive alleges that it merely posted a link to the video on its website, but Ford still hosts the video on YouTube. ECF No. 46, PageID.1089. Ford does not respond to these allegations outside of the blanket remark that it did not authorize InterMotive to use the marks. ECF No. 26, PageID.300.[12] While InterMotive had a license from Ford to use technology associated with the Police Surveillance Module, Ford alleges the license did not grant InterMotive any right to use the oval or "Go Further" trademarks. *Id.* It does not address InterMotive's allegation that the video is made and hosted by Ford.

---

[12] Ford only refers to this use in its complaint; it does not refer to it in its motion for summary judgment or response to InterMotive's motion.

Third, Ford asserts Defendants used the Ford Oval trademark in a UIM brochure for Ford created on July 23, 2013. "Brochure," ECF No. 47-11. The heading of the brochure states: "Ford Upfitter Interface Module" followed by the Ford Oval mark below it. *Id.* Defendants assert the brochure shows that InterMotive is the source of the product, as evidenced by InterMotive's logo, phone number and web address printed on the bottom of the brochure for prospective buyers. ECF No. 53, PageID.1474-75. InterMotive also alleges that "Ford knew about the brochure and actually used it" at trade shows or otherwise and InterMotive used it to demonstrate how InterMotive's UIM supported Ford vehicles. *Id.* Schafer additionally states that he shared the brochure with Randy Freiburger and other Ford employees who told Schafer "that they liked the brochure and viewed it as helpful to Ford's efforts to sell Ford vehicles. So we made the brochure with Ford and for Ford, and Ford had copies of it." Schafer Declaration, ECF No. 53-2, PageID.1501. InterMotive states that like its competitors, it develops these advertisements to demonstrate at trade shows and online that their product is compatible with Ford vehicles. ECF No. 60, PageID.1721. Ford's Freiburger testified in deposition to that effect, stating that he understood that InterMotive "need[ed] to communicate what their capability is on our vehicles for customers to understand why they should buy a module, just like the other industry competitors for them." ECF No. 54, PageID.1632 (*sealed*).

Finally, with respect to the "Ford Competitive Advantage" video, Defendants assert that they designed the video with Ford when they were "actively working . . . to market InterMotive's Upfitter Interface Module," and that Ford provided a high-resolution image of the Ford Oval mark for use in the video.[13] ECF No. 42, PageID.951; Declaration of Greg Schafer, ECF No. 53-2 ("We and Ford showed [Phase I of our UIM project with Ford] at the 2012 NTEA [trade] show together, and it is the subject of the video that we and Ford showed at that show."); "Ford Competitive Advantage" Advertisement, ECF No. 47-13. Defendants provide additional "screen shots" from the contested video, arguing that many of the other screens display the InterMotive UIM component without Ford's mark and another splash screen and voice-over stating that it is an "*InterMotive Ford* Upfitter Interface Module" and directing customers to contact InterMotive if they are interested in the product. ECF No. 46, PageID.1087-88. They further allege that Ford was "actively engaged in making the video" and *played the video at a 2012 trade show*. *Id.* at PageID.1089. Ford only contests this with the blanket assertion that it did not permit InterMotive to use its marks, and that any perceived authorization is overcome by Schafer's signing of the June 2013 Police Surveillance Mode licensing agreement and the January 2014 Hepatic

---

[13] Plaintiffs now assert that InterMotive has been using counterfeits of Ford trademarks in the production of its advertising materials. Plaintiff's' Response to Defendants' Motion for Summary Judgment, ECF No. 58, PageID.1694.

Petal licensing agreement. ECF No. 58, Page ID.1686; June 2013 licensing agreement, ECF No. 49-1 (*sealed*); January 2014 licensing agreement, ECF No. 49-2 (*sealed*).

Ford argues these uses create a "presumption of confusion" because InterMotive used a "precise replica" of Ford's marks and because InterMotive's product competed directly with Ford's product. *See Ford Motor Co. v Lloyd Design Co.*, 22 Fed. Appx. 464, 468 (6th Cir. 2001). However, *Lloyd Design* did not involve a defendant who was alleging that it was not using Ford's mark in a way that identifies the source of their goods or a defendant claiming that Ford permitted and even encouraged them to use Ford marks, *id.* at 465. Further, of the three examples cited by Plaintiffs, see ECF No. 47, PageID.1194-95, each are alleged to have been used in 2012 and 2013—up to four years before Ford announced its UIM. In 2012 and 2013, as InterMotive alleges, Ford was not selling a UIM product, but was instead working with InterMotive on *InterMotive*'s UIM. InterMotive indicates this is why the brochure, titled "Ford Upfitter Interface Module" and listed by Ford as created in 2013, includes InterMotive's logo, as well as InterMotive's web address and phone number. Similarly, InterMotive alleges the "Ford Competitive Advantage" video was created in partnership with Ford and that Ford showed the video at trade shows in 2012. Ford does not address that these advertisements were created at least three years before Ford developed its own UIM. Additionally, InterMotive alleges that after Ford introduced

its competing UIM (which InterMotive contends here was a trade secret misappropriation and trademark infringement), InterMotive stopped using Ford's marks and stated that it would not continue to use the marks; as far as InterMotive was concerned, it was only using Ford's marks because Ford allowed them to.

In reviewing the alleged claims of trademark infringement, the Court finds that a genuine issue of material fact exists as to whether InterMotive only used Ford marks to show that its UIM was compatible with Ford vehicles. InterMotive asserts that each of the advertisements demonstrate that InterMotive is the source of the UIM and that Ford's mark is placed on the advertisement to demonstrate that the UIM functions on a Ford vehicle.[14] In part, InterMotive argues this was done because it was actively working with Ford to develop this specialized UIM for Ford vehicles *with* Ford's approval. But Ford rebuts this claiming that the relationship between Ford and InterMotive ended well before the advertisements were produced and the advertisements give the incorrect impression that Ford, not InterMotive, is either the source of InterMotive's UIM or otherwise endorses the UIM. These allegations raise factual questions which are pertinent to the *Hensley* threshold question the Court considers before the "likelihood of confusion" factors

---

[14] As for the "Ford Police Interceptor Surveillance Mode," InterMotive asserts this is a Ford video hosted on Ford's YouTube channel and that InterMotive merely provides a link to this video on its website. Ford does not address this video in its motion for summary judgment.

are analyzed (i.e., "whether the defendants 'are using the challenged mark in a way that identifies the source of their goods'"). *Hensley*, 579 F.3d at 610. These factual questions include whether Ford provided a high-resolution photo of the Ford Oval mark for InterMotive to use in the "Competitive Advantage" video to demonstrate that the UIM operated on Ford vehicles, whether Ford used and played the video at trade shows, whether Ford welcomed and encouraged the production of the brochure so that InterMotive could inform Ford at trade shows that its UIM was optimized for Ford vehicles, and whether Ford gave InterMotive previous approval to use the Ford Oval mark on InterMotive's "splash screen."

In sum, the crux of both parties' arguments depends on fact-bound questions of whether Ford encouraged or aided InterMotive in using Ford's marks; InterMotive claims Ford did, Ford claims it did not.[15] If Ford knew that InterMotive was using its marks to advertise InterMotive's products' functionality on Ford vehicles, then Ford—in effect—concedes the *Hensley* threshold inquiry by saying that InterMotive was *not* using Ford's marks to show that Ford was the creator of the UIM. This question is for the fact-finder. Therefore, a

---

[15] Likewise, the resolution of this factual question will determine the merit of InterMotive's affirmative defenses of latches and acquiescence, which "require[] a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000); *McCarthy on Trademarks and Unfair Competition*, § 31:42 ("A plaintiff cannot indicate at one time to defendant that the defendant's acts are acceptable and then later sue defendant after it has acted in reliance on plaintiff's implied assurances.").

question of fact exists as to whether InterMotive used Ford's marks in a non-trademark way.

While Ford contends that the June 2013 and January 2014 licensing agreements overcome any prior authorization it gave InterMotive to use Ford's marks in 2012, this argument is unavailing. Those licensing agreements explicitly govern InterMotive's relationship with Ford regarding the Police Surveillance Mode Module and LGS's relationship with Ford regarding the Hepatic Petal. *See* ECF No. 49-1 (*sealed*); ECF No. 49-2 (*sealed*). By their own express terms, these agreements do not govern the relationship between InterMotive and Ford regarding the Upfitter Interface Module.[16] And to the extent that they should be read broadly to include the Upfitter Interface Module, Plaintiffs have not cited any specific language in the licensing agreements to suggest such an expansive reading.

The Court therefore **DENIES** Plaintiffs' and Defendants' motions for summary judgment as to Plaintiffs' Count I for Trademark Infringement.

---

[16] They may be relevant to InterMotive's use of the Ford Oval and "Go Further" trademarks in a video on InterMotive's website for the Police Surveillance Mode Module, but the Court notes that Ford has not rebutted InterMotive's assertion that *Ford* made and hosts the video and InterMotive merely provides a link to the video on its website.

### b. Ford's Claims for False Designation of Origin (Count II) & Unfair Competition (Count III)

"The ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks . . . . Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992); *Interactive Prods.*, 326 F.3d at 694 ("Similarly, to succeed on a false designation of origin claim, a plaintiff must show that the false designation creates a 'likelihood of confusion.'").

Ford asserts that under the logic of *Two Pesos*, Plaintiffs are entitled to summary judgment on its claims for False Designation of Origin under § 15 U.S.C. 1125(a) (Count II) and Unfair Competition (Count III) for the same reasons they are entitled to summary judgment on their trademark infringement claim (Count I). Plaintiffs' Motion for Summary Judgment, ECF No. 47, PageID.1194; *Two Pesos*, 505 U.S. at, 780.

Because on the record before the court there exist genuine issues of material fact as to whether InterMotive only used Ford marks to show that its UIM was compatible with Ford vehicles, and therefore whether a likelihood of confusion existed, the court **DENIES** Plaintiffs' and Defendants' motions for summary judgment as to Plaintiffs' Count II for False Designation of Origin and Count III for Unfair Competition.

### c. Ford's Claim for Trademark Dilution (Count IV)

Plaintiffs also allege Defendants intentionally used and misappropriated the Ford marks and that these actions constituted trademark dilution in violation of Section 43(c) of the Trademark Act of 1946 (Lanham Act), 15 U.S.C. § 1125(c). ECF No. 26, PageID.326.

Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. "Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 801 (6th Cir. 2004) (quoting *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003)). The Lanham Act entitles "the owner of a famous mark that is distinctive" to an injunction against another who "commences use of a mark . . . in commerce that is likely to cause dilution . . . of the famous mark" "any time after the owner's mark has become famous." 15 U.S.C. § 1125(c).

A claim for trademark dilution therefore includes five elements: (1) that the marks are famous; (2) the marks are distinctive; (3) the defendant used the marks in commerce; (4) the defendant's use began after the marks became famous; and (5) that the defendant's use is likely

to cause dilution of the distinctive quality of the mark. *Audi AG v. D'Amato*, 469 F.3d 534, 548 (6th Cir. 2006). The Sixth Circuit permits an "inference of likely harm to the senior mark instead of requiring actual proof." *V Secret Catalogue Inc. v. Moseley*, 259 F.3d 464, 476 (6th Cir. 2001).

It is clear from the record that Ford's trademarks, some of which have been in existence for over one hundred years and are known worldwide, satisfy the first two factors. *See* ECF No. 26-2 (Ford trademarks); *Kibler v. Hall*, 843 F.3d 1068, 1083 (6th Cir. 2016) ("[W]hen the general public encounters the mark in almost any context, it associates the term, at least initially, with the mark's owner.") (internal quotations omitted); *Ford Motor Co. v. Lloyd Design*, 184 F.Supp.2d 665, 679 (E.D. Mich. 2002) (finding Ford Oval and Ford marks are famous). And the parties do not appear to dispute that three, InterMotive used Ford's marks in commerce, as demonstrated by the brochure and "splash screen" uses, or four, that InterMotive began using Ford's marks after the Ford marks became famous.

As for the fifth element—that the defendant's use is likely to cause dilution of the distinctive quality of the mark—"direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence—the obvious case is one where the junior and senior marks are identical." *Audi AG*, 469 F.3d at 547 (quoting *Moseley v. Secret Catalogue*, 537 U.S.418, 434

(2003)). Under the logic of *Audi*, Ford argues that because InterMotive used identical trademarks on its Upfitter Interface Module, the fifth factor is easily fulfilled. ECF No. 47, PageID.1200.

To be sure, InterMotive used identical copies of Ford trademarks, and in that sense, Ford has demonstrated "actual dilution" under *Audi*.[17] But InterMotive also says that pursuant to the dilution statute, 15 U.S.C. § 1125(c)(3)(A), "[a]ny fair use, including a nominative or descriptive fair use" "shall not be actionable as dilution by blurring or dilution by tarnishment." ECF No. 53, PageID.1479. InterMotive argues its uses of exact copies of Ford's marks fit this exception because—as argued above—InterMotive only used Ford's marks to refer to Ford, "not as a source indicator for its own products." *Id.* As such, Defendants argue there can be no dilution. *Id.* While Defendants' arguments have roots, they take hold not as a fair use defense but in the doctrine that non-trademark use does not amount to dilution. *See* 4 *McCarthy on Trademarks and Unfair Competition*, § 24:122 Non-trademark use does not dilute (5th ed.). "Only if the defendant uses the word as its own trademark, could the allegedly unique and strong link between the

_____

[17] InterMotive asserts this is the incorrect standard because a newer version of the dilution statute came into effect in October 2006 that states dilution may be proven through a "likelihood of dilution.". ECF No. 53, PageID.1478. However, this Court has continued to apply the standard articulated in *Audi* and *Moseley*. *See Volkswagen AG v. Dorling Kindersley Pub., Inc.*, 614 F.Supp.2d 793, 808 (E.D. Mich. 2009) ("For purposes of summary judgment, VW has failed to show *either* actual dilution or the likelihood of dilution.") (emphasis added).

designation and the plaintiff's goods be weakened when the public sees the designation used to identify and distinguish different goods: that is, when the word is used as a trademark for different goods or services." *Id.* ("[T]here can be no dilution if customers will see that the word is not used to identify the source of defendant's product, but *only to describe some aspect of the product*."). The Fifth Circuit has applied this principal. That court found that a commercial printer could not be liable for dilution when it printed decals and signs with Ford marks because the printer was not using the Ford marks to identify its printing services. *Id.* (citing *Nat'l Business Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012)); *see also* Restatement Third, Unfair Competition, § 25(2), comment i (1995) ("Nontrademark uses, because they do not create an association with a different user's goods, services or business, are unlikely to dilute the distinctiveness of a mark."). Defendants have alleged such a use here by claiming that the alleged infringements demonstrate InterMotive's UIM is optimized for Ford vehicles. However, plaintiffs make the countervailing point that by including the Ford mark in InterMotive's advertisements, InterMotive creates an association to Ford that dilutes Ford's marks. As described above, the crossroads between InterMotive's and Ford's arguments depends on genuine issues of material fact; namely, whether InterMotive used Ford marks "only to describe some aspect of the [InterMotive UIM] product." *McCarthy*, § §

24:122. Accordingly, the Court **DENIES** both parties' motions for summary judgment as to Plaintiffs' Count IV for trademark dilution.[18]

### d. InterMotive's Counterclaim for Trademark Infringement (Count I)

Ford also moves for summary judgment on InterMotive's counterclaims. *See* ECF No. 47; InterMotive's Response, ECF No. 53. InterMotive contends it has a trademark right in the phrase "Upfitter Interface Module" and Plaintiffs infringed on that trademark when Ford began marketing its own module with the same name in 2016. ECF No. 53, PageID.1479-81. Conversely, Ford argues that InterMotive does not have a cognizable trademark right in the phrase "Upfitter Interface Module" because it describes a category of products rather than identifying a source of the product. ECF No. 47 PageID.1202. Ford relies on the USPTO's denial of InterMotive's application to place the term on the primary register. *Id.*

"The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C. Cir. 1989)). "A generic or common descriptive term

---

[18] Neither party moves for summary judgment as to Plaintiffs' claim for declaratory judgment (Count VI). Accordingly, this claim survives.

is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances." *Id.* (quoting *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984)). Conversely, "a merely descriptive term" can become a valid trademark "by acquiring a secondary meaning, *i.e.*, becoming distinctive of the applicant's goods." *Bath & Body Works*, 76 F.3d at 748 (internal quotations omitted); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002) ("[A] term that is 'merely descriptive' may be used as a trademark if it has acquired a secondary meaning."). "If a trademark has been registered, there is a presumption that term is not generic, and the defendant must overcome the presumption." *Id.* "Whether a name is generic is a question of fact." *Bath & Body Works*, 76 F.3d at 748 (citing J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 12.02[7][b] (3d ed. 1992)). Therefore, "the crucial question is whether there is a genuine issue of material fact as to whether the term is a generic (i.e., common descriptive) or 'merely descriptive' term." *Nartron*, 305 F.3d at 404.

InterMotive registered "Upfitter Interface Module" with the USPTO on the supplemental registry. ECF No. 26-11. When InterMotive again applied to register the mark on the primary registry, the USPTO rejected the mark stating that InterMotive's prior registration on the supplemental register "serves as evidence that the disclaimed wording 'INTERFACE MODULE' is *generic* for the identified goods, while the

mark as a whole merely describes the identified goods. Thus, the mark as a whole identifies a characteristic or use of the identified goods." ECF No. 28-1, PageID.535-36 (emphasis in original). The USPTO also reasoned that the term "UPFITTER" was "*highly* descriptive of [InterMotive's] goods" and therefore had not reached a level of acquired distinctiveness to place the mark on the primary register. *Id.* at PageID.535 (emphasis in original).

While the USPTO characterized "upfitter interface module" as "(at best) highly descriptive," the Sixth Circuit has stated that such a characterization by the USPTO "does not constitute a finding by the Patent and Trademark Office." *Bath & Body Works*, 76 F.3d at 748 (quoting McCarthy § 12.18[1] at 120109 ("The Patent and Trademark Office examining attorneys generally deny registration of allegedly generic terms by saying they are 'descriptive' under § 2(e).")). Thus, while such a characterization by the USPTO "concedes at least merely descriptiveness," "[s]uch a determination is to be made by the finder of fact." *Id.* If the mark is "merely descriptive," the finder of fact must also determine whether it has acquired "secondary meaning" such that it may be used as a trademark. *Nartron*, 305 F.3d at 404. "The appropriate 'test for genericness is whether the public perceives the term primarily as the designation of the article.'" *Id.* (citing *Blinded Veterans*, 872 F.2d at 1041).

Here, while Ford argues the term "upfitter interface module" is generic because it "describes a type of product rather than the producer," there is evidence in the record that could allow a jury to find otherwise. To be sure, in making its determination, the USPTO considered a number of "web page screen captures" showing that the term "upfitter" was being used in a "highly descriptive" way by Dodge, Ram, and Ford. ECF No. 28-1, PageID.536 (the USPTO stating that "[g]iven the numerous examples of third party highly descriptive use of mark wording, [InterMotive's] supplied evidence is insufficient to demonstrate that the relevant public understands the primary significance of the mark as identifying the source of the product rather than the product or service itself"). But a number of those examples are efforts by Ford to market its "Ford upfitter interface module," which is the subject of InterMotive's trademark infringement claim. *Id.* And as this Court has stated, such an allegation of direct, intentional copying of InterMotive's mark "is strong evidence of their secondary meaning." *Ford Motor Co. v. Lloyd Design Corp.*, 184 F.Supp.2d 665, 670 (E.D. Mich. 2002). InterMotive also presents Ford-affiliated publications where InterMotive advertised its Upfitter Interface Module, demonstrating that it was a brand that Ford associated with InterMotive. *See* ECF No. 27-2, PageID.430-442.

Further, it does not appear that the USPTO considered, nor did Ford address in its motion, an email from a Ford employee who worked on developing Ford's UIM, Syed Monnan. Monnan Deposition, ECF No.

55, PageID.1663 (*sealed*); ECF No. 53, PageID.1481 (screenshot of Monnan email, unsealed). In his email to other Ford employees, Monnan states that the term "Upfitter Interface Module" was already being used by an existing supplier and recommended changing Ford's UIM name to one of three suggestions: Programmable Upfitter Interface Module (PUIM),[19] Programmable Interface Module (PIM), or Programable Upfitter Module (PUM). *Id.* Defendants allege Syed Monnan's email is "significant" evidence of secondary meaning and shows that Ford ignored a warning of its own employee that using the phrase would entail copying InterMotive's brand and that persons in the relevant market knew that "Upfitter Interface Module" had brand recognition. ECF No. 53, PageID.1481. InterMotive suggests that Monnan's proposed alternative names further demonstrates that there are at least three alternative ways to refer to the product, and therefore "Upfitter Interface Module" is not generic or highly descriptive. *Id.*

InterMotive also provides possible proof of market confusion. It alleges that at a 2016 trade show, Ford dealers and trade show personnel were confused over whether Ford's product came from InterMotive—as prior tradeshows demonstrated that InterMotive was marketing an Upfitter Interface Module that was optimized for Ford vehicles. ECF No.

---

[19] Indeed, the record includes a screenshot of a YouTube video advertising the "Ford Programmable Upfitter Interface Module – Critical," indicating that Ford may have been considering a name change. *See* ECF No. 47-15.

42, PageID.990. InterMotive presents a declaration from Schafer (which was provided to the USPTO for InterMotive's second trademark application) summarizing his interactions with personnel from the trade show, as well as two Ford dealers attending the trade show. Nov. 13, 2017 Schafer Declaration, ECF No. 27-2, PageID.423-25. Ford does not respond to *either* of these allegations by InterMotive or explain how they are not evidence of "secondary meaning."

This evidence from InterMotive would suggest that while the term "upfitter" may be used as a descriptive term by companies like Dodge and Ram, and Ford, InterMotive has provided at least some evidence, including from inside Ford, that market confusion could exist if Ford continued to use the term "Upfitter Interface Module." As a counter-defendant moving for summary judgment, Ford must show that there is no genuine issue of material fact on the issue of "secondary meaning" and "nongenericness." But they are unable to sustain this burden. The Court therefore **DENIES** Plaintiffs' motion for summary judgment as to Defendants' Count I for trademark infringement.

### e. InterMotive's Counterclaims for Unfair Competition Under § 43(a) of the Lanham Act (Count II) and Michigan law (Count IV)

InterMotive brings a claim for unfair competition pursuant to § 43(a) of the Lanham Act and Michigan state law. As described above, "[t]he ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks . . . . Whether we call the violation

infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992). Because the Court find's InterMotive's claim for trademark infringement under Count I survives summary judgment, so too must InterMotive's claims for unfair competition on federal and state grounds. *Id.*

## f. InterMotive's Counterclaim for Breach of Contract (Count III)

InterMotive also brings a breach of contract claim arguing Ford breached the terms of the 2011 NDA when it took confidential information related to Phase 2 of the UIM development—including a confidential prototype of Phase 2—and gave it to another supplier to reproduce for Ford. InterMotive's Counterclaim, ECF No. 42, PageID.995. Ford seeks summary judgment in its favor on InterMotive's breach of contract claim. While the NDA, by its terms, only covered confidential material disclosed from November 29, 2011 to May 29, 2012, InterMotive maintains that the 2011 NDA was extended by mutual assent and that a separate, implied contract existed between the parties. ECF No. 53, PageID.1482; NDA, ECF No. 26-1, PageID.337 (explaining that the "agreement controls only Confidential Information disclosed during the six months term of this agreement, unless terminated earlier by the parties"); ECF No. 42, PageID.995 ("Apart from the NDA Agreement . . . Ford also breached an implied agreement to keep InterMotive's technology confidential").

The question of whether the terms of the NDA could be modified is a matter of state law. *Quality Prods. v. Nagel Precision*, 666 N.W.2d 251, 257 (Mich. 2003). Under Michigan law, a party alleging modification of an unambiguous term in an agreement with a restrictive amendment clause "must present clear and convincing evidence of conduct that overcomes not only the substantive portions of the previous contract allegedly amended, but also the parties' express statement regarding their own ground rules for modification or waiver as reflected in restrictive amendment clauses." *Id.* at 260. Therefore, to prevail on its claim, InterMotive must establish clear and convincing evidence of a mutual agreement to waive the explicit six-month time-frame of the NDA, as well as the restrictive amendment clause.

InterMotive alleges the NDA was modified in December 2012—six months after the NDA expired—when engineers at Ford met with InterMotive about a prototype of Phase 2 of the UIM. ECF No. 53, PageID.1483-84. At the meeting, InterMotive alleges the prototype was marked with a sticker labeled "PROTOTYPE/CONFIDENTIAL[,]" indicating Ford intended the prototype to remain confidential pursuant to the NDA. *Id.* Ford rejects the import of this event, arguing this action did not revive the NDA or alter its terms and therefore InterMotive has failed to provide clear and convincing evidence that Ford agreed to extend the NDA. ECF No.47, PageID.1206.

But InterMotive further avers that "hundreds or even thousands of pages of email and other documents from Ford and InterMotive" demonstrate that the parties mutually agreed to extend the NDA well through 2012 and 2013. ECF No. 53, PageID.1470. As one example, InterMotive describes an email exchange from Ford engineer Randy Freiburger to InterMotive in April 2012 that includes a substantial amount of Ford confidential information. *Id.* at PageID.1483. InterMotive does not provide the actual email exchange, but instead cites to Freiburger's deposition testimony acknowledging he sent the email and that the purpose of sharing the confidential information was to assist InterMotive in developing a custom UIM for Ford. *Id.*; Freiburger Deposition, ECF No. 54, PageID.1629 (*sealed*). And while the email containing the confidential information was sent in April 2012 (before the NDA expired in May 2012), InterMotive asserts that because the information was sent with the expectation that it would be used in further developing the UIM, it demonstrates that Ford expected the development would continue past May 2012, and therefore past the expiration of the NDA. ECF No. 53, PageID.1482-83. In support, Defendants also reference the July 2012 meeting arranged by Freiburger between Ford and InterMotive engineers and managers to discuss InterMotive's UIM, as well as the December 2012 meeting arranged by Freiburger where InterMotive alleges the confidential prototype of the Phase 2 module was given to Ford engineer Rob Stevens. *Id.* at

PageID.1483-84. According to one of Schafer's declarations, Stevens expressed excitement when he received the prototype. ECF No. 53-2, PageID.1508. Also in support, Defendants list a number interactions between InterMotive and Ford stretching into 2013, which they allege demonstrate the parties' shared interest in continuing to pursue an InterMotive-developed UIM for Ford "with the understanding of confidentiality." ECF No. 53, PageID.1486-87 (listing interactions and citations to the record). Ford does not rebut or even attempt to address these interactions. *See* ECF Nos. 47, 61. Finally, Defendants assert that in their complaint, they alleged there was a separate, implied contract to keep InterMotive's UIM information confidential. Defendants' Second Amended Counterclaims, PageID.995-96. They argue this contract was created when InterMotive delivered the Phase 2 prototype to Ford's engineer, Rob Sevens, in December 2012. *Id.* Because Ford did not address this implied contract in its motion for summary judgment, InterMotive asserts the motion as to this count should be denied. ECF No. 53, PageID.1488.

Ford argues it is entitled to summary judgment on InterMotive's claim because, assuming InterMotive delivered a prototype of Phase 2 to Ford engineers in December 2012, this occurred months after the NDA expired in May 2012. ECF No. 47, PageID.1204-05; NDA, ECF No. 26-1, PageID.337. Any allegation by InterMotive that the NDA was extended by the actions of Ford and InterMotive, Ford argues, are belied by express

41

language in the NDA that "[a]ll modifications to [the] agreement must be made in writing and signed by representatives of the parties." ECF No. 26-1, PageID.338; ECF No. 47, PageID.1205. This restrictive amendment clause, Ford avers, rebuts InterMotive's argument that the NDA was extended by the course of conduct of the parties. *Id.*

Ford also argues that none of the information InterMotive alleges was shared was confidential and therefore protected by the NDA. ECF No. 47, PageID.1204. Ford relies on a statement Schafer allegedly made in a July 2016 email to Ford's in-house counsel that InterMotive did not intend to bring a claim against Ford for breach of the NDA because "information regarding [InterMotive's] product has been available on [InterMotive's] website for several years. . . . Therefore, [InterMotive] ha[s] no problem with releasing Ford of any current or future claim regarding this matter." *Id.*; Schafer e-mail, ECF No. 47-16, PageID.1294

Ford relies on *Quality Products* to argue that the NDA was not properly modified. But in that case the Michigan Supreme Court found that the relevant contract could not be modified by later conduct because the party seeking modification could point to no affirmative conduct by the other party other than mere silence and knowledge of the plaintiff's actions falling outside of the contract. 666 N.W.2d at 254. Because mutuality was the cornerstone of contract modification, the plaintiff could not establish by clear and convincing evidence such mutuality absent affirmative conduct. *Id.* The Michigan Supreme Court reinstated

the original judgment of the circuit court granting summary disposition to the defendant. *Id.*

InterMotive has alleged such affirmative conduct here, which Ford has not addressed. Ford argues that one lone meeting between Ford and InterMotive in December 2012 does not meet the *Quality Products* standard. But InterMotive alleges more evidence of a continued relationship, including a July 2012 meeting, as well emails regarding UIM pricing throughout 2013 and deposition testimony from Randy Freiburger indicating that conversations about InterMotive developing a UIM for Ford extended after May 2012.

While prevailing on their claim would require Defendants to establish clear and convincing evidence of a mutual agreement to waive the explicit six-month time-frame of the NDA, as well as the restrictive amendment clause, they are not the party seeking summary judgment. Ford as the moving party must show there is no genuine issue of material fact concerning its position that the parties never reached a mutual assent to modify the terms of the NDA; but it fails to meet this burden. The record contains evidence on both sides of these questions. Ford does not address the July 2012 meeting between Ford and InterMotive discussing the UIM, nor does it address the numerous emails between Ford and InterMotive engineers about Ford continuing to consider InterMotive's custom UIM for Ford. Therefore, Ford is not entitled to summary judgment on Defendants' Count III alleging breach of contract.

The Court accordingly **DENIES** Defendants' motion for summary judgment as to Count III.

### g. InterMotive's Counterclaim for Trade Secret Misappropriation under the Michigan Trade Secrets Act (Count V)

The Michigan Uniform Trade Secrets Act ("MUTSA") provides a statutory cause of action for the misappropriation of trade secrets. M.C.L. § 445.1903. MUTSA defines a trade secret as:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> > (i) Derives independent economic value, actual or potential, from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(d); *see also Dura Global Tech., Inc. v. Magna Donnelly Corp.*, 662 F.Supp.2d 855, 859 (E.D. Mich. 2009). Michigan courts use a six-factor test to determine if information is a trade secret under MUTSA. Those factors are: "(1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other." *Dura Global*, 662 F.Supp.2d at

859. "To be a trade secret, the information must, of necessity, be a secret." *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. App. 1974). Ford challenges whether InterMotive's alleged trade secret was actually kept secret. *See* ECF No. 47, PageID.1206-08.

In its complaint, InterMotive defined its trade secret as: "involv[ing], among other things, the unique use of certain hardware to make the interface with the CAN data systems more flexible and more versatile for the cost." ECF No. 42, PageID.997. Defendants also defined the trade secret in their response to Ford's first set of interrogatories:

> InterMotive gave Ford a confidential Product Requirements Specification (PRS) in 2012 along with the Phase II prototype unit. No one had ever had a device to provide access to CAN data like InterMotive's UIM, which also allowed customers to program the device in how an input is read (active high or active low). InterMotive provided a circuit for doing this in the Phase II prototype unit it gave to Ford in December 2012. This was not a feature even provided in InterMotive's commercial device being sold at that time. InterMotive provided this feature, and explicitly marked the prototype "Confidential" and the written PRS. . . . InterMotive had not disclosed this feature to anyone prior to that time.

ECF No. 53-2, PageID.1525-26. According to these definitions, InterMotive alleges the trade secret is not the "circuit itself," but rather "the *use of it* in a new way in a new device – i.e., using 'programmable' or configurable inputs in a CAN data access device." ECF No. 53, PageID.1489-90. In other words, InterMotive alleges that the Phase 2 PRS and prototype given to Ford engineer Rob Stevens in December 2012

contained the trade secrets because it contained unique features developed for Ford's CAN bus that were not available in InterMotive's commercially-available UIM. *Id.* To rebut this, Ford argues that InterMotive has conceded that the "circuit already existed in general use," referring the company NXP Semiconductor, which Ford alleges produces a similar kind of circuit with active high and active low programmable inputs. ECF No. 47, PageID.1207.[20] Indeed, Ford claims it uses NXP's circuit in its UIM; and because NXP already produces such a circuit and publicly disclosed the active high or low functionality on its website in August 2017,[21] the information cannot be considered a trade secret. *Id.* Ford attempts to bolster its position with a declaration from NXP Technical Publications Manager Paul Manago, and attached data sheets from third-party Freescale Semiconductor, Inc. that were published in 2007. Ford argues the Freescale data sheets show the product being "intended for communication with an in-vehicle network" and demonstrate that InterMotive's alleged trade secret was available in 2007. ECF No. 47-20, PageID.1317.[22]

---

[20] Ford also disputes InterMotive's assertion that it only "recently" discovered Ford's alleged misappropriation. ECF No. 47, PageID.1207. However, Ford does not explain why or how InterMotive's alleged discovery in August 2016 rather than 2018 impacts the analysis. *Id.*

[21] Ford asserts that NXP published on its website that its circuit is intended for use in "central gateway / ***in-vehicle networking***" applications," and therefore the trade secret is no longer secret. ECF No. 61, PageID.1733.

[22] The Court notes that upon independent review of the Freescale data sheets, it cannot determine whether InterMotive's alleged trade secret was published in 2007

But under Michigan law, "a new combination of known steps or processes can be entitled to trade secret protection." *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 442 (6th Cir. 1980); *see also Catalyst & Chem. Servs., Inc v. Global Ground Support*, 350 F.Supp.2d 1, 9, (D.D.C. 2004) *aff'd* 173 Fed. Appx. 825 (Fed. Cir. 2006) ("[I]t is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself, is in the public domain."). And here InterMotive argues that it is not the circuit itself that is the trade secret, but rather its *use* "in a new way in a new device – i.e., using 'programmable' or configurable inputs in a CAN data access device." ECF No. 53, PageID.1489-90.

More importantly, InterMotive avers, the declarations from Ford's Syed Monnan and NXP's Paul Manago do not affirmatively state that the idea to use NXP's component/circuit in Ford's Upfitter Interface Module came *from NXP*. Nor do these declarations explain exactly where Ford got the idea. *Id.* InterMotive asserts Ford acquired the technology from InterMotive and the Phase 2 prototype it gave to Rob Stevens in December 2012. *Id.*; Schafer Declaration, ECF No. 53-2, PageID.1502 ("The use of programmable inputs *on such a device* such as our Upfitter Interface Module which is programmed by end users was not known at all at this time except to InterMotive."). Indeed, in deposition Syed Monnan stated he did not know where the idea to include a customer

---

and the declaration from Manago does not explicitly state that the Freescale data sheets contain such information. *See* ECF No. 47-20.

programable input in the UIM came from, and that when he joined the Ford UIM project, the idea was already in place. ECF No. 55, PageID.1655 (*sealed*). However, Monnan also stated that believed it was Ford's idea to use programmable inputs in the UIM, not Magna's[23] or NXP's. *Id.*

But Schafer provides conflicting statements about the UIM's secrecy. For example, in his February 2019 declaration, Schafer states that Phase 2 of the UIM (containing the trade secret features) was not available in its commercial/public UIM or sold by other suppliers in the market. ECF No. 53-2, PageID.1502. Despite that, he also states that he "thought Ford may have gotten our Upfitter Interface Module technology *from public sources like our own product.*" ECF No. 53-2, PageID.1511. The meaning of this statement is unclear. If by this Schafer intends to say that Ford simply acquired the UIM trade secret technology from publicly available treatises, operating manuals, or by reverse-engineering a publicly-available InterMotive UIM, then this statement is akin to an admission that the technology does not meet the definition of a trade secret. *See Arco Indus.*, 633 F.2d at 443 ("Under Michigan law, the alleged trade secret must in fact have been treated as a secret by the plaintiff."). However, if Schafer means that Ford took the confidential information about Phase 2 provided by Schafer in 2012 to develop its own

---

[23] Magna is the new supplier that worked with Ford and NXP to develop the Ford Upfitter Interface Module. *See* ECF No. 53, PageID.1490.

UIM with Magna and NXP, InterMotive has properly alleged trade secret misappropriation.

As to Ford's allegation that Freescale published InterMotive's alleged trade secret in 2007, InterMotive does not directly rebut this claim in its motion. *See* ECF No. 53, PageID.1490-91. If Freescale indeed possessed the information InterMotive claims was secret in 2007, InterMotive's claim would fail. However, Ford has not provided sufficient information to demonstrate that Freescale possessed the information InterMotive claims is its trade secret. Apart from the data sheets themselves—which the court cannot decipher—Manago's declaration only states that the data sheets were published in 2007, not that they contain InterMotive's alleged trade secrets. *See* ECF No. 47-20, PageID.1317. These allegations from Ford and InterMotive raise genuine issues of material fact as to whether the use of programmable inputs in a CAN data access device was readily available in 2007 or have since become available through the manufacturing and sale of Ford's UIM or InterMotive's UIM.

The Court, therefore, finds that a genuine issue of material fact exists as to whether Ford took trade secret information from the Phase 2 prototype and gave it to NXP to implement in the Ford UIM or whether that information was "readily ascertainable" and "acquired by competitors or the general public without undue difficulty or hardship." *Dura Global*, 662 F.Supp.2d at 859 (quoting *Kubik*, 224 N.W.2d at 87)

(finding that genuine issue of material fact remained as to how competitor to power sliding window supplier discovered the supplier's alleged trade secret, precluding summary judgment); *see also Wysong Corp. v. M.I. Indus.*, 412 F.Supp.2d 612, 630-31 (E.D. Mich. 2005) (finding that genuine issue of material fact existed as to whether veterinarian's supplier contact data was ascertainable in public forums and meetings, precluding summary judgment). Accordingly, the Court **DENIES** Ford's motion for summary judgment as to InterMotive's Count V.

### h. InterMotive's Counterclaim for False Advertising (Count VI)

A false advertisement claim under the Lanham Act requires a plaintiff to establish that:

> (1) the defendant has made false or misleading statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001). InterMotive alleges two statements made by Ford in its advertisements constitute false advertising. The first, in a promotional video titled "Ford Programmable Upfitter Interface Module 'Critical' to Industry," which is available on YouTube, a Ford representative states: "Ford is the *only* product that is actually programmable in these upfitter interface modules." ECF No. 42,

PageID.1000 (emphasis added). InterMotive alleges the statement is false because InterMotive makes a product that is programmable in upfitter interface modules and Ford *knows* that InterMotive makes such a product. *Id.* at PageID.1000-01; Plaintiffs' Amended Complaint, ECF No. 26, PageID.310 (stating that Ford's UIM and InterMotive's UIM "perform substantially the same function"); *id.* at PageID.312 ("The goods, namely upfitter interface modules are related, and, in fact, are identical."). InterMotive also alleges Ford *knows* that InterMotive created a programmable CAN database because "InterMotive brought the technology to Ford." ECF No. 42, PageID.1000-01. To rebut InterMotive's claim, Ford asserts that the statement "is simply an indication that Ford's product is superior to other programs on the market because of its programming features." ECF No. 47, PageID.1029. Ford further contends the statement is mere puffery. *Id.*

Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable consumer would rely." *Louisiana-Pacific Corp. v. James Hardie Building Prods., Inc.*, 335 F.Supp.3d 1002, 1012-13 (M.D. Tenn. 2018) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)). "Puffery is distinguishable from, and therefore does not include, 'misdescriptions or false representations of specific characterizations of a product.'" *Id.* (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)). "[T]he more general the assertions, the more likely they are to be considered puffery." *Bledsoe v.*

*FCA US LLC*, 378 F.Supp.3d 626, 648 (E.D. Mich. 2019). Although the statement that "Ford is the only product that is actually programmable in these upfitter interface modules" may be exaggerated, it is not blustering or boasting, and is a specific representation that can be refuted. The Court therefore finds the statement is not "mere puffery."

Ford alleges that even if the statement is false, it is not material to customers' purchasing decisions and produced *de minimis* exposure given the video had been viewed less than 300 times[24] at the time Plaintiffs' motion for summary judgment was filed. ECF No. 47, PageID.1209-10 (citing *Everest Capital v. Everest Funds*, 393 F.3d 755, 764 (8th Cir. 2005) (upholding trial court's finding that a misstatement was inadvertent, did not deceive or tend to deceive the intended audience and was unlikely to influence purchasing decisions where only 74 people had visited the website and there was no evidence that those people were consumers)). In a declaration, Schaffer alleges that "[t]he statement is [ ] highly material to the purchasing decisions of customers," and the number of views—at that time 328—was not trivial "because the work truck market is not very big" and "a single viewer could make the decision to buy thousands of vehicles." ECF No. 53-2, PageID.1509-10. Moreover, InterMotive explains the number of views on the YouTube video continue to grow, and the views do not include the individuals at the trade show

---

[24] Plaintiffs posit that a large percentage of the views are associated with this action. ECF No. 47, PageID.1209.

who viewed the video when it was played. ECF No. 53, PageID.1492. As Schaffer testified, trade shows constitute an important market for InterMotive to reach new and returning customers for its UIM and the allegation that a product is not "programmable" is material to customers' purchasing decisions because a product that is not programmable "has much less use to the customer." ECF No. 53-2, PageID.1509-10. InterMotive further alleges that this advertising caused the company "irreparable harm" because "it misinforms and misleads the consuming public as to their options for programmable CAN data interfaces." ECF No. 42, PageID.1002.

The Court finds that genuine issues of material fact exist regarding the materiality of the statement, and therefore whether the exposure to consumers was merely *de minimis*. Discovery was still ongoing at the time the parties filed their respective motions, (see Court's Scheduling Order ECF No. 39 ) and it is unclear from the record how many customers viewed the video at the alleged trade show in addition to the YouTube views or whether the video was shown to customers at other trade shows. ECF No. 53, PageID.1491-93. However, Defendants have alleged sufficient facts demonstrating the importance of trade shows to the upfitter interface market and the impact that the playing of such a video at a trade show could have on InterMotive's sales. Ford is therefore not entitled to summary judgment as to this alleged false advertisement.

The second alleged false advertisement is a statement in Ford's "What You Get" brochure advertisement. ECF No. 53-2, PageID.1510. The advertisement states: "[U]nlike aftermarket upfitter modules currently on the market, [Ford's UIM] is warranted by Ford and will not interrupt the Computer Area Network (CAN)." ECF No. 42, PageID.1003. Defendants allege that InterMotive makes the only other aftermarket upfitter modules currently on the market and therefore the brochure implies that InterMotive's UIM interrupts CAN data, which they allege it does not. ECF No. 42, PageID.1003. Ford asserts that because the statement contains the word "and," it is a condition precedent that the UIM be warranted by Ford. ECF No. 47, PageID.1210. Because InterMotive does not contend that its UIM is warranted by Ford, Plaintiffs do not make a false statement when they say that their UIM "is warranted by Ford *and* will not interrupt the [CAN]." *Id.* They also allege the statement is mere puffery. *Id.* InterMotive argues the statements do not become true by including the word "and"; Ford is still asserting that it is one-of-a-kind in that its UIM does not interrupt the CAN. ECF No. 53, PageID.1492-93. InterMotive also argues the statement is not mere puffery because it is not an opinion. *Id.*

The Court finds that Ford is entitled to summary judgment as to this alleged false advertisement. While InterMotive has shown that the statement may be false, it has not shown that the brochure "will likely influence the deceived customer's purchasing decisions" in the same way

it has shown the impact of the YouTube video on the purchasing decisions of customers at tradeshows. *Herman Miller*, 270 F.3d at 323. Nor has InterMotive demonstrated that the brochure was introduced into interstate commerce. *Id.* The Court, therefore, grants summary judgment in favor of Ford as to the second alleged false advertisement.

In sum, the Court **DENIES IN PART** Plaintiffs' motion for summary judgment as to Count VI alleging the first statement made in a Ford promotional video is a false advertisement, but **GRANTS IN PART** Plaintiffs' motion for summary judgment as to Count VI as to the second statement made in a Ford brochure.

## CONCLUSION

For the foregoing reasons, the Court finds as follows:

As to Counts I, II, III, and IV of Plaintiffs' Complaint alleging trademark infringement, false designation of origin, unfair competition, and trademark dilution, Plaintiff's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **DENIED**.

As to Count V of Plaintiffs' Complaint alleging cancelation of trademark registration, this count remains **DISMISSED** with prejudice by prior court order. *See* ECF No. 35.

As to Count VI of Plaintiffs' Complaint seeking declaratory judgment, this claim survives as neither party moved for summary judgment on this claim.

As to Counts I, II, III, IV and V of Defendants' counterclaims alleging trademark infringement, unfair competition on federal and state grounds, breach of contract, and trade secret misappropriation, Plaintiffs' motion for summary judgment is **DENIED**.

As to Count VI of Defendants' counterclaims alleging false advertisement, Plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**SO ORDERED.**

DATED this 30th day of September, 2019.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 30, 2019, by electronic and/or ordinary mail.

S/A. Chubb
Case Manager and Deputy Clerk