## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware Limited Liability Company, | ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No.: 17-cv-11584 |
| | ) | Judge Terrence George Berg |
| v. | ) ) | |
| **INTERMOTIVE, INC.,** a California corporation, and **GREGORY E. SCHAFFER**, an individual, | ) ) ) ) | |
| Defendants. | ) ) | |

## INTERMOTIVE'S MOTION FOR INCREASED PROFIT AWARD UNDER THE LANHAM ACT

InterMotive asks the Court to increase the Lanham Act profit awarded by the jury from $349,867 to $15,000,000. Under the Lanham Act §1117(a), the Court has the discretion to increase the award of Ford's profits if it finds the award "inadequate." The lower amount reached by the jury is inappropriate and inadequate for at least the reasons explained in the supporting brief.

InterMotive contacted Ford on November 27, 2023 regarding this matter, but was unable to reach agreement.

Respectfully submitted,

**HOWARD & HOWARD ATTORNEYS PLLC**

By: */s/ Andrew M. Grove*
    Andrew M. Grove (P48868)
    Gerald E. McGlynn III (P41149)
    Joseph W. Barber (P82728)
    Dane M. Lepola (P82742)
450 West Fourth Street
Royal Oak, Michigan 48067-2557
Tel: (248) 723-0343
Fax: (248) 645-1568
E-mail:  jg@h2law.com
        gem3@h2law.com
        jwb@h2law.com
        dlepola@howardandhoward.com

*Attorneys for Defendants*

Date: November 28, 2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **FORD MOTOR COMPANY**, a Delaware corporation, and **FORD GLOBAL TECHNOLOGIES, LLC**, a Delaware Limited Liability Company, | ) ) ) ) | |
| | ) | Civil Action No.: 17-cv-11584 |
| Plaintiffs, | ) | Judge Terrence George Berg |
| | ) | |
| v. | ) | |
| | ) | |
| **INTERMOTIVE, INC.,** a California corporation, and **GREGORY E. SCHAFFER**, an individual, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>BRIEF IN SUPPORT OF INTERMOTIVE'S MOTION FOR INCREASED PROFIT AWARD UNDER THE LANHAM ACT</u>

1

## **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................. i

TABLE OF AUTHORITIES............................................................ ii

ISSUES PRESENTED................................................................... iv

CONTROLLING AUTHORITIES.....................................................v

I.      INTRODUCTION ................................................................1

II.     APPLICABLE LAW .............................................................1

III.    ARGUMENT .......................................................................3

   A.  The Court's Ruling on This Issue Will Resolve Lingering Concerns About Whether an Award of Ford's Profits is a Jury Issue .........................................3

   B.  The Jury Found Ford's Trademark Infringement to be Willful, Deliberate and Intentional .............................................................4

   C.  Ford's "Market Reach" Argument Makes no Sense, is Not Supported, and Leaves an Undeserved Windfall to Ford ..........................................5

   D.  Ford's Module Sales are Understated, and so are its Module Profits...............9

   E.  It is Not Fair for Ford to Return Only 3% of the Profits it Wrongly Earned from Module Sales, and Nothing from Vehicle Profits..................................10

IV.     CONCLUSION.................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American Express Co. v. Lipscomb*,
　210 U.S.P.Q. 827, 1981 WL 40529 (E.D. Mich. 1981)
　*aff'd* 663 F.2d 1070 (6th Cir. 1981) ......................................................................5

*La Quinta Corp. v. Heartland Properties LLC*,
　603 F.3d 327 (6th Cir. 2010) ...........................................................................2, 4

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
　40 F.4th 454 (6th Cir. 2022) ....................................................................... iv, 2, 3

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
　No. 16-01015, 2020 WL 2128614 (S.D. Ohio 2020)............................................3

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
　316 U.S. 203 (1942) ........................................................................................6, 7

*MSC Software Corp. v. Altair Engineering, Inc.*,
　No. 07-12807, 2016 WL 1714873 (E.D. Mich. Jan. 7, 2016)...............................4

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
　463 F. Supp. 2d 733 (E.D. Mich. 2006) ..............................................................5

*Super Duper, Inc. v. Mattel, Inc.*,
　92 U.S.P.Q. 2d 1119, 2009 WL 866461(D.S.C. 2009),
　*aff'd in part* 382 Fed. App'x 308 (4th Cir. 2010)..................................................2

*U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185 (6th Cir. 1997) ...... iv, 2

*Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595 (6th Cir. 1991)......6, 7

**Statutes**

15 U.S.C. § 1117(a) ............................................................................. passim

**Other Authorities**

MCCARTHY ON TRADEMARKS, §30:91 ....................................................................13

## ISSUES PRESENTED

I.   Should the Court exercise its discretion under the Lanham Act and increase the profits awarded by the jury for Ford's trademark infringement from $349,867 to $15,000,000 when:

- The damages awarded by the jury are based on an incorrect and unsupported "market reach" argument;
- The jury found that Ford's infringement was willful, deliberate, and intentional;
- Ford's module sales and profits are understated; and
- It is not just and fair that Ford pays so little of its profits for the damage it did to InterMotive's brand, and the windfall Ford received for its bad acts?

Ford's Answer: No

InterMotive's Answer: Yes

This Court should answer: Yes

## CONTROLLING AUTHORITIES

1. Pursuant to the Lanham Act (15 U.S.C. § 1117(a)), if the Court finds that the amount of recovery based on profits is inadequate, it may, in its discretion, enter judgment for such sum as the Court finds to be just according to the circumstances of the case.

2. Pursuant to *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454 (6th Cir. 2022), a trial court has great discretion to increase profits awarded for trademark infringement as long as the award is not punitive. See also *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191–92 (6th Cir. 1997)

## I.      INTRODUCTION

InterMotive asks the Court to increase the Lanham Act profit awarded by the jury from $349,867 to $15,000,000. Under the Lanham Act §1117(a), the Court has the discretion to increase the award of Ford's profits if it finds the award "inadequate." The lower amount reached by the jury is inappropriate and inadequate for at least four reasons.

First, the number is based on an incorrect and unsupported "market reach" argument from Ford's damages expert, as explained below. Second, the jury found that Ford's infringement was willful, deliberate and intentional, and thus the Court has discretion to increase the amount.  Third, Ford's module sales and profits are understated. Fourth, it is simply not just and fair that Ford pays so little of its profits for the damage it did to InterMotive's brand, and the windfall Ford received for its bad acts. Put simply, Ford will not be deterred from future misconduct unless it is forced to disgorge more profit.

## II.     APPLICABLE LAW

The Lanham Act gives courts the discretion to increase profits awards when they are inadequate to an amount that is "just, according to the circumstances of the case.  Section 1117(a) states, pertinent part:

> *The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction*

1

> *claimed.*  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  *If the court shall find that the amount of recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.*

15 U.S.C. § 1117(a)(relevant portions italicized). A court's discretion in fashioning a Lanham Act remedy is great. *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 344–45 (6th Cir. 2010) (trebling damages when plaintiff lost control of its brand through intentional trademark infringement); *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191–92 (6th Cir. 1997) (no error for court to award quadruple profits). It is appropriate to enhance damages to deter willful violations of the Lanham Act. *Super Duper, Inc. v. Mattel, Inc.*, 92 U.S.P.Q. 2d 1119, 2009 WL 866461, at \*3–4 (D.S.C. 2009), *aff'd in part* 382 Fed. App'x 308 (4th Cir. 2010) (Court disagreed with jury verdict of $400,000 of infringer's profits and increased it to $999,113).

But please also see the holding in *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 472-474 (6th Cir. 2022). In *Max Rack*, the Sixth Circuit affirmed that the trial court has discretion to increase a profits award from a jury so long as the award is not punitive.

Thus, the Court here has the power to increase the profits awarded by the jury under the Lanham Act to an amount that the Court finds to be "just." Importantly, the jury found willful infringement by Ford. ECF No. 247, at PageID.9408, 9413, at questions 1-4 and 16-17.

## III.   ARGUMENT

### A. The Court's Ruling on This Issue Will Resolve Lingering Concerns About Whether an Award of Ford's Profits is a Jury Issue

The Court gets the final say on this issue of the amount of profits Ford must disgorge, as reported above in Section II and the discussion there of 15 U.S.C. § 1117(a). Accordingly, when the Court makes findings in support of its decision to increase profits awarded for trademark and unfair competition claims, this will be the end of the matters raised in the pre-trial briefing and the Court's discussion of them in its Order Addressing Pretrial Issues at ECF No. 227. See *Max Rack, Inc.*, 40 F.4th at 472-474, where the Sixth Circuit generally affirmed the trial court in sending the profits issue to the jury, but then reserving for itself the final decision in what the profit disgorgement should be under the Lanham Act. *Max Rack, Inc. v. Core Health & Fitness, LLC*, No. 16-01015, 2020 WL 2128614 at *6-7 (S.D. Ohio 2020). Though the Sixth Circuit vacated the final profit disgorgement decision that the trial court entered after trial, it approved of the process. In light of

3

*Max Rack*, the Court here may adjust the jury verdict under §1117(a), and support the adjustment with findings.

While there may have been some question about whether the Court could have the jury decide a profits award under the Lanham Act, there is little or no question that the jury can decide a profits award under the Michigan Uniform Trade Secrets Act. ECF No. 227 at PageID.830. This is because "claims for misappropriation of trade secrets historically have been tried by juries, including liability and damages." *MSC Software Corp. v. Altair Engineering, Inc.*, No. 07-12807, 2016 WL 1714873, at *2 (E.D. Mich. Jan. 7, 2016) (collecting cases). InterMotive "is therefore entitled to a jury trial on all aspects of the [MUTSA] claim, including damages under an unjust enrichment theory." *Id.* The Jury's verdict on InterMotive's MUTSA claim must stand.

## B. The Jury Found Ford's Trademark Infringement to be Willful, Deliberate and Intentional

The jury found Ford's infringement to be "willful, deliberate and intentional" (ECF No. 247, question 4). This is consistent with the mass of evidence showing that Ford knew of InterMotive's brand in 2011 and 2012, and even helped promote it. See Exhibits 5, 21, 24, 26, 60, 61. (See Exhibit 2 of **Exhibit B**) This willful infringement is a foundation for the Court to increase the profits awarded to InterMotive. *La Quinta Corp.*, 603 F.3d at 345 (willful infringement); *American Express Co. v. Lipscomb*, 210 U.S.P.Q. 827, 1981 WL

4

40529 (E.D. Mich. 1981) *aff'd* 663 F.2d 1070 (6th Cir. 1981) (treble damages where defendant acted knowingly and willfully); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 463 F. Supp. 2d 733, 738 (E.D. Mich. 2006) (Intentional infringement). Accordingly, there is ample precedent for an increase in award due to willful and intentional infringement.

### C. Ford's "Market Reach" Argument Makes no Sense, is Not Supported, and Leaves an Undeserved Windfall to Ford

The jury believed Ford's improper market reach argument, and it awarded only a small fraction of Ford's module profits as a result. Ford's expert argued that InterMotive was entitled to no more than 3% of Ford's module profits because, according to Ford's expert, InterMotive's "reach" into the market based on its UIM sales was only 3%. Ford told the jury that 3% of Ford's module profits was $349,867, which is what the jury awarded InterMotive – to the dollar. *See* Ford's argument at Tr. 10/31/2023, pp. 32-37(See Exhibit 1 of **Exhibit B**), citing Exhibit 945.2 (See Exhibit 2 of **Exhibit B**), compared with the jury verdict at ECF. No. 247, question 17.

**FORD ALLEGED TRADEMARK UNJUST ENRICHMENT**

| | IM Actual Market | IM Inflated Market |
|---|---|---|
| UIM U.S. Unit Sales | 81,554 | 81,554 |
| UIM Profit/Unit | $143 | $143 |
| Portion of the Market | 3% | 11% |
| Ford Unjust Enrichment | $349,867 | $1,282,844 |

EXHIBIT
945.2

But this analysis from Ford's expert makes no sense, is illogical, does not support Ford's burden in proving apportionment, and is unfair.

First, Ford had the burden of proving the amount of sales made that was *not* related to or resulting from the infringement.  In other words, Ford had the burden of proving that not all of the module sales made were because of the use of the infringing brand. This burden is established in the Lanham Act §1117(a) ("defendant must prove all elements of cost or deduction claimed"), and it is explained in the case law. In fact, courts *presume* that all sales are due to the infringement unless the infringer proves otherwise. *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 605-607 (6th Cir. 1991), citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942) ("There may be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.") Ford did not meet its burden at all. Ford's expert offered nothing to show how many Ford's customers bought

6

modules because of confusion, and how many would have bought the modules anyway.

Instead, Ford's expert analyzed what percentage of customers InterMotive reached with its UIM sales before Ford's infringement even started. (Tr. 10/31/23, pp. 33-37) (See Exhibit 1 of **Exhibit B**).  There are many problems with this presentation. First, the analysis has nothing to do with meeting Ford's burden. It is an argument directed at best to what *InterMotive's lost profits* might have been. It does not relate to *Ford's profits* in any way. Second, the analysis of how many customers bought InterMotive's UIM shows little about how many customers InterMotive reached with its advertising and promotion efforts – including efforts Ford made on InterMotive's behalf to promote InterMotive's brand. It is likely that many more people in the industry knew of InterMotive's brand than bought its product. Third, it shows little about whether the customers who bought InterMotive's product *before Ford even started selling* were confused when Ford started selling a similar product with the same brand. For all Ford's expert knows, these same customers could have bought tens of thousands of modules from Ford – and certainly more than 3% – thinking the modules were somehow coming from InterMotive. Moreover, all of the modules sold by Ford could have been bought by the InterMotive customers that Ford's expert does not dispute. Ford's expert

testimony was therefore illogical, unsupported, irrelevant and, unfortunately, confusing to the jury.

Ford's expert argued that InterMotive did not do any surveys. (Tr. 10/31/23, p. 32) (See Exhibit 1 of **Exhibit B**). But under controlling law cited above in *Wynn Oil* and *Mishawaka Rubber*, this is Ford's burden, not InterMotive's; and Ford did not conduct any surveys. Ford's expert's argument is also unfair because Ford impaired InterMotive's discovery. Ford prevented InterMotive from discovering the identities of customers who purchased infringing modules to understand whether they were confused by Ford's branding. ECF No. 76, 77, PageID.2050-2052 (Denying InterMotive access to Ford customer identities because Court assumed it was Ford's burden to use them to prove deductions to sales).

Because Ford did not meet its burden of proving apportionment, InterMotive is entitled to all of Ford's profits for its U.S. sales of infringing modules. Mr. Robinson determined that Ford sold over 90,000 modules in or from the U.S., and that Ford's profit was over $15,000,000. (Tr. 10/30/23 pp. 142-144) (Tr. 10/30/23 pp. 142-144):

```
16   accurate cost analysis with it.  So what I did was very
17   conservative assumptions based on that information and I
18   determined how much profit that Ford made in association with
19   these UIM modules.  And that totals $15,913,350.
```

The Court could use Ms. Rinke's determination of Ford's total module profit, which was around $12,000,000 ($143 per module x 81,554 modules), but Ms.

Rinke's determination is defective. As shown above, Ms. Rinke determined fewer modules were sold in the U.S. and with lower profit. But Ms. Rinke's calculation is not accurate under the law – as explained below; and Ford's total profit for the UIM modules it sold was higher than she determined.

### D. Ford's Module Sales are Understated, and so are its Module Profits

Ford's sales and profits are understated for a number of reasons.  First, Ford's sales information is current through June of 2023, but Ford's sales are ongoing – so at least 4 months of sales were missing when the jury rendered its verdict.  Second, Ford's updated sales are not supported by reliable invoice data. This is reported in the attached Declaration of Mark Robinson in Support of InterMotive's Post Trial Motions. (**Exhibit A,** ¶¶ 5-7). Ford's updates – representing tens of thousands of units – have not been verified, cross-checked with supporting invoice data or cross-examined. No witness testified as to the accuracy of what Ford produced recently. Ford has not produced any invoice data since *2020* despite being ordered to produce it. ECF No. 128 at PageID.3400, citing ECF No. 106; **Exhibit A**, ¶ 9.  This alone means that the Court could sanction Ford yet again for failing to obey its orders. According to Mr. Robinson, Ford's failure to obey the court order to produce invoice data impacted his calculations, and likely resulted in an understatement of more than 1,000 units. **Exhibit A**, ¶¶ 13b. and 15. Third, Ford has a long and unpleasant history of

underreporting its sales. ECF No. 128, ECF No. 155, PageID.5421-22. Accordingly, this is another reason to increase the award.

### E. It is Not Fair for Ford to Return Only 3% of the Profits it Wrongly Earned from Module Sales, and Nothing from Vehicle Profits

Ford is in the business of selling vehicles. It intended to sell more vehicles through its wrongdoing – or at least not lose sales to competitors like Ram and Mercedes; and in the process Ford earned hundreds of millions of dollars in profits. (Tr. 10/31/23, pp. 18-19: stipulation that Ford sold 92,365 vehicles with an average profit of $8,790 per vehicle, totaling over $800,000,000) (See Exhibit 1 of **Exhibit B**). There was abundant evidence that Ford intended to, and did in fact, sell more vehicles as a result of its wrongdoing, which includes trademark infringement and unfair competition:

- Exhibit 82 says that having a module like InterMotive's UIM will be "huge" to help Ford sell its new Transit. (See Exhibit 2 of **Exhibit B**)

- Exhibit 111 is a Ford ad touting the UIM brand and the use of the trade secret. The whole point of the ad is to sell more vehicles. (See Exhibit 2 of **Exhibit B**)

- Exhibit 321 shows Ford selling to Cox, "a very large fleet" that wants to have the "Upfitter Interface module" on "all of our [Cox] trucks." The

10

customer representative, Jim Bigelow, copied into his email the Ford advertisement that is Exhibit 111 into its email for reference:



Ford anticipated "a noticeable uptick in UIM orders (which we of course hope will lead to increased orders for Ford trucks.)" (See Exhibit 2 of **Exhibit B**)

- Exhibit 32 email from Randy Freiburger worrying that Ford was falling behind the competition and might lose sales if it did not get a module. Exhibit 313 is another email from Mr. Freiburger making a similar point. Exhibit 394[1] is an email from Rob Richardson that is also similar, with him worrying that "We are [more than] 6 years behind the lead competition (as of 2015), need to get this in ASAP. (See Exhibit 2 of **Exhibit B**)

---

[1] Used by InterMotive for impeachment on October 19, 2023, ECF 238, pp. 57-59.

- Exhibit 121 is a 2017 email chain among Ford people saying that the module is "an invaluable interface," "it is very important to retain the module," and it is "a real customer want." (See Exhibit 2 of **Exhibit B**)

- Exhibit 124 is a Ford publication advertising the UIM brand, the module and the trade secret feature. Exhibit 254 is a similar Ford advertisement but for different years.  Same with Exhibit 310. (See Exhibit 2 of **Exhibit B**)

- Exhibit 225 is Ford's video touting that the "Class-Exclusive Programmable Upfitter Interface Module" is "critical" to the industry (See Exhibit 2 of **Exhibit B**):



- Exhibit 303 is a "hero card" advertising the UIM brand, the module and the trade secret. (See Exhibit 2 of **Exhibit B**)

12

- Exhibit 308 is a Ford publication touting the UIM brand and the trade secret to sell vehicles (pages 20-23). (See Exhibit 2 of **Exhibit B**)

- Exhibit 312 is yet a different Ford publication touting the use of the UIM trademark and trade secret to sell vehicles. (See Exhibit 2 of **Exhibit B**)

- Exhibit 315 is a 2013 email from the SuperDuty chief engineer worrying that "Ram is chipping away at Super Duty … and will continue to make inroads into our fleet business unless we provide high impact fleet content" like the UIM). (See Exhibit 2 of **Exhibit B**)

- Exhibit 316 is a similar internal Ford email from 2013, arguing that "we all agree that the upfitter module is needed … I think commercial competitiveness vs. other OEMS is biggest issue.") (See Exhibit 2 of **Exhibit B**)

- Exhibit 317 is another internal email from 2015, showing how important Ford considered the module to be for selling more vehicles. Ford wanted to avoid "Loss of revenue, vehicle sales and prestege [sic]" and to "leapfrog the competition in features, flexibility and ease of use" (See Exhibit 2 of **Exhibit B**):



- Exhibit 319 show Ford targeting a big customer, Knapheide, with the UIM-branded module and its features including inputs. (See Exhibit 2 of **Exhibit B**)

The Court acknowledged some of this evidence. (Tr. 10/30/2023, pp. 119-120) (See Exhibit 1 of **Exhibit B**). Ford *is* getting a windfall even if it ends up disgorging the $13,559,167 in profits determined by the jury in its verdict at ECF No. 247. Moreover, McCarthy writes that judicial increases of awards can serve to deter future bad conduct. MCCARTHY ON TRADEMARKS, §30:91 (Discretionary power "is properly invoked not only to adjust for difficulties in proving amount, but also to deter in egregious cases of infringement.") Ford will keep doing what it is doing unless the Court imposes more of a deterrence. Ford will gladly steal from others if it only has to disgorge a small fraction of its ill-gotten gains.

IV.   **CONCLUSION**

For the foregoing reasons, InterMotive asks the Court to find:

14

- InterMotive had a protectable brand in Upfitter Interface Module when Ford began its use of the same term for the same goods, as the jury found;

- Ford infringed InterMotive's Upfitter Interface Module mark, as the jury found;

- Ford's infringement was willful, deliberate and intentional, as the jury found;

- InterMotive has no adequate remedy at law for the damage Ford did to InterMotive's brand because Ford infringed for years and caused confusion in the marketplace over the source or origin of the module with the brand Upfitter Interface Module;

- InterMotive met its burden in proving Ford's sales of infringing Upfitter Interface Modules of more than $20,000,000 (Tr. 10/30/23 p.143) (See Exhibit 1 of **Exhibit B**);

- Ford failed to prove sufficient costs, offsets, deductions and apportionment, so $349,867 is not an appropriate profit amount for Ford to disgorge;

- There was evidence of actual confusion (ECF 253, 10/26/23 pp. 11-12, 19, 38; 10/27/23, pp. 104-105, 148 (See Exhibit 1 of **Exhibit B**)).

- Ford's sales and profits from selling modules are understated, as reported above in Section III. D., in violation of at least one Court order; and

- Ford needs additional deterrence, though not a penalty, to refrain from such wrongdoing in the future.

InterMotive further asks the Court to use its discretion to increase the award for trademark infringement to $15,000,000.

**HOWARD & HOWARD ATTORNEYS PLLC**

By: */s/ Andrew M. Grove*
    Andrew M. Grove (P48868)
    Gerald E. McGlynn III (P41149)
    Joseph W. Barber (P82728)
    Dane M. Lepola (P82742)
450 West Fourth Street
Royal Oak, Michigan 48067-2557
Tel: (248) 723-0343
Fax: (248) 645-1568
E-mail:  jg@h2law.com
        gem3@h2law.com
        jwb@h2law.com
        dlepola@howardandhoward.com

*Attorneys for Defendants*

Date: November 28, 2023

16

## CERTIFICATE OF SERVICE

I certify that on November 28, 2023, I caused the foregoing document to be filed with the Clerk of the Court via the CM/ECF system, which will cause notice of same to be sent to all counsel of record.

By:  */s/ Andrew M. Grove*
Andrew M. Grove (P48868)
HOWARD & HOWARD ATTORNEYS PLLC
450 West Fourth Street
Royal Oak, Michigan 48067
Phone: (248) 723-0343
Fax: (248) 645-1568
jg@h2law.com

17