UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY and FORD GLOBAL TECHNOLOGIES, LLC,** | **4:17-CV-11584-TGB-APP** |
| Plaintiffs/Counter-Defendants, | HON. TERRENCE G. BERG |
| vs. | **ORDER DENYING FORD'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE A NEW TRIAL (ECF NO. 286)** |
| **INTERMOTIVE, INC. and GREGORY E. SCHAFFER,** | |
| Defendants/Counter-Plaintiffs. | |

Following a jury trial in this matter between Plaintiffs/Counter-Defendants Ford Motor Company and Ford Global Technologies, LLC (together, "Ford") and Defendants/Counter-Plaintiffs InterMotive, Inc. and Gregory E. Schafer (together, "InterMotive"), the jury rendered a verdict in favor of InterMotive on several of its counterclaims and assessed the amount of Ford's profits that InterMotive is entitled to recover as damages.

Presently before the Court is Ford's renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or in the alternative a new trial under Federal Rule of Civil Procedure 59. The parties have submitted written briefs explaining their positions on whether Ford is entitled to judgment as a matter of law and on whether

Ford is entitled to a new trial. ECF Nos. 286, 289, 294. Pursuant to Local Rule 7.1(f)(2), the Court will decide Ford's motion without a hearing. E.D. Mich. LR 7.1(f)(2). For the reasons stated in this Order, the Court will **DENY** Ford's motion as to its arguments that Ford is entitled to judgment as a matter of law and as to Ford's arguments that Ford is entitled to a new trial.

## CONTENTS

I.    BACKGROUND ....................................................................4
  A.    Upfitting ....................................................................5
  B.    InterMotive's Upfitter Interface Module ....................................6
  C.    History Between The Parties ................................................7
  D.    Trade Secret ...............................................................9
    1.    A Device Like The Upfitter Interface Module ............................10
    2.    Programmable Inputs ....................................................11
II.   RELEVANT PROCEDURAL HISTORY ...............................................16
III.  FORD'S MOTION .............................................................18
IV.   LEGAL STANDARDS ...........................................................19
  A.    Judgment as a Matter of Law ..............................................19
  B.    New Trial ................................................................21
V.    TRADE SECRET ANALYSIS .....................................................22
  A.    Ford's Arguments .........................................................24
  B.    Whether The Trade Secret was Generally Known .............................25
    1.    Preliminary Matter .....................................................27
    2.    Prior Art Modules ......................................................29
    3.    Summary and Conclusion .................................................52
  C.    Whether The Trade Secret Derives Independent Economic Value From Secrecy .............................................................56
VI.   TRADE SECRET DAMAGES ANALYSIS .............................................69

A.  Background ..................................................................69

1.  InterMotive's Unjust Enrichment Theories ...............70

2.  Burden of Proof .........................................................72

3.  Jury Instructions........................................................75

4.  The Jury's Award .......................................................77

5.  InterMotive's Causation Theory .................................78

B.  Judgment as a Matter of Law....................................85

1.  Damages on All of Ford's Module Sales.....................85

2.  Damages for The Entirety of Ford's Module Profits .................90

C.  New Trial.....................................................................91

1.  Apportionment Instruction ........................................91

2.  "Reasonable Estimation" Language ...........................92

3.  Head Start Instruction ..............................................95

VII.  TRADEMARK ANALYSIS.............................................97

A.  Ford's Arguments......................................................100

B.  Ownership .................................................................100

C.  Secondary Meaning...................................................105

1.  Direct Consumer Testimony .....................................107

2.  Consumer Surveys ...................................................110

3.  Exclusivity, Length, and Manner of Use..................111

4.  Amount and Manner of Advertising..........................113

5.  Amount of Sales and Number of Customers .............115

6.  Established Place in The Market...............................116

7.  Proof of Intentional Copying....................................117

8.  Balancing and Conclusion.........................................123

D.  Likelihood of Confusion............................................124

1.  Strength of The Senior Mark ...................................127

2.  Relatedness of The Goods or Services .....................129

3.  Similarity of The Marks............................................129

4.    Evidence of Actual Confusion ................................................... 130

5.    Marketing Channels Used ........................................................ 132

6.    Likely Degree of Purchaser Care ............................................. 133

7.    The Intent of Defendant in Selecting The Mark ..................... 134

8.    Likelihood of Expansion of The Product Lines ......................... 135

9.    Balancing and Conclusion ......................................................... 135

VIII. CONCLUSION ............................................................................. 136

## I.    BACKGROUND[1]

The Court has previously set forth an extensive background of the facts of this case on summary judgment. ECF No. 65. At trial, InterMotive presented its version of the events of this case largely through testimony from InterMotive's founder Gregory E. Schafer. Compared to the record on summary judgment, the evidence presented at trial provided new insights principally into the technology at issue in this case. Below, the Court will summarize the events relevant to the issues raised by the parties in the written briefs on Ford's present motion, and expand upon the technology at issue in this case in light of the record at trial.

---

[1] The facts set forth in this Background Section are based on the testimony and exhibits presented at trial, viewed in the light most favorable to InterMotive as the non-moving party. Many of these facts are basic facts of this case, generally demonstrated throughout the evidence, and/or ancillary to the issues raised by the parties. To the extent these facts are based on discrete pieces of evidence directly relevant to the issues raised by the parties, the Court will provide specific citations to the record.

### A.    Upfitting

The facts of this case center on the "upfit" marketplace. The upfit marketplace is a large aftermarket segment of the automotive industry responsible for adapting partially unfinished vehicles into specialty vehicles such as work trucks, transit vehicles, police vehicles, ambulances, fire trucks, and school busses. In parallel with the typical passenger vehicles, Ford and other automakers make partially unfinished commercial vehicles for the upfit marketplace. The automakers sell the partially unfinished vehicles to "upfitters," more formally known as specialty vehicle manufacturers, who finish the vehicles by installing aftermarket equipment to suit the needs of their fleet customers. For example, energy companies maintain fleets of lift bucket (or "cherry picker") trucks used by their workers to service power lines. To make this kind of truck, the upfitter would first buy a vehicle known as a "chassis cab," which is essentially a large pickup truck with no bed. The upfitter would then install a lift with a bucket on top to carry workers up and down, and stabilizers that can be extended to the ground to keep the truck stable and level.

Like all modern vehicles, vehicles for the upfit marketplace include various electronic control modules connected to a vehicle network. The control modules are programmed by the automakers to communicate with one another and control everything from the engine, transmission, and brakes to the doors, locks, lighting, and windshield wipers. On the

other hand, as part of the installation process, upfitters have to add their own control system for the aftermarket equipment, typically using both vehicle data and their own input signals from the aftermarket equipment. For example, in a lift bucket truck, the control system might be designed to allow workers to move the bucket only when the transmission is in park, the parking brake is engaged, the doors are closed, and the stabilizers are fully extended.

### B.    InterMotive's Upfitter Interface Module

In 2010, InterMotive launched a new product called the "Upfitter Interface Module (UIM)." The Upfitter Interface Module was designed as a programmable "plug and play" module that has inputs and outputs for the aftermarket equipment, as well as the ability to "interface" with the vehicle and eliminate the need to splice into the vehicle's wiring to access vehicle data. Specifically, in modern vehicles, the vehicle network includes a Controller Area Network ("CAN") bus. A CAN bus is a communications system used throughout the automotive industry to enable the control modules to communicate with one another without a host computer by transmitting all CAN messages on the same CAN bus. The Upfitter Interface Module reads CAN messages from the CAN bus, and is programmable with a Graphical User Interface ("GUI") to provide output signals based on user-defined Boolean logic combinations of selected CAN messages and input signals.

6

## C.    History Between The Parties[2]

In 2011 and early 2012, Ford and InterMotive explored a potential business relationship where InterMotive would design an Upfitter Interface Module for Ford to offer on vehicles for the upfit marketplace as a factory installed (or Original Equipment Manufacturer ("OEM")) option. The preliminary discussions between Ford and InterMotive were governed by a Confidential Disclosure Agreement (the "CDA"). The CDA was executed on November 29, 2011, and had a six-month disclosure term and a two-year confidentiality period. The CDA thus "controlled" confidential information shared through May 29, 2012. The "duty to protect" confidential information shared under the CDA (or "confidentiality obligation") expired on November 29, 2013.[3]

In response to Ford's interest in InterMotive's module, InterMotive devised a three-phase plan for developing incrementally improving versions for Ford. At the time, in 2012, the largest commercial vehicle show in North America, the annual National Truck Equipment Association ("NTEA") Work Truck Show, was coming up in March. At Ford's request, InterMotive quickly developed the Phase 1 module, a

---

[2] Schafer testified at length on the history between the parties over several days of the trial, with reference to numerous documents admitted as trial exhibits. *See generally* ECF Nos. 250, 251, 252, 253, 255. For reference, Schafer offered a summary of his testimony at the conclusion of direct examination by InterMotive. ECF No. 253, PageID.10026–10038.

[3] The CDA was admitted as Trial Exhibit 20.

Ford-specific version of InterMotive's module with special enhancements for Ford customers. Additionally, Ford and InterMotive made plans to jointly promote the Upfitter Interface Module, including by making a video and a brochure, and by having InterMotive present in Ford's booth. At the 2012 NTEA show, Ford chief engineer Robert Stevens played the video during Ford's scheduled presentation before about 400 people, and called Schafer out by name to stand up in the crowd for recognition.

Under the three-phase plan, Phase 2 was to be a module with Ford-compliant hardware and InterMotive firmware, and Phase 3 was to be the same thing but with Ford-compliant firmware. After meetings to brainstorm additional improvements for the Phase 2 module, InterMotive prepared a specification in March 2012. Following months of phone conversations with Ford about the design of the Phase 2 module, InterMotive later delivered a confidentially-marked prototype at a demonstration in December 2012. In early 2013, Ford informed InterMotive that Ford was not moving forward with developing its own Upfitter Interface Module. After being so informed, InterMotive stopped development toward the Phase 3 module.

Unbeknownst to InterMotive, who understood that Ford wanted InterMotive to serve Ford customers by offering the Ford-specific Phase 1 module, Ford sent its own specification to other potential suppliers for quotes in summer 2013. Years later, at the 2016 NTEA show, Ford announced that several of its 2017 vehicles would include an "Upfitter

8

Interface Module" that would better enable upfitters to interact with the electrical system of Ford vehicles for upfitting modifications. According to InterMotive, it was apparent as soon as Ford showed its new module that Ford had taken InterMotive's confidential information from the Phase 2 specification. Although InterMotive took issue with Ford for copying InterMotive's technology and using the same "Upfitter Interface Module" name, InterMotive attempted to resolve its issues with Ford and maintain the good relationship between the parties.

Ford, however, responded by bringing this case against InterMotive, alleging that InterMotive infringed on Ford's trademark rights by using Ford's marks on InterMotive products and marketing materials without Ford's consent. ECF No. 26. InterMotive then counterclaimed, alleging that Ford took trade secret and other confidential information from the Phase 2 specification and prototype and shared it with another supplier to develop its module, and infringed on InterMotive's trademark rights in the "Upfitter Interface Module" name. ECF No. 42.

### D. Trade Secret

At trial, InterMotive defined the trade secret as "the use of programmable inputs in a device like the Upfitter Interface Module." ECF No. 266, PageID.11154. In other words, the trade secret is a combination of two elements: (1) a device like the Upfitter Interface Module; and (2) programmable inputs.

9

### 1. A Device Like The Upfitter Interface Module[4]

With respect to the language "a device like the Upfitter Interface Module," InterMotive views the Upfitter Interface Module as a unique device in the upfit marketplace. In an effort to prove that the trade secret was known, Ford presented prior art modules that Ford argues practice the trade secret. InterMotive's theory on what makes the Upfitter Interface Module unique featured prominently when InterMotive disputed Ford's theories that the prior art modules, and particularly those that InterMotive concedes have programmable inputs, are like the Upfitter Interface Module. As the basis for distinguishing the prior art modules, InterMotive argues that, to be like the Upfitter Interface Module, a device must have three prototypical features.

First, the device must be a single module, as opposed to a system with multiple modules. Being a single module reflects that the Upfitter Interface Module operates independently, and, conversely, does not require additional components to function. Second, the device must have a CAN interface, not a different component known as a CAN gateway. For purposes of communicating with the vehicle, the Upfitter Interface Module has a "direct" CAN interface for reading CAN messages. By contrast, a CAN gateway provides a CAN interface only "indirectly"

---

[4] As to InterMotive's argument concerning the language "a device like the Upfitter Interface Module," the supporting testimony from InterMotive witnesses is set forth in the below discussion of the prior art modules. *See infra* Section V(B)(2).

through an additional component that translates CAN messages to another language. Third, the device must have an easy-to-use GUI for programming the device. With InterMotive's easy-to-use GUI, the Upfitter Interface Module is programmable by upfitters on a laptop. On the other hand, if a device uses complicated programming technology designed for engineers, such as programmable logic controller ("PLC") technology, then that shows that the device is not intended for upfitters.

According to InterMotive, even for devices that have programmable inputs, if a prior art module is not the prototypical single module with a CAN interface and an easy-to-use GUI, then the prior art module is not like the Upfitter Interface Module, and therefore does not practice the trade secret.

### 2.    Programmable Inputs[5]

InterMotive's asserted trade secret also involves "the use of programmable inputs" in the device. Before turning to the technology of programmable inputs, it is important to know that the word "programmable" has different meanings in different contexts. The normal sense in which the module would be described as "programmable" is when the module has programmable outputs. In the context of outputs,

---

[5] Witnesses for both parties, including, but not limited to, their technical experts, discussed the technology of programmable inputs throughout the eleven-day trial. The Court has attempted to amalgamate the extensive discussion of the background facts, which the parties do not appear to dispute, into the following explanation.

"programmable" refers generally to giving users the ability to use the GUI to define the logic that maps the inputs to the outputs. For example, in a lift bucket truck, the user would define a set of conditions where, before activating the output that allows workers to move the bucket, the inputs must see that the transmission is in park, the parking brake is engaged, the doors are closed, and the stabilizers are fully extended. On the other hand, even in programmable modules with programmable outputs, not all inputs are programmable inputs. As explained in more detail below, in the context of inputs, on the other hand, "programmable" refers to implementing a specific type of input which then enables giving users the ability to use the GUI to choose the electrical configuration of the inputs for compatibility with different input signals.

Some introduction on inputs is necessary to understand the technology of programmable inputs. The inputs can be alternatively described as "discrete inputs" or as "switch inputs." As distinguished from reading multiple CAN messages from the same CAN bus, the inputs are individually hardwired to input switches on the upfit equipment. Specifically, the module includes a connector with input pins for the inputs, and upfitters connect input wires from the input switches to the input pins on the connector. Generally, the module uses the inputs to sense the input signals generated when the input switches are closed (or "on") or open (or "off") and determine the status of the upfit equipment.

12

In the technology of programmable inputs, the word "programmable" is shorthand for the phrase "programmable as active high or active low." The term "active high" refers to an electrical configuration in which the input is compatible with a 12 volt (i.e., "high") input signal from the input switch, and the term "active low" refers to an electrical configuration in which the input is compatible with a 0 volt (i.e., "low") input signal from the input switch. The terminology "active high" or "active low," however, is not exclusive to programmable inputs. Rather, regardless of the type of input, the inputs are configured as active high or active low according to the voltage of the input signals that the input switches are wired to generate. Before elaborating on this point, it is helpful to know that the difference is also reflected in terminology such as "switched to battery" or "switched to ground" and "high true" or "low true."

To generate the input signals, the input switches are wired to the inputs from the vehicle's electrical system. Depending on their location and function, the input switches are wired from the 12 volt side or from the ground, or 0 volt, side of the battery. Since the battery itself is grounded to the vehicle's chassis, much of the vehicle serves as ground, which can make it more convenient to use 0 volt input wires. For example, the input switch for sensing whether lights are turned on might have a 12 volt input wire, while the input switches for sensing whether a

door is closed or whether a stabilizer is fully extended might have 0 volt input wires.

For the 12 volt input wires, the inputs must be active high, and for the 0 volt input wires, the inputs must be active low. In the active high configuration, the input switch is "active" and the input is read as logically "true" in response to the 12 volt (i.e., "high") input signal generated when the input switch is closed. In the active low configuration, the input switch is "active" and the input is read as logically "true" in response to the 0 volt (i.e., "low") input signal generated when the input switch is closed. The inputs must be compatible with the voltage of the input signals because the inputs have different electrical configurations depending on the voltage. For example, the inputs commonly have resistors for keeping the input signals from "floating" when the input switches are open. In the active high configuration, the input has a "pull-down" resistor for bringing the input signal down to 0 volts. In the active low configuration, the input has a "pull-up" resistor for bringing the input signal up to 12 volts.

Schafer testified that programmable inputs are one of three types of inputs relevant to the active high and active low configurations. ECF No. 253, PageID.10029–10033. The first type of input is a "fixed" input, which refers to inputs that are fixed as active high or fixed as active low. *Id.*, PageID.10029–10030. With fixed inputs, if the inputs are not compatible with the voltage of the input signals, then upfitters have to

add and separately wire relays between the input switches and the inputs to switch the voltage. ECF No. 252, PageID.9941–9942.

The second type of input is a "hardware configurable" input, which refers to inputs that are configured as active high or active low using hardware. ECF No. 253, PageID.10030–10031. Schafer testified that this is the type of input used in the original Upfitter Interface Module. *Id.* According to Schafer, the inputs are "hardware configurable" in the sense that InterMotive custom-builds the input with a pull-down resistor for the active high configuration or with a pull-up resistor for the active low configuration. *Id.*

The third type of input, and the one which is otherwise known as a "programmable" input, is a "firmware configurable" input, which refers to inputs that are configured as active high or active low using firmware. *Id.*, PageID.10031. Schafer testified that this is the type of input used in the Phase 2 prototype. *Id.*, PageID.10033. As described by Schafer, the inputs are implemented with an integrated circuit with both pull-down resistors and pull-up resistors that can be turned on using transistors. *Id.*, PageID.10031. The inputs are "programmable" and "firmware configurable" because users use the GUI to choose the configuration of the input during programming, and the firmware loaded into the module controls the transistors to turn on a pull-down resistor for the active high configuration or turn on a pull-up resistor for the active low configuration. *Id.*, PageID.10031–10032.

15

The use of programmable inputs in a device like the Upfitter Interface Module benefits both the manufacturer and upfitters. Generally, upfitters are concerned with flexibility, and particularly having enough inputs for their logic and the right configurations for their inputs switches. In addition to meeting the needs of upfitters, the manufacturer is concerned with packaging, and particularly having the optimum number of inputs. To borrow an example from trial, suppose that the manufacturer knows that upfitters need up to eight inputs, but different customers will need different combinations of active high inputs and active low inputs. With programmable inputs, the manufacturer can provide eight inputs, and the upfitters can configure the inputs as active high or active low on an as-needed basis depending on the voltage of the input signals. The solution of providing eight fixed inputs would require upfitters to add relays every time the inputs are not compatible with the voltage of the input signals. The solution of providing sixteen fixed inputs would eliminate the need for upfitters to add relays but would double the number of input pins and require either a bigger connector or multiple connectors.

## II.   RELEVANT PROCEDURAL HISTORY

A jury trial was held in this matter from October 18, 2023 to November 1, 2023. The following of InterMotive's counterclaims were submitted to the jury: (i) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (ii) false advertising under Section 43(a)

of the Lanham Act, 15 U.S.C. § 1125(a); (iii) breach of contract; (iv) trade secret misappropriation under the Michigan Uniform Trade Secrets Act (the "MUTSA"), M.C.L. §§ 445.1901–1910; (v) unfair competition under Michigan law; and (vi) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Although Ford brought this case against InterMotive, none of Ford's claims were still alive by the time this case was submitted to the jury. Specifically, Ford dismissed its last remaining trademark infringement claim after presenting its case-in-chief.

With respect to Ford's present renewed motion for judgment as a matter of law, the jury found for InterMotive on its counterclaim for trade secret misappropriation under the MUTSA. As set forth in the verdict form, the jury found that "the use of programmable inputs in a device like the Upfitter Interface Module" was InterMotive's trade secret, and that Ford misappropriated InterMotive's trade secret. ECF No. 247, PageID.9411. Based on its assessment of the amount of Ford's profits that were caused by Ford's use of the trade secret, the jury awarded InterMotive $13,209,300 for trade secret misappropriation. *Id.*

Additionally, the jury found for InterMotive on two of its Lanham Act counterclaims: (1) trademark infringement under Section 32 of the Lanham Act; and (2) unfair competition under Section 43(a) of the Lanham Act. As set forth in the verdict form, the jury found that InterMotive owns a valid trademark in the product name "Upfitter

17

Interface Module." *Id.*, PageID.9408. The jury was instructed to find for InterMotive on validity if it proved that InterMotive's registered "Upfitter Interface Module" trademark is at least descriptive (i.e., is not generic) and has acquired distinctiveness through secondary meaning. ECF No. 266, PageID.11142–11145. Furthermore, the jury found that Ford's use of the "Upfitter Interface Module" name created a likelihood of confusion as to the origin of Ford's module, and therefore constituted trademark infringement and unfair competition under the Lanham Act. ECF No. 247, PageID.9408, 9413. Additionally, the jury found that Ford's infringement was willful, deliberate, and intentional. *Id.*, PageID.9408. Based on its assessment of the amount of Ford's profits that were caused by Ford's Lanham Act violations, the jury awarded InterMotive $0 for trademark infringement and $349,867 for unfair competition. *Id.*, PageID.9408, 9413.

## III.  FORD'S MOTION

Ford's motion for judgment as a matter of law or in the alternative a new trial is directed to: (1) InterMotive's trade secret misappropriation counterclaim under the MUTSA; (2) unjust enrichment damages for trade secret misappropriation under the MUTSA, which the jury awarded in the amount of $13,209,300; and (3)(i) InterMotive's trademark infringement counterclaim under Section 32 of the Lanham Act, and (ii) InterMotive's unfair competition counterclaim under Section 43(a) of the Lanham Act (collectively, the "Lanham Act counterclaims").

Below, the Court will consider the positions of the parties in light of the evidence presented at trial and the applicable law, and determine whether Ford is entitled to judgment as a matter of law and whether Ford is entitled to a new trial on these issues.

## IV.   LEGAL STANDARDS

In its motion, Ford moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or in the alternative a new trial under Federal Rule of Civil Procedure 59.

### A.   Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs the procedures for judgment as a matter of law in a jury trial. Under Rule 50, judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50 provides for a party to file a motion for judgment as a matter of law challenging the sufficiency of the evidence to support an adverse jury verdict in a pre-verdict Rule 50(a) motion and to renew it in a post-verdict Rule 50(b) motion. As explained by the Sixth Circuit, a Rule 50 motion for judgment as a matter of law "amalgamates" what were formally a motion for a directed verdict and a motion for judgment notwithstanding the verdict ("JNOV"). *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 779 (6th Cir. 2020).

19

Under Rule 50(a), a motion for judgment as a matter of law "may be made at any time before the case is submitted to the jury" and "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). If a district court does not grant a timely, pre-verdict motion for judgment as a matter of law under Rule 50(a), then "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). In that event, Rule 50(b) provides that, after a verdict and entry of judgment, the movant may file a "renewed" motion for judgment as a matter of law. *Id.* "A Rule 50(b) motion is only a renewal of the pre-verdict motion, and it can be granted only on grounds advanced in the pre-verdict motion." *Hanover*, 974 F.3d at 780 (quotations omitted).

The Sixth Circuit has instructed that a district court may grant a motion for judgment as a matter of law challenging the sufficiency of the evidence "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). "The evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of [the] court should not be substituted for that of the jury." *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175–76 (6th Cir. 1996). "The district

court must indulge all presumptions in favor of the validity of the jury's verdict, and should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result." *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997) (quotations omitted).

### B. New Trial

Federal Rule of Civil Procedure 50(b) provides that a renewed motion for judgment as a matter of law "may include an alternative or joint request for a new trial" under Federal Rule of Civil Procedure 59. Fed. R. Civ. P. 50(b). After a jury trial, Rule 59 authorizes a district court to grant a new trial "on all or some of the issues" and "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1) & (a)(1)(A). "Generally courts have interpreted this language to mean that a new trial is warranted when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045–46 (6th Cir. 1996) (quotation omitted).

"To constitute proper grounds for granting a new trial, an error, defect or other act must affect the substantial rights of the parties." *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001) (citing Fed. R. Civ. P.

61). Accordingly, "a motion for a new trial will not be granted unless the moving party suffered prejudice." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004). "The burden of showing harmful prejudice rests on the party seeking the new trial." *Id.* (quotation omitted).

The Sixth Circuit has instructed that jury instructions are reviewed "as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Id.* "A refusal to give a requested jury instruction is reversible error only if three conditions are satisfied. First, the omitted instruction must be a correct statement of the law. Second, the instruction must not be substantially covered by other delivered charges. Third, the failure to give the instruction must impair the requesting party's theory of the case." *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996).

## V.    TRADE SECRET ANALYSIS

The MUTSA contains a two-part definition of information that qualifies as a trade secret:

> (d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902.

The statutory requirements focus on two different aspects of the secrecy of the information the plaintiff claims as a trade secret. Pursuant to the first requirement, the information must derive "independent economic value" from secrecy, which precludes protection for information that is "generally known" within the industry or "readily ascertainable" by others. *See*, *e.g.*, *Manos v. Melton*, 100 N.W.2d 235, 238 (Mich. 1960) ("… [T]his Court has also recognized that the law does not provide protection for knowledge which is common property in the trade, or for an idea which is well-known or easily ascertainable."); *Kubik, Inc. v. Hull*, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974) ("The term 'trade secret' does not encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship."). Pursuant to the second requirement, the plaintiff must take reasonable efforts to maintain the secrecy of the information. *See*, *e.g.*, *Kubik*, 224 N.W.2d at 87 ("To be a trade secret, the information must, of necessity, be a *secret*; specifically, there must be

evidence presented that sufficient measures have been taken to guard the secrecy of the information and preserve its confidentiality.").

The Michigan Supreme Court has instructed that the following factors from Section 757 of the Restatement of Torts provide useful guidelines for determining whether particular information is a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1984) (quoting RESTATEMENT OF THE LAW, TORTS § 757 cmt. b (AM. LAW INST. 1939)).

## A.    Ford's Arguments

As to InterMotive's trade secret misappropriation counterclaim, Ford moves for judgment as a matter of law on two grounds. First, Ford moves for judgment as a matter of law that no trade secret protection exists for lack of secrecy. Ford argues that it is entitled to judgment as a matter of law because "the use of programmable inputs in a device like the Upfitter Interface Module" was generally known. Specifically, Ford argues that InterMotive and other companies disclosed the trade secret

24

in prior art modules that were in the public domain before InterMotive shared the trade secret with Ford. Second, Ford moves for judgment as a matter of law that no trade secret protection exists for lack of independent economic value from secrecy. Ford argues that it is entitled to judgment as a matter of law because a "product idea" like "the use of programmable inputs in a device like the Upfitter Interface Module" cannot derive independent economic value from secrecy because the act required to obtain economic value from the idea, selling the product, destroys the secrecy of the idea. For the reasons set forth below, the Court finds that Ford is not entitled to judgment as a matter of law on InterMotive's trade secret misappropriation counterclaim.

## B. Whether The Trade Secret was Generally Known

Ford's first ground for judgment as a matter of law on InterMotive's trade secret misappropriation counterclaim is that "the use of programmable inputs in a device like the Upfitter Interface Module" was generally known. The Michigan Supreme Court has instructed that "a plaintiff can claim a trade secret if it shows that the information it seeks to protect has the characteristics outlined in the Restatement." *Hayes-Albion*, 364 N.W.2d at 616. Once the plaintiff has presented sufficient evidence to make out a prima facie case that the information it seeks to protect is a trade secret, the defendant can rebut that prima facie case by presenting evidence demonstrating that the information the plaintiff seeks to protect was common knowledge in the industry. *Id.*

At trial, Ford presented four prior art modules in an effort to prove that the trade secret was generally known: (1) the InPower Vehicle Control Module System ("VCMS"); (2) the InterMotive Programmable Relay Power Center ("PRPC"); (3) the original InterMotive Upfitter Interface Module; and (4) the Zeta proposal. With respect to the prior art modules, the jury heard testimony from Ford's technical expert, Mr. Scott Andrews, and InterMotive's technical expert, Dr. Juan R. Pimentel, as well as a few other Ford and InterMotive witnesses. Andrews and other Ford witnesses testified for Ford that the prior art modules practice the trade secret, while Pimentel and other InterMotive witnesses, particularly Schafer, testified for InterMotive that the prior art modules do not practice the trade secret.

In the written briefs, the parties take the prior art modules in turn. Similar to a prior art invalidity analysis in patent law, the parties frame the issues in terms of whether the prior art modules satisfy the trade secret definition, including in particular whether the prior art modules that have programmable inputs are like the Upfitter Interface Module. In accordance with the competing testimony from their witnesses, Ford's arguments and InterMotive's counterarguments largely amount to the parties rehashing the theories they presented at trial. Specifically, Ford argues that the prior art modules practice the trade secret, while InterMotive distinguishes the prior art modules, arguing that they do not

have programable inputs, are not like the Upfitter Interface Module, or both.

In connection with InterMotive's distinctions, Ford also makes several secondary arguments. Specifically, Ford argues that, even if InterMotive distinguished the prior art modules, the distinctions between the trade secret and the prior art modules are irrelevant. Ford argues that the distinctions are irrelevant for a number of reasons, including that the distinctions are not part of the trade secret definition, and that the distinctions are "too minor" to afford trade secret protection.

### 1.    Preliminary Matter

As a preliminary matter, the Court will separately address one of Ford's secondary arguments. At trial, InterMotive defined the trade secret as "the use of programmable inputs in a device like the Upfitter Interface Module." ECF No. 266, PageID.11154. With respect to the language "a device like the Upfitter Interface Module," Ford takes issue with the way InterMotive distinguished the prior art modules. Compared to Ford's argument that the device can be any module for upfitters that interfaces with the vehicle, InterMotive argues that the device must be a single module, have a CAN interface, not a CAN gateway, and have an easy-to-use GUI. Likewise, InterMotive distinguished the prior art modules for not having one or more of the three prototypical features. Ford argues that the distinctions are not part of the trade secret

definition, and that InterMotive cannot change the trade secret after trial. The Court disagrees for two reasons.

First, the limitation to a single module with a CAN interface and an easy-to-use GUI is not facially inconsistent with the language "a device like the Upfitter Interface Module." As defined by InterMotive, the trade secret is directed to a device like "the" capital U-I-M "**U**pfitter **I**nterface **M**odule." Particularly given that InterMotive asserts trademark protection in the "Upfitter Interface Module" name, the trade secret definition clearly refers to the Upfitter Interface Module that InterMotive originally launched in 2010. In other words, the trade secret is directed to a device like InterMotive's module, not like any device for the upfit marketplace. Moreover, as will become clear from the below discussion of the prior art modules, the evidence supports InterMotive's view that the three prototypical features are unique to the Upfitter Interface Module. As well, Ford can hardly argue otherwise. Rather than those of the prior art modules, Ford adopted the same three features, along with the same name, for its own Upfitter Interface Module. As an example from the various marketing materials that Ford created for its module, the "Work Smarter Than Ever" advertisement admitted as Trial Exhibit 111 depicts the device as a single module, and describes that the device provides "Various CAN signals" and "Downloadable software to configure the UIM" that gives users the ability "to modify and input your

code for programming and delivering a smart upfit to your customer." Trial Ex. 111.

Second, as implied by Ford's focus on the way InterMotive distinguished the prior art modules "at trial," the record refutes Ford's basic contention that InterMotive is improperly attempting to change the trade secret "after trial." As Ford itself points out, InterMotive made clear that it was relying on the limitation to a single module with a CAN interface and an easy-to-use GUI to distinguish the prior art modules. In fact, Schafer made it a point to highlight to the jury that Ford was dismissing InterMotive's view that the three prototypical features are unique to the Upfitter Interface Module. As stated by Schafer: "Throughout the trial you've been trying to say an Upfitter Interface Module is an Upfitter Interface Module is an Upfitter Interface Module. If it's used by the upfit industry and it's a module, it's an Upfitter Interface Module, and we've been trying to state over and over that's not true." ECF No. 253, PageID.10055. Notably, the Court observes that Ford does not claim any surprise in connection with the way InterMotive distinguished the prior art modules.

## 2. Prior Art Modules

Below, the Court, like the parties in the written briefs, will review the prior art modules in turn, and determine whether substantial evidence supported the jury's presumed finding that no prior art module individually practices the trade secret. As set forth below, in

29

chronological order, prior to the events of this case, one of InterMotive's competitors, InPower, began selling the VCMS, a device with programmable inputs, in December 2008. Although InterMotive concedes that the VCMS has programmable inputs, InterMotive argues that the VCMS is not like the Upfitter Interface Module. InterMotive launched the original Upfitter Interface Module in 2010, prior to the discussions between Ford and InterMotive. The parties presented two different theories on the type of input used in the original Upfitter Interface Module. While InterMotive argues that the inputs are hardware configurable inputs, Ford argues that the inputs are implemented in a way that requires programming, and are therefore effectively the same to upfitters as programmable inputs. Ford of Europe received the proposal from Zeta, an existing supplier, in February 2012, after the parties executed the CDA in November 2011, but before InterMotive shared the trade secret with Ford in the March to December 2012 timeframe. The Zeta proposal is merely an internal Ford of Europe document, not an actual commercially available product. InterMotive argues that the Zeta proposal both does not have programmable inputs and is not like the Upfitter Interface Module. InterMotive released the PRPC, another new product, in 2014, after Ford began sharing confidential information with other potential suppliers in summer 2013, but before Ford began offering its Upfitter Interface Module in 2016. The Court notes that, in this regard, the PRPC is "prior art" mainly to the

issue of trade secret status in the interim. Although InterMotive concedes that the PRPC has programmable inputs, InterMotive argues that the PRPC is not like the Upfitter Interface Module.

### a) InPower VCMS

The first prior art module that Ford argues practices the trade secret is the InPower Vehicle Control Module System ("VCMS"). InterMotive concedes that the InPower VCMS has programmable inputs. As such, the dispute between the parties is whether the VCMS is like the Upfitter Interface Module. At trial, Ford presented the VCMS in connection with a video deposition of InPower's co-founder John Melvin. Melvin testified that InPower began selling the VCMS to customers in the upfit marketplace in December 2008. ECF No. 286-2, PageID.11863. "Its goal was to replace relay control systems with an electronic system and give customers the ability to program it themselves." *Id.*, PageID.11862. Schafer testified that he knows Melvin and that InPower is one of InterMotive's competitors. ECF No. 253, PageID.10115.

The data sheet admitted as Trial Exhibit 992 describes the VCMS as "a modular, programmable switch panel system used for controlling vehicle 12 volt auxiliary devices" that "can be configured to fit a wide range of applications that require the driver to operate devices such as lights, beacons, fans, compressors, pumps, etc." ECF No. 287-8, PageID.12453. As its main component, the VCMS includes a programmable power module. *Id.* The power module contains the inputs

and the outputs, and the power module can be connected with other VCMS components on a serial bus. *Id.* Although the data sheet does not describe a vehicle network, Melvin explained that the power module and the serial bus are based on the I2C communication protocol, and testified that InPower developed an interface between a CAN bus and an I2C bus. ECF No. 286-2, PageID.11863. Additionally, the VCMS has programmable inputs. According to the data sheet, the inputs on the power module "can be individually programmed to activate from either a contact closure to ground or to +12 volts" and are "programmable to pull up for ground true actuation or to pull down for +12 volt true actuation." ECF No. 287-8, PageID.12453–12454.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the VCMS does not practice the trade secret. Although InterMotive concedes that the VCMS has programmable inputs, InterMotive disputed Ford's theory that the VCMS is like the Upfitter Interface Module.

As to whether the VCMS is like the Upfitter Interface Module, Ford addresses only the CAN interface. With respect to the CAN interface, the dispute between the parties centers on Melvin's testimony that InPower developed an interface between a CAN bus and an I2C bus. Andrews explained that, in the context of the VCMS, the interface is a translator that translates CAN messages to the I2C language. ECF No. 242, PageID.9070. Likewise, Andrews testified that the VCMS is like the

Upfitter Interface Module because the translator can be connected from the CAN bus to the I2C bus to put CAN messages into the power module. *Id.*, PageID.9071.

On the other hand, Schafer and Pimentel distinguished the VCMS. Along with the related reason that the VCMS is not a single module, Schafer testified that the VCMS is not like the Upfitter Interface Module because the power module can only connect to the CAN bus through the translator. ECF No. 252, PageID.9872. As described by Schafer, with the CAN interface, the Upfitter Interface Module can "communicate on CAN" and read CAN messages to "speak with the vehicle." *Id.* By contrast, the VCMS requires an additional component to "send it out on a different language like a translator, CAN to something else." *Id.* Pimentel agreed with Schafer and added that the translator is a different component known as a CAN gateway. ECF No. 264, PageID.10759. Pimentel explained that the word "gateway" refers to "a gateway between a device and the network." *Id.*, PageID.10748. Furthermore, Pimentel testified that the VCMS is not like the Upfitter Interface Module because a CAN gateway "is totally different" than a CAN interface. *Id.*, PageID.10759. For purposes of communicating with the vehicle, Pimentel explained that the Upfitter Interface Module has a "direct" CAN interface for reading CAN messages. *Id.*, PageID.10767. By contrast, Pimentel explained that the power module of the VCMS has a CAN interface only "indirectly"

through an additional component that translates CAN messages to another language. *Id.*, PageID.10768–10769.

In addition to not being a single module and not having a CAN interface, Schafer testified that the VCMS is not like the Upfitter Interface Module because the VCMS does not have an easy-to-use GUI. ECF No. 252, PageID.9872–9873. Specifically, Schafer explained that InPower "decided to follow kind of a PLC approach, a programmable logic controller," which is a programming technology that has "been around for a long time" and is "used a lot in factories." *Id.*, PageID.9873. The PLC programming approach is "a complicated way of programming something," and InPower consequently "offer[s] a two-day course on how to program their device." *Id.* Adding that "[i]t takes about five minutes to understand how to program with ours," Schafer testified that "I would not say that they have anywhere near the same type of device or technology." *Id.*

Accordingly, InterMotive presented substantial countervailing evidence for the jury to reasonably reject Ford's theory and find that the VCMS does not practice the trade secret. Although Andrews testified for Ford that the VCMS is like the Upfitter Interface Module, the jury could have reasonably relied instead on Schafer's and Pimentel's testimony for InterMotive that the VCMS is not like the Upfitter Interface Module. As summarized by Pimentel, although the VCMS has programmable inputs, the VCMS is not a single module, has a CAN gateway, not a CAN

34

interface, and does not have an easy-to-use GUI. ECF No. 264, PageID.10767–10768. These attributes distinguish InterMotive's UIM from the VCMS.

The Court is not persuaded by Ford's secondary argument that the InterMotive UIM's claimed distinctions from the VCMS are "too minor" to afford trade secret protection. Initially, Ford addresses only the CAN interface, and even then, Ford's argument is directed to its own distinction between an "indirect" and a "direct" CAN "connection." ECF No. 286, PageID.11832. As opposed to Ford's generalized version, the actual distinction is between a CAN gateway and a CAN interface, including that a CAN gateway is a different, additional component that translates CAN messages to another language. Moreover, Ford does not address the remaining distinctions that the VCMS is not a single module and does not have an easy-to-use GUI. In light of the evidence on the VCMS, and in the absence of a fully developed argument to the contrary, the Court is not persuaded that InterMotive's distinctions represent the type of "[t]rivial advances" that are not protectible as trade secrets. *Manos*, 100 N.W.2d at 239.

### b) InterMotive PRPC

The second prior art module that Ford argues practices the trade secret is InterMotive's own Programmable Relay Power Center ("PRPC"). As with the InPower VCMS, the InterMotive PRPC has programmable inputs, and the dispute between the parties is whether the PRPC is like

the Upfitter Interface Module. To elaborate, following the development of the Phase 2 prototype that InterMotive delivered to Ford in December 2012, InterMotive did not add programmable inputs to the Upfitter Interface Module that InterMotive originally launched in 2010. However, InterMotive concedes that the PRPC, another new product which similarly has a CAN interface and an easy-to-use GUI that InterMotive released in 2014, furthermore has programmable inputs. InterMotive initially sent a PRPC prototype to Tom Spence at Kerr Industries in February 2014 for feedback and began selling the PRPC in July 2014.

As distinguished from whether the PRPC is like the Upfitter Interface Module, the parties do not dispute the basic similarities and differences between the two InterMotive products. Generally, the PRPC has the same functionality as the Upfitter Interface Module, plus additional functionality compared to the Upfitter Interface Module. In relation to the additional functionality, the PRPC is bigger, more capable, more complex, and more expensive than the Upfitter Interface Module.

The instruction manual admitted as Trial Exhibit 643 describes that the PRPC contains various "configurable" or "programmable" outputs and that InterMotive's programming software "allows logical combinations (AND, OR, =, >, <) of various vehicle data to control an output." ECF No. 287-1, PageID.12419. As well, the PRPC "provides access to a broad range of vehicle data" and also has various inputs that "can be used as part of the programmable logic." *Id.* Additionally, the

36

instruction manual describes some inputs as being "High/Low Configurable." *Id.*, PageID.12431. Consistent with the instruction manual, Schafer testified that the PRPC has programmable inputs. ECF No. 253, PageID.10023. Likewise, Andrews testified that he studied the circuit board and determined that the PRPC has a chip for implementing programmable inputs made by the Microchip company. ECF No. 242, PageID.9082–9084.

As to the differences compared to the Upfitter Interface Module, Schafer explained that the PRPC "was developed to be kind of the central brain for an entire multiplex system to control a vehicle." ECF No. 253, PageID.10023. In the vehicle, the PRPC operates as part of a control system that includes the PRPC as the "main unit," as well as "ancillary devices" that the PRPC requires to function. *Id.* As described by Schafer, "it's a bus controller basically, it could control an entire bus vehicle." ECF No. 255, PageID.10189. For purposes of communicating with the vehicle, the PRPC not only reads CAN messages from the CAN bus, but also has the ability to issue "active commands" by writing onto the CAN bus. ECF No. 253, PageID.10025–10026. By contrast, the Upfitter Interface Module is "read-only" and "never transmitted on the CAN bus." *Id.*, PageID.10026.

Moreover, the PRPC contains more inputs and more outputs. With respect to the inputs, the instruction manual describes that the PRPC has ten "general purpose" inputs, as well as one "analog" input and one

"dedicated ignition" input. ECF No. 287-1, PageID.12419. With respect to the outputs, Schafer explained that the PRPC "handles a lot of power." ECF No. 253, PageID.10023. In addition to eight "low current" outputs, the instruction manual describes that the PRPC has eight "relay" outputs. ECF No. 287-1, PageID.12419. As to the relay outputs, Schafer explained that the PRPC includes large relays to provide high power outputs that give users the ability to control upfit equipment that requires more power. Likewise, the PRPC has a large, 80 amp power cable to handle the additional power. For reference, Andrews similarly explained that the PRPC has "very large relays" and "one of the reasons this is so large is that it's meant for controlling things that require a lot of power." ECF No. 242, PageID.9088–9089. Although qualifying that "the fact is it's still operating in more or less the same way," Andrews explained that the Upfitter Interface Module "really can't provide much power at all" and "that's a significant difference in the kinds of devices that it's going to operate."

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the PRPC does not practice the trade secret. Although InterMotive conceded that the PRPC has programmable inputs, InterMotive disputed Ford's theory that the PRPC is like the Upfitter Interface Module.

As summarized by Andrews, the PRPC has "all the same functionality of a UIM plus some higher current capacity and some

additional input features." Given that the PRPC has programmable inputs, Andrews testified that the PRPC discloses the trade secret because "I'd say the things that are supposedly secret are publicly available than even if there are other things that sort of renders the secret things not secret anymore." ECF No. 242, PageID.9089. On the other hand, Schafer testified that the PRPC does not disclose the trade secret because "it has to be in the type of product that you're talking about" and "there were no other devices like the UIM that had that." ECF No. 255, PageID.10186–10187.

As instructed by the Sixth Circuit, a district court's role in deciding a motion for judgment as a matter of law is to view the evidence in the light most favorable to the non-moving party, without weighing the evidence, questioning the credibility of the witnesses, or substituting its own judgment for that of the jury. *K & T Enters.*, 97 F.3d at 175–76. Here, the parties presented a dispute concerning whether the PRPC is sufficiently similar to the Upfitter Interface Module to disclose the trade secret or sufficiently different from the Upfitter Interface Module to avoid disclosing the trade secret. Although Andrews testified for Ford that the PRPC is like the Upfitter Interface Module, the jury could have reasonably relied instead on Schafer's and Pimentel's testimony for InterMotive that the PRPC is not like the Upfitter Interface Module.

### c) Original Upfitter Interface Module

The third prior art module that Ford argues practices the trade secret is the original InterMotive Upfitter Interface Module. InterMotive launched the original Upfitter Interface Module in 2010. Versions of the original Upfitter Interface Module include the UIM401, which came to be called the Phase 0 module, and the UIM501, the Ford-specific Phase 1 module introduced at the 2012 NTEA show. The original Upfitter Interface Module is the prototypical single module with a CAN interface and an easy-to-use GUI. As such, the dispute between the parties is whether the original Upfitter Interface Module has programmable inputs.

As discussed above, Schafer testified that, in addition to a "fixed" input, the three types of inputs relevant to the active high and active low configurations include two types of configurable inputs: (1) a "hardware configurable" input and (2) a "programmable" a.k.a. "firmware configurable" input. Generally, both types of configurable inputs are configurable as active high or active low, except that hardware configurable inputs are configured using hardware, while programmable inputs are configured using firmware during programming. For one version of the original Upfitter Interface Module, the brochure admitted as Trial Exhibit 998 describes the "Switch Inputs" as being "Power/Ground." ECF No. 287-10, PageID.12458. Consistent with the brochure, Schafer testified that the original Upfitter Interface Module

40

has configurable inputs. ECF No. 253, PageID.10030–10031. However, Schafer explained that not all configurable inputs are programmable inputs. *Id.*, PageID.10030. As between the two types of configurable inputs, Schafer testified that the inputs are hardware configurable inputs, not the programmable inputs of the trade secret. *Id.*, PageID.10030–10031.

On the other hand, Ford presented a different theory on the type of input used in the original Upfitter Interface Module. Under Ford's theory, the inputs are not only configured using hardware, but also implemented in a way that requires programming. Ford argues that the inputs are therefore effectively the same to upfitters as programmable inputs.

As the basis for Ford's theory, Andrews testified that the original Upfitter Interface Module has what he would call "bidirectional" inputs. ECF No. 242, PageID.9074–9075. Generally, the inputs are configured using hardware for compatibility with both 12 volt input signals and 0 volt input signals. *Id.*, PageID.9075. Compared to programmable inputs and the ability to configure the inputs using firmware, bidirectional inputs give users the ability to wire the input switches from either side of the battery and leave the inputs to configure themselves. *Id.*, PageID.9063–9064. As described by Andrews, the inputs are implemented with a circuit where "you just put kind of small resistors,

actually high-value resistors, in the circuit" such that "now it works both ways" and "it's able to do both." *Id.*, PageID.9063.

Andrews testified that, as with programmable inputs, implementing bidirectional inputs also requires programming by users. *Id.*, PageID.9063–9065. For background, Andrews explained that the relationship between software, firmware, and logic is that firmware and logic are different kinds of software loaded into the module during programing. *Id.*, PageID.9061. Generally, while programmable inputs involve using the firmware part of the software to configure the inputs, bidirectional inputs involve configuring the logic part of the software that maps the inputs to the outputs. *Id.* Specifically, because bidirectional inputs give users the ability to wire the input switches from either side of the battery, users have to configure the logic to make sure that the input will be read as logically true in response to the voltage of the input signal that the input switch is wired to generate. *Id.*, PageID.9063–9064. As summarized by Andrews, the difference between bidirectional inputs and programmable inputs is that users "would configure the logic to respond appropriately without having to configure the pin." *Id.*, PageID.9076. Put another way, users "wouldn't have to program the pin, but they would have to change the logic." *Id.*, PageID.9065. However, since their implementations require programming either way, Andrews testified that bidirectional inputs are effectively the same to upfitters as programmable inputs. *Id.*

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the original Upfitter Interface Module does not practice the trade secret. As instructed by the Sixth Circuit, a district court's role in deciding a motion for judgment as a matter of law is to view the evidence in the light most favorable to the non-moving party, without weighing the evidence, questioning the credibility of the witnesses, or substituting its own judgment for that of the jury. *K & T Enters.*, 97 F.3d at 175–76. Contrary to Ford's interpretation of the evidence, addressed below, the parties presented two different theories on the type of input used in the original Upfitter Interface Module. Andrews testified for Ford that the inputs are effectively programmable inputs in the form of bidirectional inputs whose implementation requires programming. At the same time, Andrews acknowledged on cross-examination that he never attempted to verify this point by actually programming an InterMotive module. ECF No. 250, PageID.9445–9446. On the other hand, Schafer testified for InterMotive that the inputs are hardware configurable inputs and nothing more. Speaking from personal knowledge, Schafer described that the inputs are "hardware configurable" in the sense that InterMotive custom-builds the input with a pull-down resistor for the active high configuration or with a pull-up resistor for the active low configuration. ECF No. 253, PageID.10030–10031.

43

Accordingly, InterMotive presented substantial countervailing evidence for the jury to reasonably reject Ford's theory and find that the original Upfitter Interface Module does not practice the trade secret. As a whole, the evidence on the type of input used in the original Upfitter Interface Module did not preclude the jury from believing Schafer's testimony that the inputs are hardware configurable inputs, not programmable inputs, much less compel the jury to instead believe Andrews's testimony that the inputs are bidirectional inputs and that bidirectional inputs are effectively the same as programmable inputs.

To address Ford's interpretation of the evidence, the Court is not persuaded that Schafer's testimony for InterMotive and Andrews's testimony for Ford can be fit together in a way that shows that the original Upfitter Interface Module has programmable inputs. For reference, the reasoning for Ford's argument that "InterMotive's earlier UIM practiced the alleged trade secret" is reproduced in full below:

> At trial, InterMotive attempted to distinguish this earlier UIM because the inputs were internal to themselves "hardware" configurable as opposed to "software" configurable. ECF No. 253, PageID.10030–10031 (Mr. Schafer testifying and attempting to distinguish "hardware configurable" inputs from software). But from the upfitting trade's perspective, the inputs were "programmable" because the upfitter connected his or her laptop to the UIM to configure—with "software"—the UIM inputs as "active high" or "active low." ECF No. 242, PageID.9063–9065 (Mr.

> Andrews explaining different means to achieve
> programmability looking same to upfitter).

ECF No. 286, PageID.11834 (emphasis omitted).

Basically, Ford argues that the original Upfitter Interface Module has programmable inputs because the inputs are configured as active high or active low using software. As best understood by the Court, Ford's argument relies on three assumptions: (1) that the original Upfitter Interface Module has bidirectional inputs; (2) that programmable inputs and bidirectional inputs are both configured as active high or active low using software; and (3) that, for this reason, bidirectional inputs are a form of programmable inputs. But the evidence does not support any of the three assumptions. Rather, Ford conflates both the different theories presented by the parties and the different ways bidirectional inputs and programmable inputs work.

With respect to the first assumption, that the original Upfitter Interface Module has bidirectional inputs, Ford cites Andrews's testimony that the inputs are bidirectional inputs, as well as Schafer's testimony that the inputs are hardware configurable inputs. A comparison of Ford's argument to the cited evidence shows that Ford attempts to recast Schafer's testimony by putting the words "internal to themselves" in Schafer's mouth before the term "hardware configurable." In doing this, Ford creates the impression that "hardware configurable"

is another way of saying "bidirectional," and thereby suggests that Schafer agreed with Andrews that the inputs are bidirectional inputs.

However, Schafer's description of hardware configurable inputs bears no resemblance to Andrews's description of bidirectional inputs. As opposed to bidirectional inputs that configure themselves to give users the ability to wire the input switches from either side of the battery, Schafer described that the inputs are "hardware configurable" in the sense that InterMotive custom-builds the input for the active high configuration or for the active low configuration. In fact, when Ford sought an admission from Schafer that the inputs are bidirectional inputs, Schafer testified that "I don't know what you mean by bidirectional inputs." ECF No. 250, PageID.9537. Similar to his above description of the sense in which the inputs are "hardware configurable," Schafer explained that the original Upfitter Interface Module "was built differently to be able to receive 12 volts or 0 volts on the inputs." *Id.*

With respect to the second assumption, that programmable inputs and bidirectional inputs are both configured as active high or active low using software, Ford cites Schafer's testimony that programmable inputs are configured using firmware during programming, followed by Andrews's testimony that implementing bidirectional inputs also requires programming by users. Comparing Ford's argument to Schafer's testimony and Andrews's testimony, it can be seen that, in place of the terms "firmware" and "logic," Ford attributes the more general word

"software" to Schafer in the context of programmable inputs and to Andrews in the context of bidirectional inputs. Moreover, in the context of bidirectional inputs, it can be seen that Ford puts the words "configure the inputs using software" in Andrews's mouth in place of the words "configure the logic." Building on the assumption that the original Upfitter Interface Module has bidirectional inputs, Ford blurs the distinction between the different ways bidirectional inputs and programmable inputs work.

But in fact, Schafer never used the word "software" when distinguishing between the "hardware configurable" inputs used in the original Upfitter Interface Module and the "programmable or firmware configurable" inputs of the trade secret. ECF No. 253, PageID.10030– 10032. Consistent with Schafer's testimony, Andrews explained that the "logic" relevant to bidirectional inputs and the "firmware" relevant to programmable inputs are two different parts of the "set of software" loaded into the module during programming. ECF No. 242, PageID.9061. Moreover, Andrews never testified that bidirectional inputs give users the ability to configure the inputs using software. As set forth above, Andrews explained that, generally, while programmable inputs involve using the firmware part of the software to configure the inputs, bidirectional inputs involve configuring the logic part of the software that maps the inputs to the outputs. *Id.* As described by Andrews, "if you have a bidirectional one," "it works both ways," but the voltage of the input

signal "might not work in your logic" and "you need to do something about that" "in your logic" during programming "and then your logic would work." *Id.*, PageID.9063–9064. By contrast, with programmable inputs, the firmware for configuring the inputs would be "a different part of the software" and "something separate where you're actually configuring how the—how the input pin reacts to whether it's switched to the battery or switched to ground." *Id.*, PageID.9060. For reference, Pimentel similarly explained that the technology of programmable inputs "is very specific" and "there is a misconception as to what that means" because "it's not really programming the inputs" but "really configuring the input." ECF No. 264, PageID.10752.

With respect to the third assumption, that bidirectional inputs are a form of programmable inputs, Ford cites Andrews's testimony that bidirectional inputs are effectively the same to upfitters as programmable inputs. However, as distinguished from presenting Ford's theory that they are effectively the same to upfitters, Andrews never went so far as to testify that bidirectional inputs are a form of programmable inputs. In fact, Andrews testified that bidirectional inputs are "not programmable," but instead, are "another way" compared to "ways of making it programmable." ECF No. 242, PageID.9061. As set forth above, as summarized by Andrews, the difference between bidirectional inputs and programmable inputs is that users "would configure the logic to respond appropriately without having to configure

48

the pin." *Id.*, PageID.9076. Put another way, users "wouldn't have to program the pin, but they would have to change the logic." *Id.*, PageID.9065.

As to the original Upfitter Interface Module, the Court is not persuaded by Ford's secondary argument that InterMotive's distinctions are "too minor" to afford trade secret protection. Ford's argument is directed to "any low-level distinction" between the inputs used in the original Upfitter Interface Module and the programmable inputs of the trade secret. ECF No. 286, PageID.11834. The Court can only assume that Ford's argument refers, not to InterMotive's distinction involving hardware configurable inputs, but to Ford's distinction involving bidirectional inputs. However, as set forth above, the evidence on the type of input used in the original Upfitter Interface Module did not preclude the jury from relying on Schafer's testimony that the inputs are hardware configurable inputs, much less compel the jury to instead rely on Andrews's testimony that the inputs are bidirectional inputs.

### d) Zeta Proposal

The fourth prior art module that Ford argues practices the trade secret is the Zeta proposal. Ford presented the Zeta proposal in connection with testimony from Ford of Europe's Robert Richardson. As InterMotive points out, the Zeta proposal is merely an internal Ford of Europe document, not an actual commercially available product. Richardson explained that Zeta was an existing supplier and that the

proposal was a potential solution for an interface module on Ford Transit vehicles for the European upfit marketplace. ECF No. 238, PageID.8658–8661. Richardson testified that the Zeta proposal was prepared at his request and received by Ford of Europe in February 2012. *Id.*, PageID.8658–8659.

The document admitted as Trial Exhibit 642, entitled "CAN Gateway Proposals," describes the Zeta proposal as a "modular concept" for a system that includes a CAN gateway based on an existing controller, plus the ability for users to add I/O modules and to program the I/O modules with a GUI. ECF No. 287, PageID.12410–12413. According to the document, each I/O module is an "Intelligent unit with programmable I/O." *Id.*, PageID.12412.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the Zeta proposal does not practice the trade secret. According to Ford, "InterMotive did not dispute" that Zeta proposed a "CAN Upfitter Interface Module" that "included programmable inputs." ECF No. 286, PageID.11834. Contrary to Ford's assertion, InterMotive disputed both Ford's theory that the Zeta proposal has programmable inputs and Ford's theory that the Zeta proposal is like the Upfitter Interface Module.

As to why the Zeta proposal practices the trade secret, Richardson testified that the document "is a proposal of a CAN Upfitter Interface Module" and that he understands the phrase "Intelligent unit with

50

programmable I/O" to mean "fully programmable in all areas with programmable inputs and outputs." ECF No. 238, PageID.8658, 8667.

On the other hand, Pimentel distinguished the Zeta proposal. With respect to programmable inputs, Pimentel disagreed with Richardson and testified that "I believe he's speculating because there is no explicit way to actually say that it's programmable inputs." ECF No. 264, PageID.10753. Pimentel noted that "I/O" stands for "input/output," but explained that the term "programmable I/O" is "extremely generic" and "so widely used in the computer industry, it's like saying software." *Id.*, PageID.10751–10752. Moreover, Pimentel explained that "normally when you say programmable, you program the outputs normally" and "do not program the inputs." *Id.*, PageID.10752. By contrast, the technology of programmable inputs "is very specific" and "there is a misconception as to what that means" because "it's not really programming the inputs" but "really configuring the input." *Id.* Correspondingly, Pimentel testified that the term "programmable I/O" does not designate programmable inputs unless "you qualify it explicitly somewhere else." *Id.*, PageID.10753. Likewise, Pimentel testified that the Zeta proposal does not have programmable inputs because the remainder of the document does not describe anything about configuring the inputs. *Id.*

Additionally, Pimentel testified that the Zeta proposal is not like the Upfitter Interface Module because the system is not a single module, has a CAN gateway, not a CAN interface, and does not have an easy-to-

use GUI. *Id.*, PageID.10748–10751, 10755–10758. With respect to the GUI, Pimentel explained that upfitters would need at least one week of classes to program the I/O modules because the GUI depicted in the document uses PLC programming technology designed for engineers. *Id.*, PageID.10756–10758.

Accordingly, InterMotive presented substantial countervailing evidence for the jury to reasonably reject Ford's theories and find that the Zeta proposal does not practice the trade secret. Although Richardson testified for Ford that the Zeta proposal practices the trade secret, the jury could have reasonably relied instead on Pimentel's testimony for InterMotive that the Zeta proposal does not have programmable inputs and is not like the Upfitter Interface Module.

### 3.   Summary and Conclusion

Having considered the evidence presented at trial, the Court upholds the jury's presumed finding that no prior art module individually practices the trade secret. As to the prior art modules that InterMotive concedes have programmable inputs, the InPower VCMS and the InterMotive PRPC, the jury could have reasonably found that they fail to satisfy the trade secret definition for lack of a device like the Upfitter Interface Module. On the other hand, as to the original InterMotive Upfitter Interface Module, the prototypical single module with a CAN interface and an easy-to-use GUI, the jury could have reasonably found that it fails to satisfy the trade secret definition for lack of programmable

inputs. As to the remaining prior art module, the Zeta proposal, the jury could have reasonably found that it fails to satisfy the trade secret definition both for lack of programmable inputs and for lack of a device like the Upfitter Interface Module. As well, given that the Zeta proposal is merely an internal Ford of Europe document, not an actual commercially available product, the jury could have reasonably disregarded the Zeta proposal as irrelevant to the public domain in the first place.

The Court notes that, after taking the prior art modules in turn and framing the issues in terms of whether they individually practice the trade secret, Ford makes a one-sentence catch-all argument that the prior art modules as a whole disclose the trade secret. "Even if," Ford argues, "some of the above products lacked some aspect of the asserted trade secret [], InterMotive did not demonstrate that, taking these products as a whole, the broad concept of a device 'like a UIM' with 'programmable inputs' is an actionable trade secret." ECF No. 286, PageID.11835.

In support of its argument, Ford cites to a district court's conclusion that the plaintiff's concept for a user interface for operating a computer hard drive was not protectable as a trade secret because the evidence submitted by the defendants demonstrated that the concept was generally known. *Convolve, Inc. v. Compaq Comput. Corp.*, No. 00-cv-5141, 2011 U.S. Dist. LEXIS 152762, at *49–*53 (S.D.N.Y. Oct. 6, 2011)

(denying trade secret protection to plaintiff's concept for a "Quick and Quiet" user interface that enables the user to choose quicker, but noisier operation or slower, but quieter operation), *aff'd in relevant part*, 527 F. App'x 910, 922 (Fed. Cir. 2013). As the only supporting analysis, Ford adds the following parenthetical explanation to the case citation: "rejecting assertion that 'each piece of evidence is missing some element of [the claimed trade secret]' where, taking the prior art products as a whole, the relevant concept 'was well known in the industry.'" ECF No. 286, PageID.11835 (quoting *Convolve*, 2011 U.S. Dist. LEXIS 152762, at *53).

As Ford points out, the district court concluded that the concept "was well known in the industry" notwithstanding the plaintiff's contention that "each piece of evidence is missing some element" of the concept. However, the district court did not, as Ford suggests, deny trade secret protection because individual deficiencies in each piece of evidence were overcome by "taking the prior art products as a whole." Rather, the district court explained that the evidence demonstrated not only that several other companies had contemplated the concept, but also that the concept had been disclosed in a published patent. *Convolve*, 2011 U.S. Dist. LEXIS 152762, at *51–*53. In, as Ford puts it, "rejecting" the plaintiff's contention that "each piece of evidence is missing some element" of the concept, the district court was saying that the plaintiff was incorrect. The court did not, as Ford suggests the Court should do

here, summarily conclude that the concept was unprotectable anyway because the evidence as a whole disclosed every element.

Here, the trade secret is a combination of two elements: (1) a device like the Upfitter Interface Module; and (2) programmable inputs. Ford's argument amounts to the conclusion that the combination is not a protectable trade secret because both elements are in the public domain. However, the Sixth Circuit has held that, under Michigan law, "a new combination of known steps or processes can be entitled to trade secret protection." *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 442 (6th Cir. 1980). *See also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410–11 (6th Cir. 2006) (collecting cases and citing *Arco* with approval in case governed by MUTSA as consistent with line of authority recognizing that a trade secret can exist in a combination of elements each of which by itself is in the public domain).

Ford does not identify, much less apply, applicable legal standards for denying trade secret protection to new combinations of known elements. Likewise, the Court will not attempt to identify and apply the applicable legal standards in the first instance. In light of the jury's presumed finding that no prior art module individually practices the trade secret, and in the absence of a fully developed argument to the contrary, the Court is not persuaded that the specific combination InterMotive claims as a trade secret was generally known. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is

entitled to judgment as a matter of law on InterMotive's trade secret misappropriation counterclaim because "the use of programmable inputs in a device like the Upfitter Interface Module" was generally known.

### C.    Whether The Trade Secret Derives Independent Economic Value From Secrecy

Ford's second ground for judgment as a matter of law on InterMotive's trade secret misappropriation counterclaim is that "the use of programmable inputs in a device like the Upfitter Interface Module" is an unprotectable "product idea" that does not derive independent economic value from secrecy. Ford's argument involves a comparison of the information InterMotive claims as a trade secret to the statutory definition of a trade secret under the MUTSA. Under the MUTSA, "the use of programmable inputs in a device like the Upfitter Interface Module" must in relevant part "[d]erive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." M.C.L. § 445.1902(d)(i).

In connection with the statutory "independent economic value" requirement, Ford's argument centers on a hypothetical scenario where InterMotive exploited the trade secret by adding programmable inputs to the Upfitter Interface Module. For purposes of its instant ground for judgment as a matter of law, Ford does not dispute that the trade secret has economic value. Moreover, Ford does not repeat its above arguments

that the trade secret was generally known through disclosure in InterMotive products. Rather, Ford cites the relationship between the two elements to argue that the trade secret does not derive independent economic value from secrecy. In this regard, the Court notes that, while Ford invokes the evidence presented at trial, Ford's argument does not appear to correspond to a particular issue submitted to the jury or implicate a specific finding made by the jury.

Ford argues that the information InterMotive claims as a trade secret, "the use of programmable inputs in a device like the Upfitter Interface Module," has two characteristics of a purportedly unprotectable "product idea." First, Ford argues that InterMotive could obtain economic value from the trade secret only by selling an Upfitter Interface Module with programmable inputs. Second, Ford argues that selling an Upfitter Interface Module with programmable inputs would immediately disclose the trade secret. According to Ford, the MUTSA does not protect a product idea because an idea for a product does not fall within the statutory definition of a trade secret. Specifically, Ford argues that a product idea cannot derive independent economic value from secrecy because the act required to obtain economic value from the idea, selling the product, destroys the secrecy of the idea.

In opposition, as best understood by the Court, InterMotive responds to a different argument. As stated by InterMotive, "Ford argues that the trade secret became public through Ford's sales in 2016." ECF

No. 289, PageID.12487. Referring to Ford's actual sales rather than InterMotive's hypothetical sales, InterMotive argues that "any sales of modules did not destroy the trade secret" and that "Ford cannot benefit from its own actions in allegedly publicizing it." *Id.*, PageID.12486–12487. Likewise, InterMotive does not respond to Ford's argument that the MUTSA does not protect a product idea. Nonetheless, while not in the context of Ford's interpretation of trade secret law, InterMotive principally disputes one of Ford's underlying factual contentions. Specifically, InterMotive argues that selling an Upfitter Interface Module with programmable inputs does not disclose the trade secret.

As explained below, the Court finds that the information InterMotive claims as a trade secret, "the use of programmable inputs in a device like the Upfitter Interface Module," falls within the statutory definition of a trade secret. In support of its argument to the contrary, Ford cites the Sixth Circuit's *Richter* and *Stromback* decisions. According to Ford, *Richter* and *Stromback* stand for the proposition that the MUTSA does not protect a product idea because an idea for a product cannot derive independent economic value from secrecy. However, having considered the evidence presented at trial in light of the applicable trade secret law, the Court is not persuaded that the principles articulated by the Sixth Circuit to deny trade secret protection in those cases apply to the information InterMotive claims as a trade secret in this case.

58

In *Richter*, the alleged trade secret was directed to the plaintiff's concept for fashion-coordinated school supplies. *Richter v. Westab, Inc.*, 529 F.2d 896, 898 (6th Cir. 1976). The plaintiff, a firm that created and developed product ideas and marketing strategies, presented the concept to the defendant, the nation's largest manufacturer of school supplies. *Id.* According to the concept, the defendant would coordinate the designs used on binders with fashion trends in the clothing industry, and market the resulting fashion binders in fashion magazines rather than the usual trade journals. *Id.*

Following the presentation, the plaintiff delivered samples of interchangeable binder covers, but the defendant rejected the plaintiff's designs. *Id.* After the defendant independently developed its own designs and utilized the concept for several fashion binder lines, the plaintiff sued the defendant to recover royalty damages under two theories of recovery. *Id.* at 898–99. In addition to an express contract to pay a royalty on all sales of fashion binders, the plaintiff alleged that the defendant breached an implied contract to pay a royalty for the use of the plaintiff's trade secret. *Id.* at 899. After finding that the agreed upon terms covered only fashion binders carrying specific designs to be furnished by the plaintiff and accepted by the defendant, the Sixth Circuit found that the defendant did not breach the express contract because the defendant developed its own designs. *Id.* Additionally, the Sixth Circuit found that

no implied contract arose because the concept was not a trade secret. *Id.* at 900.

The Sixth Circuit held that the plaintiff's concept for fashion-coordinated school supplies was not a trade secret because the concept did not fall within the common law definition of a trade secret. *Id.* As the Sixth Circuit explained, the case was governed by Ohio law, and Ohio courts at the time followed the common law definition of a trade secret from Section 757 of the Restatement of Torts. *Id.* at 897, 900 & n.1 (quoting definition from Ohio case and noting that definition was taken from the Restatement). *See also Hayes-Albion*, 364 N.W.2d at 614 (noting that the Restatement "provides useful guidelines that have been widely adopted"). As set forth in Comment b to Section 757, the Restatement defines a trade secret as follows:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. … A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.

RESTATEMENT OF THE LAW, TORTS § 757 cmt. b (AM. LAW INST. 1939).

In applying the common law definition, the Sixth Circuit focused on the requirement that information must be "used in one's business" to constitute a trade secret. *Richter*, 529 F.2d at 900. The Sixth Circuit concluded that trade secret law does not protect a marketing concept or a new product idea because, once implemented, they do not by secrecy create a "continuing" competitive advantage. *Id.* As explained by the Sixth Circuit:

> This definition does not include a marketing concept or a new product idea. Trade secret law is designed to protect a continuing competitive advantage, which a company enjoys due to confidential information it possesses, from destruction due to disclosure by a departed former employee. A marketing concept does not by confidentiality create a continuing competitive advantage because once it is implemented it is exposed for the world to see and for competitors to legally imitate.

*Id.*

In *Stromback*, the plaintiff asserted a trade secret claim under the MUTSA based on the defendant's alleged misappropriation of the plaintiff's copyrighted poem and screenplay into a movie. *Stromback v. New Line Cinema*, 384 F.3d 283, 302–03 (6th Cir. 2004). The Sixth Circuit held that the poem and screenplay were not trade secrets as a matter of law because they did not fall within the statutory definition of a trade secret. *Id.* at 305. In applying the statutory definition, the Sixth Circuit directed its analysis to the requirement that "information alleged

to be a trade secret must '[d]erive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.'" *Id.* (quoting M.C.L. § 445.1902(d)(i)).

The Sixth Circuit concluded that trade secret law does not protect original literary works because they derive value only through public exploitation, not from secrecy. *Id.* As explained by the Sixth Circuit:

> Thus, the essence of a trade secret is that it derives its value from secrecy. Here, Stromback could not possibly argue that his poem and screenplay had "independent economic value" because he kept them secret. Those works would have "independent economic value" only if they were exploited publicly through broad dissemination.

*Id.*

As a preliminary matter, the Court will address InterMotive's principle argument in opposition to Ford's request for judgment as a matter of law. As distinguished from Ford's interpretation of trade secret law, addressed below, InterMotive principally disputes one of Ford's factual contentions. Specifically, InterMotive argues that selling an Upfitter Interface Module with programmable inputs would not disclose the trade secret. InterMotive does not dispute the general proposition that, when a trade secret is an idea for a product, marketing a product

embodying the idea reveals the trade secret to the public. However, InterMotive cites the complexity of the modules at issue in this case, including that the Upfitter Interface Module has a combination of hardware and firmware, to argue that discovering the trade secret would require reverse engineering. InterMotive argues that Ford's failure to present a theory on how long reverse engineering would take and how much reverse engineering would cost is fatal to Ford's argument. Likewise, while InterMotive addresses Ford's reliance on the Sixth Circuit's *Richter* and *Stromback* decisions, it does so only in furtherance of its reverse engineering argument. Specifically, InterMotive argues that *Richter* and *Stromback* are "distinguishable on their facts" because the fashion binders at issue in *Richter* are "nothing like a sealed module with hardware and firmware" and the poem and screenplay at issue in *Stromback* are "obviously not the same as a module with hardware and firmware." ECF No. 289, PageID.12489.

Although the information InterMotive claims as a trade secret is "the use of programmable inputs in a device like the Upfitter Interface Module," InterMotive's argument is directed to "the trade secret products" and "the trade secret technology." However, the Upfitter Interface Module itself is not protected. As Ford points out, InterMotive concedes that the Upfitter Interface Module that InterMotive originally launched in 2010 was in the public domain and susceptible to reverse engineering. Moreover, in the context of the Upfitter Interface Module,

programmable inputs are a user-facing feature intended for use by upfitters who purchase a module. Specifically, the whole point of implementing programmable inputs is giving users the ability to configure the inputs as active high or active low during programming. Accordingly, it is beyond dispute that selling an Upfitter Interface Module with programmable inputs would disclose the trade secret.

In support of its argument, InterMotive cites the Michigan Court of Appeals' *Kubik* decision. The Court finds *Kubik* instructive, but not for the proposition that selling an Upfitter Interface Module with programmable inputs would not disclose the trade secret. In *Kubik*, the trade secret was directed to the plaintiff's manifold design information. *Kubik*, 224 N.W.2d at 82. The manifold was a modification to otherwise standard hydrostatic drive units, which the plaintiff sold as integrated packages to customers in the automation industry for use as components in transfer and conveyor systems. *Id.* The parties agreed that the manifold design information could be lawfully discovered by reverse engineering any of the marketed units. *Id.* at 88. Based on varying estimates, the record showed that reverse engineering would take at least 30 hours and perhaps up to 4 months. *Id.* at 88, 93. At the same time, the record showed that the packages were not easily subject to observation and examination, and that it would be difficult to obtain a marketed unit from a customer for inspection. *Id.* at 93.

In combination with these factors, the Michigan Court of Appeals addressed the trade secret status of the manifold design information for two different extents of marketing. Although the plaintiff had marketed 22 units prior to the misappropriation, the Michigan Court of Appeals concluded that the plaintiff was entitled to judgment because the "limited extent" of marketing did not constitute a public disclosure. *Id.* By contrast, considering that the plaintiff had subsequently marketed a "large number" of units, the Michigan Court of Appeals summarily concluded that the plaintiff was not entitled to a permanent injunction because "other competitors in the industry could, and perhaps have, legally duplicated the equipment." *Id.* at 94–95.

On the other hand, as to the proposition that the MUTSA does not protect a product idea, the Court is not persuaded by Ford's conclusory application of the Sixth Circuit's *Richter* and *Stromback* decisions to the facts of this case. With respect to *Richter*, Ford merely labels the information InterMotive claims as a trade secret as an unprotectable "product idea." ECF No. 286, PageID.11835–11836. As Ford points out, in denying trade secret protection to the plaintiff's concept for fashion-coordinated school supplies, along with a "marketing concept," the Sixth Circuit distinguished a "trade secret" from a "new product idea." *Richter*, 529 F.2d at 900. However, the Sixth Circuit was applying the common law of trade secrets, and InterMotive asserts its trade secret misappropriation counterclaim under a Michigan statute, the MUTSA.

65

Contrary to Ford's back-to-back quotation of the MUTSA and *Richter* in order to suggest that the Sixth Circuit held that the MUTSA does not protect a product idea, the difference in the applicable trade secret law is not insignificant.

As the Sixth Circuit explained, the common law of trade secrets does not protect a product idea because an idea for a product is not itself "used in one's business" to afford a competitive advantage, and, conversely, once implemented, does not by secrecy create a "continuing competitive advantage." *Id.* And as the Sixth Circuit further explained, although the "used in one's business" requirement dictates against trade secret protection, courts developed the so-called "law of ideas," including submission-of-ideas law so that firms who specialize in product ideas and marketing strategies can protect their work product by contract. *Id.* at 900–02. On the other hand, relevant to whether the applicable trade secret law in this case protects a product idea, in an intentional departure from the Restatement, the MUTSA eliminated the "used in one's business" requirement. In its place, the MUTSA codified the statutory "independent economic value" requirement, and furthermore established protection for information that derives either "actual or potential" independent economic value from secrecy. As explained by Milgrim, a leading treatise on trade secret law, the statutory definition of a trade secret "differs from the Restatement definition and is broad enough to encompass matter traditionally analyzed at the common law under

66

'submission-of-idea,' not trade secret principles." 4 Milgrim on Trade Secrets § 9.05(4).

In addition to the difference in the applicable trade secret law, Ford does not grapple with what the Sixth Circuit meant by the term "new product idea" in the first place. To the extent the principles articulated by the Sixth Circuit operate to deny trade secret protection under the MUTSA, the Court finds *Richter* instructive, but not for the proposition that the information InterMotive claims as a trade secret does not fall within the statutory definition of a trade secret. At some level, every product embodies the idea for the product. In the context of the law of ideas, rather than the trade secret context, the Sixth Circuit wrote at length to delimit the contours of unprotectable product ideas. Specifically, and to InterMotive's point that the case is distinguishable on its facts, the Sixth Circuit made clear that it was referring to an abstract idea for a product, not the idea embodied by an actual, concrete product. After denying trade secret protection, the Sixth Circuit applied "the principle denying legal protection to abstract ideas" to conclude that protection was not available elsewhere in the law. *See Richter*, 529 F.2d at 902. The Sixth Circuit characterized the case as involving an "abstract idea" that "lacks concreteness." *Id.* at 901–02. As explained by the Sixth Circuit, a concept "is of little use until solidified into a concrete application" and an idea "has little commercial value until translated into a specific utilization." *Id.* at 902.

67

Here, by contrast, Schafer testified that InterMotive shared the trade secret with Ford in electronic and hard copies of the Phase 2 specification, in phone conversations about the design of the Phase 2 module, and in the Phase 2 prototype itself, which InterMotive delivered to Ford at the December 2012 demonstration. ECF No. 252, PageID.9900–9909. Notably, Schafer testified that the Phase 2 prototype was a fully functional working prototype. ECF No. 255, PageID.10161–10162. Moreover, Schafer testified that InterMotive delivered wiring harnesses for installing the module and a copy of the GUI for programming the module on a flash drive. ECF No. 251, PageID.9813–9814. While nearly all states have enacted the Uniform Trade Secrets Act on which the MUTSA is modeled, Ford does not cite any cases where a court has addressed analogous facts and held that trade secret law does not protect a product idea embodied by a working prototype.

With respect to *Stromback*, Ford merely cites the Sixth Circuit's conclusion that trade secret law does not protect original literary works because they derive value only through public exploitation. Without factual or analytical support, Ford adopts the Sixth Circuit's conclusion to argue that InterMotive could obtain economic value from the trade secret only by selling an Upfitter Interface Module with programmable inputs. However, whatever may be the case for a poem and screenplay, it defies common sense to say that information encompassed by a working prototype cannot derive independent economic value from secrecy. Like

68

all automakers, Ford itself surely maintains the secrecy of future products to protect the competitive advantage of being the first to market with new inventions.

Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to judgment as a matter of law on InterMotive's trade secret misappropriation counterclaim because "the use of programmable inputs in a device like the Upfitter Interface Module" is an unprotectable "product idea" that does not derive independent economic value from secrecy.

## VI.  TRADE SECRET DAMAGES ANALYSIS

Under the MUTSA, the plaintiff in a trade secret case "is entitled to recover damages for misappropriation." M.C.L. § 445.1904. The MUTSA provides that the damages the plaintiff may recover include "the actual loss caused by misappropriation" and "the unjust enrichment caused by misappropriation," and that in lieu of other methods, "the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty." *Id.*

### A.  Background

In its motion, Ford moves for judgment as a matter of law or in the alternative a new trial on unjust enrichment damages for trade secret misappropriation, which the jury awarded in the amount of $13,209,300 of Ford's profits. Before turning to Ford's motion, some background is helpful to understanding the issues raised by the parties.

### 1.    InterMotive's Unjust Enrichment Theories

As to InterMotive's counterclaims, the damages issues in this case have centered on Ford's profits. InterMotive did not seek any actual damages. Instead, InterMotive sought only disgorgement of Ford's profits under unjust enrichment theories. Ford offers its own version of the Upfitter Interface Module as an option on vehicles for the upfit marketplace, and the parties ultimately stipulated to over 90,000 sales where customers have "taken" the option and purchased the at-issue module when buying vehicles. Depending on the counterclaim, InterMotive sought to recover either Ford's "vehicle profits" (i.e., profits on sales of vehicles with the at-issue module) or Ford's "module profits" (i.e., profits on sales of the at-issue module itself).

For its trade secret misappropriation counterclaim, InterMotive asserted throughout this case that it is entitled to recover Ford's vehicle profits. Under InterMotive's theory, Ford's vehicle profits represent unjust enrichment "caused by" misappropriation because Ford's use of the trade secret enabled Ford to make "additional" (or "more") vehicle sales. During expert discovery, InterMotive argued that the trade secret drove vehicle sales, but did not disclose any analysis for determining the actual amount of additional vehicle sales. InterMotive acknowledged only that it has the burden to prove sales of vehicles with the trade secret, and argued that Ford has the burden to apportion vehicle sales not caused by Ford's use of the trade secret. At the pretrial stage, InterMotive similarly

70

argued that the trade secret drove "at least some" vehicle sales, and that Ford has the burden to establish the portion of vehicle sales attributable to factors other than the trade secret.

In parallel, Ford repeatedly argued that the rules from patent law apply to trade secret cases. Specifically, Ford reads unjust enrichment "caused by" misappropriation as requiring application of the "rule of apportionment" or the "entire market value rule" exception. In patent law, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). The Federal Circuit has held that the patentee must not only identify the "smallest salable unit embodying the patented invention," but also "estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). "The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). The Federal Circuit has held that to satisfy the entire market value rule, the patentee must prove that "the patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Power*

*Integrations*, 904 F.3d at 979. Applying these principles, Ford argued that InterMotive can only seek to recover Ford's module profits, not Ford's vehicle profits, and even then, only in proportion to the incremental value of its Upfitter Interface Module that is attributable to the trade secret.

## 2.    Burden of Proof

In the written briefs, the parties, as they have throughout this case in connection with InterMotive's unjust enrichment theories, dispute which party has what burdens in trade secret cases when damages are measured by unjust enrichment "caused by" misappropriation. At the pretrial stage, the Court issued an order addressing a number of last-minute issues raised by the parties, including the assignment of burdens in this case. ECF No. 227. Among other authorities, the Court recognized the Third Restatement of Unfair Competition, as well as Milgrim, a leading treatise on trade secret law. *Id.*, PageID.8301. According to both authorities, in connection with the burden of establishing sales of products with the trade secret, the plaintiff has the burden of proving causation between misappropriation and unjust enrichment. On the other hand, the defendant has the burden of proving what the parties refer to as apportionment, that is, establishing any portion of sales or profits that were not attributable to the trade secret.

Specifically, in Section 45, the Restatement provides that the plaintiff may recover "the actor's own pecuniary gain resulting from the

appropriation," and that the "primary factors" governing whether an award is appropriate include "the degree of certainty with which the plaintiff has established the fact and extent of … the actor's pecuniary gain resulting from the appropriation." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 (AM. LAW INST. 1995). In the commentary to Section 45, the Restatement explains that the "traditional form of restitutionary relief" is "an accounting of the defendant's profits on sales attributable to the use of the trade secret." *Id.* § 45 cmt. f. "The plaintiff is entitled to recover the defendant's net profits. The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits." *Id.*

Consistent with the Restatement, Milgrim explains that: "Needless to say, just as is the case for a plaintiff which seeks to establish its lost profits, where a plaintiff seeks entitlement to the defendant's profits attributable to the misappropriation, the plaintiff has a burden of establishing the basis of such contention." 4 Milgrim on Trade Secrets § 15.02(3)(c). "Where a plaintiff seeks to recover the defendant's profits resulting from the misappropriation, its burden is only to establish that the defendant achieved revenues from use of the trade secret. Where plaintiff meets that burden, defendant has the burden of proving permissible deductions from gross revenues." *Id.* § 15.02(3)(c)(i). "In addition to expenses, defendant may reduce its potential unjust

enrichment liability by establishing that a portion of its value of its product was attributable to something other than the misappropriated trade secret." *Id.* "Trade secret decisions, at least those under the UTSA, have almost uniformly followed the approach taken in copyright and trademark law, that is, they place the burden of proving permissible deductions from the defendant's profits on the defendant." *Id.* § 15.02(3)(f)(ii)(B).

In addition to these authorities, the Court recognized the general rule that the plaintiff has the burden of proving damages with reasonable certainty. ECF No. 227, PageID.8302. Rather than adopting Ford's proposal to apply the rules from patent law, the Court tailored the reasonable certainty standard and the applicable trade secret law to the particular facts and circumstances of this case. *Id.*, PageID.8299–8303. As noted above, InterMotive had argued that Ford's use of the trade secret caused Ford to make "additional" (or "more") vehicle sales. As well, at the time, InterMotive had signaled its intention to seek a percentage of Ford's vehicle profits. In light of InterMotive's unjust enrichment theories, the Court ruled, first, that InterMotive has the burden of proving causation between misappropriation and unjust enrichment, and second, that this includes both the fact and the actual amount of additional vehicle sales. *Id.*, PageID.8301–8303. On the other hand, in connection with declining to adopt Ford's proposal to apply the rules from patent law, the Court ruled that Ford has the burden of proving

apportionment in terms of establishing any setoffs or deductions. *Id.*, PageID.8302.

### 3.    Jury Instructions

The Court's ruling was incorporated into the jury instructions on unjust enrichment damages for trade secret misappropriation. In addition to incorporating the Court's ruling, the jury instructions were crafted to reflect the last-minute development that, in the alternative to Ford's vehicle profits, InterMotive was seeking to recover Ford's module profits. Previously, InterMotive had expressly focused on Ford's vehicle profits, not in the alternative to, but instead of Ford's module profits. For reference, the jury instructions state:

> InterMotive has the burden of proving its damages with reasonable certainty. Damages not based on evidence presented in this case or on speculation and conjecture are not recoverable, but damages are not speculative merely because they cannot be ascertained with mathematical precision.

> In this case InterMotive is seeking damages based on the unjust enrichment caused by Ford's misappropriation.

> In order to prove entitlement to unjust enrichment or disgorgement damages, InterMotive must prove by a preponderance of the evidence both (1) that Ford's use of the trade secret caused Ford to make additional vehicle sales, and (2) a reasonable estimation of the actual amount of additional vehicle sales caused by the misappropriation of the trade secret.

Alternatively, InterMotive seeks to recover the profits Ford gained from the sale of Ford's modules caused by the misappropriation of InterMotive's trade secret.

If InterMotive meets this burden with evidence as to the amount of additional vehicle or module sales that were caused by the misappropriation of the trade secret, the burden will then shift to Ford to prove its setoffs and deductions to arrive at the amount of vehicle or module profits from sales that were actually caused by the misappropriation of the trade secret.

For example, if InterMotive seeks a damages award based on a certain percentage or amount of Ford's vehicle or Ford's module profits, then InterMotive must prove that the trade secret drove that percentage or amount of vehicle or module sales.

If you find that InterMotive has not met its burden of proof in showing that Ford's unjust enrichment was caused by the misappropriation of the trade secret, a damages award based on Ford's vehicle or module profits would necessarily be speculative and therefore impermissible.

But if you find that InterMotive has shown by a preponderance of the evidence that Ford's use of the trade secret caused additional vehicle or module sales, and that the evidence provides a reasonable estimation of the amount of additional vehicle or module sales caused by the misappropriation of the trade secret, then you must award unjust enrichment damages to InterMotive in an amount of Ford's profits from

> such sales after deducting any setoffs or costs that
> Ford has shown should not be included in
> calculating the net profit.

ECF No. 266, PageID.11158–11160.

### 4.    The Jury's Award

At trial, the parties stipulated to Ford's vehicle sales and Ford's vehicle profits before calling their damages experts. ECF No. 264, PageID.10846–10847. Along with a stipulation that Ford's average per-unit vehicle profit was $8,790, the parties stipulated before the jury that: "From model year 2017 to the present, Ford has sold 92,365 vehicles worldwide with the Ford Upfitter Interface Module installed on the vehicle." ECF No. 265, PageID.10924. In the discussion of the stipulation at trial, the parties confirmed that the number of Ford's vehicle sales represents the number of Ford's module sales, meaning that their damages experts would only need to testify on Ford's module profits. ECF No. 264, PageID.10852.

With respect to Ford's module profits, the jury heard testimony from InterMotive's damages expert, Mr. Mark A. Robinson, and Ford's damages expert, Ms. Sara D. Rinke. Robinson testified for InterMotive that, in connection with $23,157,489 in revenues, Ford's profits on sales of 90,488 modules in North America were $15,913,350, corresponding to an average per-unit module profit of $176. *Id.*, PageID.10869–10871. Rinke testified for Ford that Ford's profits on sales of 92,360 modules

worldwide were $13,209,300, corresponding to an average per-unit module profit of $143. ECF No. 265, PageID.10930.

As set forth in the verdict form, the jury was asked to separately assess the amount of Ford's vehicle profits and the amount of Ford's module profits that were caused by Ford's use of the trade secret. ECF No. 247, PageID.9411. The jury awarded $0 of Ford's vehicle profits and $13,209,300 of Ford's module profits, the exact amount of Rinke's calculation for all of Ford's module profits. *Id.* In other words, while the jury did not award any of Ford's vehicle profits, the jury awarded unjust enrichment damages both on all of Ford's module sales and for the entirety of Ford's module profits on those sales. Accordingly, the jury presumably found that InterMotive proved that all of Ford's module sales were caused by Ford's use of the trade secret. Conversely, the jury presumably found that Ford did not establish that portions of Ford's module sales or Ford's module profits were attributable to factors other than the trade secret.

### 5. InterMotive's Causation Theory

In its motion, Ford challenges the sufficiency of InterMotive's evidence to support the jury's decision to award all of Ford's module profits. As Ford points out, the jury was instructed that InterMotive could meet its burden of proving causation "with evidence as to the amount of additional vehicle or module sales that were caused by the misappropriation of the trade secret." ECF No. 266, PageID.11159. In

opposition, InterMotive does not direct the Court to a discrete theory that the trade secret drove a particular percentage or amount of Ford's module sales. Rather, InterMotive cites evidence that InterMotive presented throughout trial in support of its trade secret misappropriation counterclaim, including a discrete theory for Ford's vehicle sales.

In an effort to prove that at least some of Ford's vehicle sales (and therefore vehicle profits) were caused by Ford's use of the trade secret, InterMotive presented a theory that the trade secret drove a percentage of Ford's vehicle sales. InterMotive presented its theory through testimony from InterMotive's former vice president of sales, Marc Ellison. In correlation with how often the benefits of using programmable inputs comes up in his interactions with customers, Ellison testified that the trade secret drove twenty percent of Ford's vehicle sales. ECF No. 255, PageID.10290–10293. For background, Ellison explained that Ford "knew that customers want and need" an Upfitter Interface Module and that adding the option "was integral to what Ford was saying they needed to do to be able to sell more vehicles." *Id.*, PageID.10286. Likewise, Ellison testified that, in addition to "some customers who are just going to be Ford customers," there is "a percentage of customers who are going to buy that vehicle because of this feature." *Id.* As described by Ellison, customers would buy a particular vehicle because of an option like the Upfitter Interface Module because "it gives them some ability to create

features on their vehicles" and "will help them build a better vehicle and make it easier to deliver what their customers want." *Id.*, PageID.10290.

Furthermore, Ellison testified that customers have expressed an interest in programmable inputs. *Id.*, PageID.10275. Ellison explained that customers are "always looking for easier ways to install" and "always looking for easier ways to accomplish their goals." *Id.* Generally, the use of programmable inputs makes design, installation, and packaging easier by giving users the ability to configure the inputs during programming, eliminating relays and reducing wiring, and allowing for a smaller package. *Id.*, PageID.10291–10293. As well, Ellison testified that there are instances where the interest in programmable inputs would drive customers to buy vehicles from Ford because its Upfitter Interface Module has the feature. *Id.*, PageID.10290–10291. Based on his experience that the benefits of using programmable inputs "comes up probably 20 percent of the time" in his interactions with customers, Ellison testified that the trade secret drove twenty percent of Ford's vehicle sales. *Id.*, PageID.10292.

Ultimately, InterMotive was unable to persuade the jury to award any of Ford's vehicle profits. On the other hand, in support of the jury's decision to award all of Ford's module profits, InterMotive cites a body of evidence on the significance of programmable inputs to argue that the jury could have reasonably found that the trade secret drove Ford's module sales.

Initially, InterMotive relies on the background facts concerning Ford's interest in having its own Upfitter Interface Module. InterMotive points out that Ford was worried about falling behind the competition and losing vehicle sales to Chrysler and other competitors. Among other internal Ford documents, InterMotive cites a March 2013 report on the 2013 NTEA show. As shown in the document admitted as Trial Exhibit 214, the report summarizes the presentations by other automakers. Trial Ex. 214. In connection with Chrysler's module for Ram trucks, the Vehicle System Interface Module ("VSIM"), Ford identified the "Risk Level to Super Duty" as "High" after noting that some customers "require access to vehicle information in order to even be considered for a bid" and that Ford offered "only limited vehicle communication." *Id.* Moreover, InterMotive cites a March 2013 email chain between Ford employees about whether Ford should continue developing its own Upfitter Interface Module. As shown in the document admitted as Trial Exhibit 315, a Ford engineer insisted that Ford needed to move forward because "Ram is chipping away at Super Duty" and "will continue to make inroads into our fleet business unless we provide high impact fleet content." Trial Ex. 315.

Moreover, InterMotive points out that Ford wanted a module that would "leapfrog the competition" to give Ford a competitive advantage and enable Ford to make more vehicle sales. Among other internal Ford documents, InterMotive cites the Upfitter Interface Module "Project

Management File" attached to a January 2015 email chain between Ford employees. As shown in the document admitted as Trial Exhibit 317, Ford identified the "Value Proposition" for the Upfitter Interface Module as: "Will enable Ford continued dominance in the commercial upfitter market. Chrysler currently offers an upfitter module. Ford version will leapfrog the competition in features, flexibility and ease of use." Trial Ex. 317. Similarly, Ford identified the "Risk of Not Doing" as: "Loss of revenue, vehicle sales and prestige in the Upfitter market (Police, Ambulance, Rescue, Utility, RVs …)." *Id.*

As well, InterMotive points out that Ford did not want the Ford-specific Phase 1 module introduced at the 2012 NTEA show. Rather than the original version, Ford wanted a new module, which soon became the trade secret version with programmable inputs. For background, Schafer explained that the CDA defined Ford confidential information to include instructions provided to suppliers on meeting Ford's requirements for new products. ECF No. 252, PageID.9877–9878. With respect to the three-phase plan, Ellison testified that "they were asking us for Phase 1, and then Phase 2 and Phase 3 were the steps to get to provide them with a—with an even better solution." ECF No. 255, PageID.10276. Schafer testified that "the UIM without the programmable inputs surely has a number of customers that want it" and that "programmable outputs, the ability to—to read vehicle data, that's all very, very significant." ECF No. 252, PageID.9943. "However," Schafer continued, "with the trade secret,

it becomes something that more customers want." *Id.* In explaining why customers would see the benefits of programmable inputs, Schafer testified that:

> That flexibility of not having to change harnesses and connect to different wires and for their equipment to your device, that it's always the same, is—is absolutely beneficial to the builders. As we heard earlier, the customers they're targeting are really the engineers associated with designing and manufacturing these—these vehicles. I believe the customer base is larger than that, but engineers especially would—would see the value in programmable inputs.

*Id.* As summarized by Schafer: "They wanted more, they wanted better. The term that was used a lot was 'leapfrog the competition,' and this device surely allowed them to do that." ECF No. 252, PageID.9878.

Additionally, InterMotive points out that the use of programmable inputs enabled Ford to package its Upfitter Interface Module on certain vehicles. Specifically, InterMotive cites a September 2013 email chain between Ford engineer Syed Monnan and other Ford employees about the connectors for the inputs and the outputs. As shown in the document admitted as Trial Exhibit 899, Monnan explained that having programmable inputs would allow Ford to use one 24-way connector instead of two 24-way connectors or one bigger connector. Trial Ex. 899. At trial, Monnan testified that using programmable inputs helped Ford package its module to fit in the vehicle by reducing the number of

connectors and associated wiring. ECF No. 242, PageID.8998. With reference to Monnan's testimony, Schafer added that "packaging is everything in building a vehicle" and that "anything you can do to reduce the size of the component is definitely beneficial to the designer." ECF No. 252, PageID.9942–9943.

InterMotive also argues that Ford "touted" the use of programmable inputs in advertisements for its Upfitter Interface Module. Among other marketing materials, InterMotive cites the "Work Smarter Than Ever" advertisement that Ford created for the 2016 NTEA show. As shown in the copy admitted as Trial Exhibit 111, Ford advertises that "Inputs 1 through 9 offer" the "Active High or Active Low" configurations. Trial Ex. 111. As additional examples, InterMotive cites the Special Vehicle Engineering ("SVE") Bulletin admitted as Trial Exhibit 124, which describes that the Upfitter Interface Module has "9 configurable inputs (active low or active high)," and the Body Builder Layout Book admitted as Trial Exhibit 308, which describes that "Upfitter Switches #1–9" are "High/Low (configurable)." Trial Exs. 124, 308. As well, InterMotive cites YouTube videos, such as the Snow Plow News video admitted as Trial Exhibit 225, in which a Ford employee calls the "programmable" Upfitter Interface Module "critical" to the industry. Trial Ex. 225. InterMotive argues that the marketing materials demonstrate Ford's intention to sell its module because of the

programmable inputs. It follows, InterMotive argues, that Ford cannot argue that factors other than the trade secret drove Ford's module sales.

## B.    Judgment as a Matter of Law

Against this background, Ford moves for judgment as a matter of law on damages for trade secret misappropriation on two grounds directed to the jury's unjust enrichment award. First, arguing that InterMotive did not prove that all of Ford's module sales were caused by Ford's use of the trade secret, Ford moves for judgment as a matter of law that InterMotive is not entitled to unjust enrichment damages on all of Ford's module sales. Second, arguing that Ford's module profits were partly attributable to factors other than the trade secret, Ford moves for judgment as a matter of law that InterMotive is not entitled to unjust enrichment damages for the entirety of Ford's module profits. For the reasons set forth below, the Court finds that Ford is not entitled to judgment as a matter of law on unjust enrichment damages for trade secret misappropriation.

## 1.    Damages on All of Ford's Module Sales

Ford's first ground for judgment as a matter of law on unjust enrichment damages for trade secret misappropriation is that InterMotive is not entitled to unjust enrichment damages on all of Ford's module sales. The jury was instructed that InterMotive could meet its burden of proving causation "with evidence as to the amount of additional vehicle or module sales that were caused by the misappropriation of the

trade secret." ECF No. 266, PageID.11159. "For example, if InterMotive seeks a damages award based on a certain percentage or amount of Ford's vehicle or Ford's module profits, then InterMotive must prove that the trade secret drove that percentage or amount of vehicle or module sales." *Id.* Ford argues that it is entitled to judgment as a matter of law because InterMotive did not prove that all of Ford's module sales were caused by Ford's use of the trade secret. In particular, Ford argues that InterMotive did not meet its burden of proving causation because InterMotive did not present evidence to guide the jury in the determination of the actual amount of additional module sales. According to Ford, there is no evidence to support a finding that the trade secret drove any of Ford's module sales, much less all of Ford's module sales.

In support of its argument, Ford points out that InterMotive did not present things like expert testimony or market studies in an effort to establish that one hundred percent of Ford's modules sales were driven by the trade secret or carve out module sales Ford would have made regardless of programmable inputs. On the other hand, Ford does not address the evidence that was presented at trial except to cast two snippets of testimony from InterMotive witnesses in Ford's favor. Specifically, Ford cites Ellison's testimony that the benefits of using programmable inputs "comes up probably 20 percent of the time" in his interactions with customers, but only to argue that this contradicts the jury's decision to award all of Ford's module profits. Similarly, Ford cites

Schafer's testimony that adding programmable inputs makes the Upfitter Interface Module something that "more customers want," but only to argue that this is insufficient to prove the amount of additional module sales to a reasonable certainty.

In opposition, InterMotive argues that InterMotive met its burden of proving causation by doing two things. First, InterMotive cites Robinson's testimony to point out that InterMotive established Ford's sales of modules with the trade secret, including the number of Ford's module sales, and the revenues and profits on Ford's module sales. Second, InterMotive cites the body of evidence on the significance of programmable inputs to argue that the jury could have reasonably found that the trade secret drove Ford's module sales. InterMotive argues that Ford, not InterMotive, has the burden of going further and establishing any portion of Ford's module sales that were not attributable to the trade secret.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that InterMotive is entitled to unjust enrichment damages on all of Ford's module sales.

Initially, the jury could have reasonably found that Ford's modules sales (and therefore module profits) were caused by Ford's use of the trade secret. In its motion, Ford largely omits to mention the evidence that InterMotive presented throughout trial in support of its trade secret

misappropriation counterclaim. However, the Court agrees with InterMotive that the jury could have reasonably relied on the body of evidence on the significance of programmable inputs and found that the trade secret drove Ford's module sales. As InterMotive points out, Ford wanted a new module that would "leapfrog the competition," and the use of programmable inputs was apparently important enough to take from InterMotive, implement, and advertise throughout its marketing materials.

Notably, in its reply brief, Ford acknowledges InterMotive's citation to "evidence about Ford wanting the trade secret, advertising it, and selling it." ECF No. 294, PageID.13155. While Ford attempts to dismiss the evidence, Ford's only rebuttal is to call it "sporadic" and argue that it is not "reliable and tangible" enough to satisfy the entire market value rule from patent law. *Id.* However, it should be clear from the Court's above discussion of the evidence that the record at trial is replete with relevant documents and detailed testimony from knowledgeable witnesses. As well, the Court notes that, while Ford takes issue with the lack of things like market studies, Ford neglects to mention that it inhibited InterMotive's ability to present such evidence by refusing to produce its customer information during fact discovery.

With respect to the actual amount of additional module sales, as noted above, InterMotive does not direct the Court to a discrete theory that the trade secret drove a particular percentage or amount of Ford's

88

module sales. At the same time, not all "additional" sales are on equal footing in the particular facts and circumstances of this case. Ford is in the business of selling vehicles, while the Upfitter Interface Module is one of many separately-priced options on vehicles for the upfit marketplace. Even assuming the significance of programmable inputs, the assertion that Ford is on the hook for billions of dollars because sales of vehicles optioned with the trade secret module surely include "additional" sales that otherwise would have been lost to competitors is justifiably met with a demand for proof as to the actual amount. By contrast, all of Ford's module sales, the number of which the parties stipulated to at trial, are "additional" sales in the sense that Ford's market share was built entirely on sales of the trade secret module. Coupled with the finding that the trade secret drove Ford's module sales, the jury could have reasonably found that the stipulated number of Ford's module sales represents the amount of additional module sales.

In summary, there was substantial evidence for the jury to reasonably find that InterMotive is entitled to unjust enrichment damages on all of Ford's module sales. The jury could have reasonably found that Ford's modules sales (and therefore module profits) were caused by Ford's use of the trade secret, and that the stipulated number of Ford's module sales represents the amount of additional module sales. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to judgment as a matter of law because InterMotive did

not prove that all of Ford's module sales were caused by Ford's use of the trade secret.

## 2. Damages for The Entirety of Ford's Module Profits

Ford's second ground for judgment as a matter of law on unjust enrichment damages for trade secret misappropriation is that InterMotive is not entitled to unjust enrichment damages for the entirety of Ford's module profits. Ford argues that it is entitled to judgment as a matter of law because Ford's module profits were partly attributable to factors other than the trade secret. The Court has considered Ford's arguments and is not persuaded that Ford is entitled to judgment as a matter of law. Ford's basic contention is that, in addition to the trade secret, the value of its Upfitter Interface Module is partly attributable to other features of the Upfitter Interface Module and other confidential information InterMotive shared with Ford. However, Ford's arguments either assume that InterMotive has the burden of proving apportionment pursuant to the "rule of apportionment" from patent law, or go to the province of the jury to weigh evidence, or both. And, once again, Ford largely omits to mention the evidence that InterMotive presented throughout trial in support of its trade secret misappropriation counterclaim. Rather, in support of its argument, Ford cites snippets of testimony from InterMotive witnesses, such as Schafer's testimony that "the UIM without the programmable inputs surely has a number of

customers that want it" and that other features of the Upfitter Interface Module are "all very, very significant." As InterMotive points out, it was the province of the jury to weigh such evidence in the context of the body of evidence on the significance of programmable inputs as a whole. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to judgment as a matter of law because Ford's module profits were partly attributable to factors other than the trade secret.

### C.   New Trial

In the alternative to judgment as a matter of law, Ford moves for a new trial on unjust enrichment damages for trade secret misappropriation on three grounds directed to the jury instructions. First, Ford argues that it is entitled to a new trial because the jury should have been given an apportionment instruction. Second, Ford argues that it is entitled to a new trial because a "reasonable estimation" of the amount of additional module sales does not satisfy the reasonable certainty standard. Third, Ford argues that it is entitled to a new trial because the jury should have been given a head start instruction. For the reasons set forth below, the Court finds that Ford is not entitled to a new trial on unjust enrichment damages for trade secret misappropriation.

### 1.   Apportionment Instruction

Ford's first argument for a new trial on unjust enrichment damages for trade secret misappropriation is that the jury should have been given an apportionment instruction.

91

The jury was instructed that, if it found that InterMotive met its burden of proving causation, then it must award InterMotive unjust enrichment damages "in an amount of Ford's profits from such sales after deducting any setoffs or costs that Ford has shown should not be included in calculating the net profit." ECF No. 266, PageID.11159–11160. However, Ford argues that the jury should not have been permitted to award the entirety of Ford's module profits. Instead, Ford argues that the jury should have been instructed to award Ford's module profits in proportion to the incremental value of its Upfitter Interface Module that is attributable to the trade secret. In other words, Ford argues that the jury should have been instructed in accordance with the "rule of apportionment" from patent law.

As InterMotive points out, in the order addressing pretrial issues, the Court declined to adopt Ford's proposal to apply the rules from patent law. ECF No. 227, PageID.8299–8303. Ford acknowledges this point, and states that it just "raises the argument here to preserve the issue." ECF No. 286, PageID.11843. Accordingly, for the reasons stated the in the order addressing pretrial issues, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to a new trial because the jury should have been given an apportionment instruction.

## 2.    "Reasonable Estimation" Language

Ford's second argument for a new trial on unjust enrichment damages for trade secret misappropriation is that a "reasonable

estimation" of the amount of additional module sales does not satisfy the reasonable certainty standard. The jury instructions begin by stating: "InterMotive has the burden of proving its damages with reasonable certainty. Damages not based on evidence presented in this case or on speculation and conjecture are not recoverable, but damages are not speculative merely because they cannot be ascertained with mathematical precision." ECF No. 266, PageID.11158. With respect to InterMotive's burden of proving causation, the jury was instructed to award InterMotive unjust enrichment damages if it found that "InterMotive has shown by a preponderance of the evidence that Ford's use of the trade secret caused additional vehicle or module sales, and that the evidence provides a reasonable estimation of the amount of additional vehicle or module sales caused by the misappropriation of the trade secret." *Id.*, PageID.11159–11160.

Ford argues that the jury instructions "did not state the correct standard" because proving the amount of additional module sales to a reasonable certainty requires more than an estimation. ECF No. 286, PageID.11843. Ford argues that "reasonable certainty" requires "objective facts and data" and "detailed evidence" such as expert testimony and market studies, and that an "estimation," even a "reasonable" one, "falls short." *Id.*, PageID.11844.

The Court is not persuaded that the "reasonable estimation" language turns the jury instructions into an incorrect statement of the

law. As set forth above, the jury was instructed that InterMotive has the burden of proving its damages with reasonable certainty. Furthermore, the jury was instructed that InterMotive's burden of proving causation includes two elements: (1) that Ford's use of the trade secret "caused additional vehicle or module sales"; and (2) a "reasonable estimation of the amount" of additional vehicle or module sales. Taking the jury instructions as a whole in the context of this case, the later "reasonable estimation" language is not, as Ford suggests, a misstatement of the earlier reasonable certainty standard. Rather, the "caused additional vehicle or module sales" language and the "reasonable estimation of the amount" language are two elements of InterMotive's burden of proving causation for its unjust enrichment theories. In conjunction with the jury instructions as a whole, the Court finds that the two elements together are a proper application of the reasonable certainty standard to the particular facts and circumstances of this case. In this regard, the Court once again notes that, while Ford takes issue with the lack of things like market studies, Ford neglects to mention that it inhibited InterMotive's ability to present such evidence by refusing to produce its customer information during fact discovery. Accordingly, the Court will **DENY** Ford's motion for a new trial because, taken in context of the jury instruction as a whole, a "reasonable estimation" of the amount of additional module sales satisfies the reasonable certainty standard.

### 3.   Head Start Instruction

Ford's third argument for a new trial on unjust enrichment damages for trade secret misappropriation is that the jury should have been given a head start instruction. Specifically, Ford argues that the jury should have been instructed to limit an award of unjust enrichment damages to what Ford argues was the period of secrecy. In support of its argument, Ford cites the Uniform Trade Secrets Act (the "UTSA") on which the MUTSA is modeled. In the commentary to the section on damages, the UTSA explains that: "Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation." UNIF. TRADE SECRETS ACT § 3 cmt. (NAT'L CONF. OF COMM'RS ON UNIF. STATE LAWS 1985).

Ford argues that, in this case, the jury should have been given a head start instruction because InterMotive did not maintain the secrecy required to sustain trade secret protection. As to the period of secrecy, Ford argues that the trade secret was no longer entitled to protection on November 29, 2013, the expiration of the "duty to protect" confidential information shared under the CDA, and in 2014, when InterMotive released the PRPC with programmable inputs. In opposition, InterMotive argues that whether Ford was free to use the trade secret

under the CDA and whether InterMotive disclosed the trade secret in the PRPC were disputed issues submitted to the jury, not legal matters on which the jury should have been instructed to find for Ford.

The Court agrees with InterMotive. The jury was instructed that InterMotive's burden of proving trade secret protection includes that: "InterMotive took reasonable efforts under the circumstances to keep the technology secret." ECF No. 266, PageID.11155. Furthermore, the jury was instructed that: "An owner of technology does not take reasonable measures to keep it secret if the owner discloses it to the public or to a third party without any obligation to keep it secret." *Id.*, PageID.11156. In connection with the CDA and the PRPC, Ford's argument for a head start instruction assumes the inquiry. In Ford's words, its argument relies on the assumption that the trade secret "was freely available in the public domain." ECF No. 286, PageID.11845. However, with respect to the CDA, Ford does not address that the jury was separately instructed to resolve a dispute concerning whether Ford was free to use the trade secret upon the November 29, 2013 expiration of the "duty to protect" confidential information. As stated in the jury instructions: "Ford maintains that its obligation to keep the trade secret confidential expired after that time period. InterMotive maintains that the course of conduct of the parties created a continuing obligation to keep the trade secret confidential. It is your responsibility to determine whether InterMotive took reasonable measures to maintain the confidentiality of the trade

96

secret." ECF No. 266, PageID.11157. Likewise, with respect to the PRPC, Ford does not address that the parties presented a dispute concerning whether the PRPC practices the trade secret. As well, it follows that Ford does not address that the jury resolved the disputed issues against Ford and found that the trade secret was entitled to protection.

Contrary to the evidence presented at trial, Ford's argument for a head start instruction assumes the inquiry on disputed issues of trade secret status that were submitted to the jury. And, in any event, given that the jury resolved the disputed issues against Ford, the omission of a head start instruction caused no prejudice to Ford and is therefore harmless. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to a new trial because the jury should have been given a head start instruction.

## VII.  TRADEMARK ANALYSIS

As stated above, the jury found for InterMotive on two of its Lanham Act counterclaims: (1) trademark infringement under Section 32 of the Lanham Act; and (2) unfair competition under Section 43(a) of the Lanham Act. Specifically, in the verdict form, the jury found that InterMotive owns a valid trademark in the product name "Upfitter Interface Module." ECF No. 247, PageID.9408. The jury was instructed to find for InterMotive on validity if it proved that InterMotive's registered "Upfitter Interface Module" trademark is at least descriptive (i.e., is not generic) and has acquired distinctiveness through secondary

meaning. ECF No. 266, PageID.11142–11145. Furthermore, the jury found that Ford's use of the "Upfitter Interface Module" name created a likelihood of confusion as to the origin of Ford's module, and therefore constituted trademark infringement and unfair competition under the Lanham Act. ECF No. 247, PageID.9408, 9413. Additionally, the jury found that Ford's infringement was willful, deliberate, and intentional. *Id.*, PageID.9408. Based on its assessment of the amount of Ford's profits that were caused by Ford's Lanham Act violations, the jury awarded InterMotive $0 for trademark infringement and $349,867 for unfair competition. *Id.*, PageID.9408, 9413.

The Lanham Act is intended "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce" and "to protect persons engaged in such commerce against unfair competition." 15 U.S.C. § 1127. The Lanham Act provides for the registration of trademarks, which it defines to include "any word, name, symbol, or device, or any combination thereof … used by a person … to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Id.*

InterMotive asserts its Lanham Act counterclaims under Sections 32 and 43(a), which both impose civil liability on a defendant who uses a trademark in a manner that is "likely to cause confusion, or to cause

mistake, or to deceive." 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). Section 32 applies to registered trademarks, and Section 43(a) protects qualifying unregistered trademarks. As explained by the Supreme Court, "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

In order for a mark to be registered as a trademark, the mark must be capable of distinguishing the applicant's goods from the goods of others. *Id.* "Only those marks that are distinctive as a matter of law are accorded trademark protection." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 512 (6th Cir. 2007) (quotation omitted). "The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness." *Bath & Body Works, Inc. v. Luzier Personalized Cosms., Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) (quotation omitted). "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769 (emphasis omitted).

Marks are classified in four general categories of generally increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Bath & Body Works*, 76 F.3d at 748. Marks that

are suggestive, arbitrary, or fanciful "are deemed inherently distinctive and are entitled to protection" because "their intrinsic nature serves to identify a particular source of a product." *Two Pesos*, 505 U.S. at 768. "In contrast, generic marks—those that refer to the genus of which the particular product is a species—are not registrable as trademarks." *Id.* (quotation, alteration, and citation omitted). *See also Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) ("A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods.") (quotation omitted). "On the other hand a term that is "merely descriptive" may be used as a trademark if it has acquired a secondary meaning." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002).

### A.   Ford's Arguments

As three separate grounds for judgment as a matter of law on InterMotive's Lanham Act counterclaims, Ford argues that: (1) InterMotive did not prove ownership; (2) InterMotive did not prove secondary meaning; and (3) InterMotive did not prove a likelihood of confusion. For the reasons set forth below, the Court finds that Ford is not entitled to judgment as a matter of law on InterMotive's Lanham Act counterclaims.

### B.   Ownership

Ford's first ground for judgment as a matter of law on InterMotive's Lanham Act counterclaims is that InterMotive did not prove ownership

100

of the "Upfitter Interface Module" name. As discussed below, Ford's basic contention is that other companies used, and therefore owned, the "Upfitter Interface Module" name before InterMotive. "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.*

At trial, Schafer testified that InterMotive began selling its module under the "Upfitter Interface Module" name in 2010. ECF No. 252, PageID.9986. Furthermore, Schafer testified that none of InterMotive's competitors have used the "Upfitter Interface Module" name as a brand, and that people in the upfit marketplace do not refer to their modules generically as "upfitter interface modules." *Id.*, PageID.9874, 9876. On the other hand, Ford argues that InterMotive did not prove ownership because other evidence demonstrates that InterMotive was not the first company in the upfit marketplace to use the "Upfitter Interface Module" name. In support of its argument, Ford cites documents for other modules with names that include combinations of the words "upfitter," "interface," and "module," specifically, the names "Police Equipment Interface Module" and "RAM Truck Upfitter Module."

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that InterMotive proved ownership of the "Upfitter Interface Module" name.

Ford's argument is directed to purportedly undisputed evidence that two other companies in the upfit marketplace, Whelen and DGE, sold modules under the "Upfitter Interface Module" name before InterMotive. With respect to the Whelen module, Ford presented the installation guide admitted as Trial Exhibit 762 in connection with testimony from Ford witness Randy Freiburger. Freiburger testified that the installation guide is for the Whelen "Police Upfitter Interface Module" and that Whelen was selling its module in 2008. ECF No. 251, PageID.9669–9671. Although the installation guide is entitled "Police Equipment Upfitter Interface Module," the first paragraph of the document identifies the module as the "Police Equipment Interface Module (PEIM)." ECF No. 287-3, PageID.12441. Consistent with the first paragraph, Schafer testified that he is familiar with the Whelen module and that "everyone knows of it in the industry" as "a PEIM." ECF No. 252, PageID.9875–9876. As to the title, Schafer pointed out that: "Ford had pulled out part of what they were saying up top, but left off the beginning of the name to try to just show someone using in the name Upfitter Interface Module. They don't. It—it's a PEIM." *Id.*, PageID.9875. With respect to the DGE module, Ford presented the brochure admitted as Trial Exhibit 964 in connection with testimony from Ford witness

Robert Stevens. The brochure identifies the module as the "RAM Truck Upfitter Module (RTUM)." ECF No. 287-7, PageID.12451. Stevens testified that DGE was selling its module in 2011. ECF No. 238, PageID.8732. In light of the evidence presented at trial, the jury could have reasonably rejected Ford's theory that InterMotive did not prove ownership of the "Upfitter Interface Module" name for two reasons.

First, the evidence does not support, much less undisputably support, Ford's contention that other companies used the "Upfitter Interface Module" name before InterMotive. Initially, as to DGE, Stevens testified that DGE was selling its module in 2011, which is not before 2010, when Schafer testified that InterMotive began using the "Upfitter Interface Module" name. And in any event, as InterMotive points out, Whelen and DGE do not use the same "Upfitter Interface Module" name and "UIM" acronym as InterMotive. Rather, Whelen uses the name "Police Equipment Interface Module" and the acronym "PEIM," and DGE uses the name "RAM Truck Upfitter Module" and the acronym "RTUM." More generally, as opposed to the "Upfitter Interface Module" name, Whelen and DGE sold modules with names that include combinations of the words "upfitter," "interface," and "module." Notably, while Schafer acknowledged this point, Schafer testified that InterMotive's competitors each have "different names or brands for their product" and explained that they are "usually more prescriptive" and "very specific as to what

they were trying to do with the name of the product." ECF No. 252, PageID.9876.

Second, in the context of the descriptive names at issue in this case, the evidence Ford cites does not support Ford's underlying contention that other companies owned the "Upfitter Interface Module" name before InterMotive. In connection with its contention that other companies used the "Upfitter Interface Module" name before InterMotive, Ford argues that InterMotive did not prove ownership under "the standard test" that awards ownership to "the first to actually use the mark in the sale of goods or services." *Sengoku Works*, 96 F.3d at 1219. As InterMotive puts it, "Ford argues that the jury should have found that someone else owned Upfitter Interface Module, and so InterMotive could not." ECF No. 289, PageID.12496.

However, as with the "Upfitter Interface Module" name used by InterMotive, the "Police Equipment Interface Module" name used by Whelen and the "RAM Truck Upfitter Module" name used by DGE are at most descriptive. Because descriptive marks are distinctive and qualify for protection only upon acquiring secondary meaning, the rule for descriptive marks requires more than the general rule for inherently distinctive marks. As explained by a leading treatise on trademark law: "In a dispute over priority of use for a mark requiring secondary meaning, mere priority of use (as for technical trademarks) is insufficient. It is the party who first achieved trademark significance in the mark through

104

secondary meaning who is the senior user of such a mark." 2 McCarthy on Trademarks & Unfair Competition § 16:34.

Consistent with the rule for descriptive marks, the jury was instructed to find for InterMotive on ownership if InterMotive proved in relevant part that "InterMotive was the first to use the term in a manner that allowed consumers in the marketplace to identify the term with InterMotive and its products." ECF No. 266, PageID.11140–11141. Despite assuming that Whelen and DGE acquired ownership, Ford does not direct the Court to any evidence that people in the upfit marketplace associated the "Upfitter Interface Module" name with Whelen and DGE when InterMotive began using the name in 2010. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to judgment as a matter of law because InterMotive did not prove ownership of the "Upfitter Interface Module" name.

## C. Secondary Meaning

Ford's second ground for judgment as a matter of law on InterMotive's Lanham Act counterclaims is that InterMotive did not prove secondary meaning in the "Upfitter Interface Module" name. "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Two Pesos*, 505 U.S. at 766 n.4 (quotation omitted). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify

the source of the product rather than the product itself." *Inwood Lab'ys,*
*Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 851 n.11 (1982).

The Sixth Circuit has held that a district court must consider seven
factors in analyzing whether a descriptive mark has acquired
distinctiveness through secondary meaning: (1) direct consumer
testimony; (2) consumer surveys; (3) exclusivity, length, and manner of
use; (4) amount and manner of advertising; (5) amount of sales and
number of customers; (6) established place in the market; and (7) proof
of intentional copying. *Herman Miller, Inc. v. Palazzetti Imps. & Exps.,*
*Inc.*, 270 F.3d 298, 311–12 (6th Cir. 2001).

"No single factor is determinative and every one need not be
proven." *Id.* at 312. Nonetheless, "[t]he evidentiary burden necessary to
establish secondary meaning is substantial." *Burke-Parsons-Bowlby*
*Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989).
"Secondary meaning is proved [only] when by a preponderance of the
evidence it can be determined that the attitude of the consuming public
toward the mark denotes a single thing coming from a single source." *Id.*
(quotation omitted).

Below, the Court will consider and balance the seven factors that a
district court must consider in analyzing whether a descriptive mark has
acquired distinctiveness through secondary meaning in light of the
evidence presented at trial, and determine whether the factors support
the jury's finding that the "Upfitter Interface Module" name acquired

distinctiveness through secondary meaning before Ford began using the same name in 2016.

### 1.    Direct Consumer Testimony

The first factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is direct consumer testimony associating the "Upfitter Interface Module" name with InterMotive. Instead of direct testimony from consumers, the Sixth Circuit has allowed reliance on non-consumer testimony and circumstantial testimony as support for a plaintiff's claim that consumers associate its trademark with the plaintiff. *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999) (noting lack of direct consumer testimony and relying on deposition testimony from defendant's and plaintiff's employees that they could recognize plaintiff's temporary road sign that featured its allegedly protectable dual-spring design when driving by on the highway), *rev'd on other grounds*, 532 U.S. 23 (2001); *Herman Miller*, 270 F.3d at 312 (noting lack of "explicit testimony" from consumers and relying on "a variety of circumstantial testimony" from design experts, authors, historians, and plaintiff's employees "indicating a link between [plaintiff] and [its allegedly protectable furniture designs] in the mind of the consuming public for modern furniture").

Ford maintains that InterMotive did not present any direct testimony from consumers. InterMotive disagrees. InterMotive cites two

emails, one from a consumer and one from a Ford employee, where the writer identified InterMotive's module as "the InterMotive Upfitter Interface Module." InterMotive argues that the emails demonstrate that people in the upfit marketplace recognized the "Upfitter Interface Module" name as InterMotive's brand.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the first factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name.

The first email is a March 2012 email from Ben Martinsen at Boss Industries to Ford's support department. Before requesting information on interpreting Ford CAN messages, Martinsen explained that: "I was recently at the NTEA Work Truck Show in Indianapolis and attended the Ford chassis update. They talked about the InterMotive Upfitter Interface Module, and how Ford had worked closely with InterMotive to develop it. I talked with Rob Stevens after the presentation, and he directed me to contact you guys to get going." Trial Ex. 24. The second email is a June 2012 email from Ford's Randy Freiburger to other Ford employees. In connection with reporting an upcoming meeting "to discuss being an intermediary for the InterMotive Upfitter Interface Module," Freiburger shared a brochure for the Ford-specific version of InterMotive's module entitled "Ford Upfitter Interface Module." Trial Ex. 26.

As Ford points out, the emails amount to a single consumer and a single Ford employee identifying InterMotive's module as "the InterMotive Upfitter Interface Module." While the emails are limited circumstantial evidence, they nonetheless offer at least some indication that people in the upfit marketplace associated the "Upfitter Interface Module" name with InterMotive. Specifically, each email reflects the writer's knowledge that InterMotive is the company who makes the Upfitter Interface Module, and therefore constitutes circumstantial evidence that "the attitude of the consuming public toward" the "Upfitter Interface Module" name "denotes a single thing coming from a single source." *Appalachian Log Homes*, 871 F.2d at 596.

Moreover, this is particularly true for Martinsen's knowledge following the 2012 NTEA show. Schafer explained that the three-day NTEA show is "massive" and "the single biggest commercial vehicle show in North America." ECF No. 251, PageID.9800. For reference, Ford witness Timothy Stoehr agreed and added that "most every upfitter in the country that I know of would attend" the NTEA show "to get information or—or sell their products, you know, or whatever." ECF No. 250, PageID.9510–9511. With respect to the 2012 NTEA show, Schafer testified that Stevens gave the presentation "in a room of about 400-plus people" and that after the presentation "it exploded from there." ECF No. 251, PageID.9799–9800. As described by Schafer, Ford and InterMotive "got a lot of questions" and were "getting lots of positive feedback" at their

booths, there was "a lot of buzz" around the Upfitter Interface Module because "there was just nothing like it in the market," and "the overall feeling was extremely positive." *Id.*, PageID.9800–9801. Accordingly, in light of other evidence about the 2012 NTEA show, and particularly the impact of Ford's and InterMotive's joint effort to promote InterMotive's module, the jury could have reasonably inferred that Martinsen's knowledge is relevant to consumers as a whole.

## 2. Consumer Surveys

The second factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is consumer surveys demonstrating that the consuming public identifies the "Upfitter Interface Module" name with InterMotive. "Because the determination of whether a mark has acquired secondary meaning is primarily an empirical inquiry, survey evidence is the most direct and persuasive evidence." *Herman Miller*, 270 F.3d at 312.

As Ford points out, InterMotive did not conduct any secondary meaning surveys in this case. As well, InterMotive does not address the second factor or direct the Court to any empirical evidence concerning the portion of the consuming public that identifies the "Upfitter Interface Module" name with InterMotive. Accordingly, the Court finds that there was not substantial evidence for the jury to reasonably find that the

second factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name.

### 3.    Exclusivity, Length, and Manner of Use

The third factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is the exclusivity, length, and manner of InterMotive's use of the "Upfitter Interface Module" name. "The duration of use of the mark can establish secondary meaning where the duration is more than a relatively short period." *Appalachian Log Homes*, 871 F.2d at 596.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the second factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name.

In arguing that the third factor cuts against secondary meaning, Ford addresses only the exclusivity of use. According to Ford, InterMotive was never the exclusive company using the "Upfitter Interface Module" name in the upfit marketplace. Specifically, Ford rests on its contention, discussed above in the context of ownership, that Whelen and DGE used the "Upfitter Interface Module" name before InterMotive. However, as set forth above, as opposed to the same "Upfitter Interface Module" name and "UIM" acronym as InterMotive, Whelen uses the name "Police Equipment Interface Module" and the acronym "PEIM," and DGE uses

the name "RAM Truck Upfitter Module" and the acronym "RTUM." While Schafer acknowledged that Whelen and DGE sold modules with names that include combinations of the words "upfitter," "interface," and "module," Schafer testified that none of InterMotive's competitors have used the "Upfitter Interface Module" name as a brand. ECF No. 252, PageID.9874, 9876. Rather, Schafer testified that InterMotive's competitors each have "different names or brands for their product" and explained that they are "usually more prescriptive" and "very specific as to what they were trying to do with the name of the product." *Id.*, PageID.9876. Accordingly, the jury could have reasonably found that InterMotive was the exclusive company using the "Upfitter Interface Module" name in the upfit marketplace.

On the other hand, InterMotive focuses on the length and manner of use. As InterMotive points out, Schafer testified that InterMotive has sold its module under the "Upfitter Interface Module" name since 2010, over five years before Ford began offering its module using the same name in 2016. ECF No. 252, PageID.9986. Among other things, Schafer testified that InterMotive has used the "Upfitter Interface Module" name on packaging and in brochures, news releases, and magazine articles. *Id.*, PageID.9986–9987. In addition to testimony from Schafer, InterMotive cites testimony from InterMotive's former vice president of sales, Marc Ellison. Ellison added that InterMotive promoted its module under the "Upfitter Interface Module" name at trade shows, including jointly with

112

Ford at the 2012 NTEA show in a video, a brochure for the Ford-specific version of InterMotive's module, and an article in Ford's Super Trucker magazine. ECF No. 255, PageID.10211–10221. Accordingly, the jury could have reasonably found that InterMotive consistently used the "Upfitter Interface Module" name throughout its promotional efforts for more than a relatively short period of time.

Moreover, the jury could have reasonably found that InterMotive demonstrated the intention to use the "Upfitter Interface Module" name as a brand. As InterMotive points out, Ellison testified that InterMotive used capitalization for each word of the name (i.e., capital U, capital I, and capital M) for the purpose of designating the "Upfitter Interface Module" name as InterMotive's brand. *Id.*, PageID.10205–10207. Among other places where InterMotive used the capital U-I-M format, Ellison pointed to several emails to Ford employees in the January to August 2012 timeframe. *Id.*, PageID.10205–10207, 10229–10230. Ellison testified that he used capitalization "to emphasize our brand" and "to show them the brand" because having a brand is "how you get recognized" and "it's all about, you know, the ownership and providing to your customers something that they recognize as yours." *Id.*

### 4.   Amount and Manner of Advertising

The fourth factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is the amount and manner of

113

advertising of InterMotive's module using the "Upfitter Interface Module" name. "Advertising expense also is relevant but will not, standing alone, establish secondary meaning." *Appalachian Log Homes*, 871 F.2d at 596. "Where advertising expenditures are required to merely survive in the competitive market, advertising expenditures cannot be used to prove secondary meaning." *Id.* (quotation omitted). "However, extensive advertising which results in consumer association with a single source can establish secondary meaning." *Id.* (emphasis omitted).

According to Ford, the fourth factor cuts against secondary meaning because advertising of the Upfitter Interface Module "was non-existent." ECF No. 286, PageID.11849. The Court can only assume that this is a mistaken argument. As InterMotive points out, the jury heard testimony and saw evidence that InterMotive promoted its module under the "Upfitter Interface Module" name at multiple trade shows each year, including jointly with Ford at the 2012 NTEA show, and in videos, brochures, news releases, and magazine articles. Because Ford does not meaningfully address the fourth factor, the Court deems Ford to have forfeited any argument that the amount and manner of InterMotive's advertising was insufficient to result in the upfit marketplace associating the "Upfitter Interface Module" with InterMotive. Accordingly, the Court finds that there was substantial evidence for the jury to reasonably find that the fourth factor weighs in favor of a determination that InterMotive

has established secondary meaning in the "Upfitter Interface Module" name.

### 5.    Amount of Sales and Number of Customers

The fifth factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is the sales volume of InterMotive's module using the "Upfitter Interface Module" name. "Sales volume, though relevant, is not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of the source." *Appalachian Log Homes*, 871 F.2d at 596.

The Court observes that InterMotive provided sales information from 2012 onwards across two different "UIM Family Sales" documents. According to the documents admitted as Trial Exhibits 334 and 728, InterMotive sold: 254 modules in 2012; 460 modules in 2013; 1,010 modules in 2014; 1,724 modules in 2015; and 6,051 modules in 2016. ECF No. 270-5, PageID.11294 (Trial Ex. 728); ECF No. 286-10, PageID.12400 (Trial Ex. 334). While correctly identifying the number of 2015 module sales, Ford selectively cites the less complete of the two documents to assert that InterMotive only provided sales information from 2014 onwards, and that the number of 2014 module sales were a fraction of the actual number. ECF No. 286, PageID.11849 ("The evidence at trial was that InterMotive sold only 90 units in its 'UIM Family' in 2014, the first year of sales data it provided.") (citing Trial Ex. 334). This selective

use of the data appears intended to create the incorrect impression that InterMotive's module sales using the "Upfitter Interface Module" name were insignificant except for one year before Ford began using the same name in 2016, when in reality they increased every year from 2012 to 2016.

Because Ford does not meaningfully address the fifth factor in light of the evidence presented at trial, the Court deems Ford to have forfeited an argument that InterMotive's sales volume was insufficient to indicate that the upfit marketplace recognized the "Upfitter Interface Module" name as a source identifier associated with InterMotive. Accordingly, the Court finds that there was substantial evidence for the jury to reasonably find that the fifth factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name.

## 6.  Established Place in The Market

The sixth factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is whether the "Upfitter Interface Module" name has an established place in the market with a significant market share. However, neither Ford nor InterMotive explicitly addresses the sixth factor. As well, neither Ford nor InterMotive directs the Court to any empirical evidence concerning InterMotive's market share. Accordingly, the Court finds that there was not substantial evidence for

the jury to reasonably find that the sixth factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name.

### 7.    Proof of Intentional Copying

The seventh factor that the Court must consider in analyzing whether the "Upfitter Interface Module" name has acquired distinctiveness through secondary meaning is proof of intentional copying with the intent to benefit from InterMotive's reputation. The Sixth Circuit has explained that evidence of intentional copying "is especially helpful to establishing secondary meaning because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Herman Miller*, 270 F.3d at 314 (quotations omitted). "However, mere knowledge of the competitor's mark is insufficient as a matter of law to prove intentional copying." *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 514 (6th Cir. 2004). Specifically, "intentional copying is not actionable under the Lanham Act absent evidence that the copying was done with the intent to derive a benefit from the reputation of another." *Id.* (quotation and alteration omitted).

Although InterMotive also directs the Court to other evidence concerning the seventh factor, the dispute between the parties centers on an August 2014 email from Ford engineer Syed Monnan to other Ford employees. Monnan was not involved in the discussions between Ford and InterMotive. At the time, Monnan worked at Chrysler on Chrysler's

module for Ram trucks, the Vehicle System Interface Module ("VSIM").
In August 2013, Ford hired Monnan from Chrysler to lead the work on
Ford's module. After joining Ford, Monnan emailed other team members
to recommend changing the name of Ford's module. In his email, entitled
"Upfitter Module Name Change" in the subject line, Monnan advised that
an aftermarket supplier was using the "Upfitter Interface Module" name,
and recommend that Ford change the name to avoid any issues:

> It appears the Upfitter Interface Module (UIM)
> name may be used by an existing aftermarket
> Supplier. To ensure we don't run into any issues
> with another potential company that has the same
> name as UIM, I recommend we change the name
> to Programmable Upfitter Interface Module
> (PUIM), or Programmable Interface Module (PIM),
> or Programmable Upfitter Module (PUM).

ECF No. 286-3, PageID.11866.

At trial, Monnan disputed that he was referring specifically to
InterMotive, that he was concerned about Ford causing confusion, and
that he thought Ford was doing something wrong. Instead, Monnan
claimed that multiple companies used the "Upfitter Interface Module"
name, that he was concerned about Ford using a generic term, and that
Ford had every right to use the name. Specifically, on direct examination
by Ford, Monnan testified that the referenced supplier "could be several
suppliers" because the "Upfitter Interface Module" name was "commonly
used." ECF No. 238, PageID.8842. As well, Monnan testified that he was

concerned that the "Upfitter Interface Module" name is "too generic" and "just like saying the word 'shoe.'" *Id.* Furthermore, Monnan testified that he recommended changing the name because "I just wanted to have Ford have their own name, you know, so it's more identifiable." *Id.* In short, Monnan explained that "we still have every right to use it, but it's just too generic" and "it doesn't look like it's a Ford module." *Id.*, PageID.8843.

In anticipation of InterMotive citing Monnan's email, Ford cites Monnan's subsequent testimony at trial. Ford acknowledges Monnan's email as "indicating" Ford's knowledge of InterMotive's prior use. However, Ford argues that Monnan's testimony establishes that Ford did not copy InterMotive's mark. Specifically, Ford cites Monnan's testimony that he was concerned about genericness to argue that Ford chose the "Upfitter Interface Module" name as a descriptive term. Ford argues that Monnan's testimony absolves Ford of intentional copying because choosing a descriptive term shows an intent to accurately describe a product, not an intent to benefit from another's reputation.

On the other hand, InterMotive argues that Monnan's email demonstrates Ford's knowledge that using the same "Upfitter Interface Module" name as InterMotive would cause confusion. In support of its argument, InterMotive disputes Ford's basic contention that Ford chose the "Upfitter Interface Module" name as a descriptive term. Instead, InterMotive argues that Ford copied what Ford knew was InterMotive's brand and then used it as Ford's brand. Specifically, InterMotive cites

119

the history between the parties to argue that Ford recognized the "Upfitter Interface Module" name as InterMotive's brand for years. As well, InterMotive points out that Ford knew and used other descriptive terms before beginning to sell its module under the "Upfitter Interface Module" name. Specifically, InterMotive cites an April 2016 email chain between Monnan and other Ford employees, in which a Ford marketing person identified Ford's module as the "F-Series Interface Module" and as the "CAN interface module." Trial Ex. 17.

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the seventh factor weighs in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name. Although Ford argues that Monnan's testimony absolves Ford of intentional copying, Ford's knowledge of InterMotive's prior use of the "Upfitter Interface Module" name is beyond dispute, and the jury was free to trust their eyes and read Monnan's email as demonstrating Ford's knowledge that using the same name as InterMotive would cause confusion.

Moreover, the jury could have reasonably disregarded Monnan's testimony based on its evaluation of his credibility. Among other things, Monnan disputed that InterMotive was the "existing aftermarket Supplier" that was already using the "Upfitter Interface Module (UIM) name." Rather, Monnan claimed that the referenced company "could be

several suppliers" because he knew from his time at Chrysler that the "Upfitter Interface Module" name was "commonly used." ECF No. 238, PageID.8842. According to Monnan, the referenced company could be Chrysler, GM, InPower, or other companies because "they all appear to use the same name." ECF No. 242, PageID.8968. However, the jury saw evidence that refutes these claims. For example, Monnan identified the module he worked on at Chrysler as the "Chrysler Upfitter Interface Module." ECF No. 238, PageID.8822. But when presented with evidence on Chrysler's module, Monnan acknowledged that Chrysler uses the name "Vehicle System Interface Module" and the acronym "VSIM," and then claimed that he and his colleagues called the VSIM an "Upfitter Interface Module" internally within Chrysler. ECF No. 242, PageID.8974–8976. Similarly, as set forth above, the jury was presented with evidence that InPower uses the entirely different name "Vehicle Control Module System" and the acronym "VCMS."

With respect to avoiding "any issues with another potential company that has the same name as UIM," Monnan also disputed that he was concerned about Ford causing confusion. Rather, Monnan testified that he was concerned that the "Upfitter Interface Module" name is "too generic" and that he recommended other names because he "just wanted to have Ford have their own name, you know, so it's more identifiable." ECF No. 238, PageID.8842. However, as shown in his email, Monnan recommended other names that are similarly descriptive.

Specifically, compared to the "Upfitter Interface Module" name, Monnan proposed adding the word "Programmable," substituting the word "Programmable" for the word "Upfitter," or substituting the word "Programmable" for the word "Interface." ECF No. 286-3, PageID.11866.

And in any event, over two exchanges with InterMotive's counsel on cross-examination, Monnan ultimately acknowledged that he was concerned about Ford causing confusion by using the same name:

> Q. You were—you were concerned about confusion with InterMotive and its Upfitter Interface Module.
> A. Confusion is the generic, that's all it is.
> Q. But you were concerned about InterMotive and its name, correct?
> A. Not InterMotive; any supplier. It could be—it could be any OEM. It could be Chrysler, it could be GM, it could be InPower, it could be those other—and they all appear to use the same name. So it's just too generic, that's the confusion, that's the issue, that it being generic, that's all it is.

ECF No. 242, PageID.8968.

> Q. Okay. Confusion was one of the concerns that you had when you wrote this email, correct?
> A. Yes.
> Q. Okay. So looking at the email still, doesn't it make more sense that you were worried about confusion with InterMotive's name than with genericness?
> A. Not with InterMotive, not just with InterMotive; any company. Like I said over and over, GM, Chrysler, those other companies, they all have the same name, so that causes confusion.

*Id.*, PageID.8973–8974.

### 8.   Balancing and Conclusion

As set forth above, the Court finds that there was substantial evidence for the jury to reasonably find that several factors weigh in favor of a determination that InterMotive has established secondary meaning in the "Upfitter Interface Module" name. Specifically, the factors that favor InterMotive include: the first factor of direct consumer testimony associating the "Upfitter Interface Module" name with InterMotive; the third factor of the exclusivity, length, and manner of InterMotive's use of the "Upfitter Interface Module" name; the fourth factor of the amount and manner of advertising of InterMotive's module using the "Upfitter Interface Module" name; the fifth factor of the sales volume of InterMotive's module using the "Upfitter Interface Module" name; and the seventh factor of proof of intentional copying with the intent to benefit from InterMotive's reputation. On the other hand, the remaining factors do not outweigh the factors that favor InterMotive. Specifically, the remaining factors include: the second factor of consumer surveys demonstrating that the consuming public identifies the "Upfitter Interface Module" name with InterMotive; and the sixth factor of whether the "Upfitter Interface Module" name has an established place in the market with a significant market share. In the absence of evidence concerning these factors, they do not favor either party.

123

After considering and balancing the factors in light of the evidence presented at trial, the Court concludes that the factors support the jury's finding that the "Upfitter Interface Module" name acquired distinctiveness through secondary meaning before Ford began using the same name in 2016. Accordingly, the Court will **DENY** Ford's motion as to its argument that Ford is entitled to judgment as a matter of law of invalidity on InterMotive's Lanham Act counterclaims.

### D.   Likelihood of Confusion

Ford's third ground for judgment as a matter of law on InterMotive's Lanham Act counterclaims is that InterMotive did not prove that Ford's use of the "Upfitter Interface Module" name created a likelihood of confusion as to the origin of Ford's module. InterMotive asserts its Lanham Act counterclaims under Sections 32 and 43(a), which both impose civil liability on a defendant who uses a trademark in a manner that is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

The Sixth Circuit has held that a district court must consider eight factors (sometimes called the *Frisch* factors) to determine whether a likelihood of confusion exists: (1) strength of the senior mark;

124

(2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.* (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)). Explaining that "likelihood of confusion is the essence of an unfair competition claim," the Sixth Circuit has instructed that the same eight likelihood of confusion factors considered under Section 32 are considered under Section 43(a). *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir. 1991). *See also Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) ("Under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks.").

"These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Grp., Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991). "Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." *Id.* "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* The question of whether a likelihood of confusion exists is a mixed question of fact and law. *Id.* "Factual findings must be made

with respect to the likelihood of confusion factors set out above." *Id.*
"However, the further determination of whether a given set of
foundational facts establishes a likelihood of confusion is a legal
conclusion." *Id.*

Below, the Court will consider and balance the eight factors that a
district court must consider in determining whether a likelihood of
confusion exists in light of the evidence presented at trial, and determine
whether the factors support the jury's finding that Ford's use of the
"Upfitter Interface Module" name created a likelihood of confusion as to
the origin of Ford's module.

At the outset, the Court notes that Ford does not address all of the
likelihood of confusion factors. ECF No. 286, PageID.11850–11853. After
asserting that InterMotive "failed to provide evidence of infringement,"
*id.*, PageID.11850, Ford addresses only some of the factors, *id.*,
PageID.11850–11853, and concedes that "InterMotive submitted some
evidence on the other elements," *id.*, PageID.11852. According to Ford,
however, "that does not permit a finding of infringement." *Id.*,
PageID.11852. But given the factors Ford concedes favor InterMotive,
together with the other proof, such a finding is not only permissible but
required.

As discussed below, the factors Ford does not address include the
second factor of the relatedness of the goods or services, the third factor
of the similarity of the marks, and the fifth factor of the marketing

channels used. With its concession that InterMotive presented substantial evidence on these factors, Ford is conceding that it used an identical mark on nearly identical products sold to the same customers in the same specialty vehicle marketplace. The Sixth Circuit has suggested, although perhaps not held, that in such cases a likelihood of confusion exists as a matter of law. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190–91 (6th Cir. 1988) ("Obviously, since both marks use absolutely identical language to sell a nearly identical service, the likelihood of confusion must be considered great."); *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 592 (6th Cir. 2015) ("In the circumstances of this case, the nearly identical nature of the marks and the relatedness of the goods are likely sufficient to reject Defendants' claim that the verdict was against the weight of the evidence.").

### 1.   Strength of The Senior Mark

The first factor that the Court must consider in determining whether a likelihood of confusion exists is the strength of the "Upfitter Interface Module" name. "The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." *Homeowners Grp.*, 931 F.2d at 1107. The Sixth Circuit has explained that the evaluation of the strength of the mark encompasses two separate components. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). The first component, "conceptual strength," involves the question of inherent distinctiveness and which of the four

127

categories (i.e., generic, descriptive, suggestive, and arbitrary or fanciful) the mark occupies. *Id.* The second component, "commercial strength," involves the recognition, or strength, of the mark in the marketplace. *Id.* "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Homeowners Grp.*, 931 F.2d at 1107. "The stronger the mark, all else equal, the greater the likelihood of confusion." *Id.*

Having considered the evidence presented at trial, the Court finds that the "Upfitter Interface Module" name is not an especially strong mark. In the written briefs, the parties do not discuss the first factor in any detail. As the only discussion by either party, Ford directs the Court to its briefing on the issue of secondary meaning. With respect to the first component, the "Upfitter Interface Module" name is descriptive, and therefore does not possess conceptual strength as an inherently distinctive mark. With respect to the second component, the Court has upheld the jury's finding that the "Upfitter Interface Module" name acquired distinctiveness through secondary meaning. At the same time, InterMotive did not conduct any secondary meaning surveys in this case, and presented only limited and circumstantial evidence that people in the upfit marketplace associated the "Upfitter Interface Module" name with InterMotive. Accordingly, the Court finds that there was not

substantial evidence for the jury to reasonably find that the first factor weighs in favor of a determination that a likelihood of confusion exists.

### 2.   Relatedness of The Goods or Services

The second factor that the Court must consider in determining whether a likelihood of confusion exists is whether InterMotive and Ford used the "Upfitter Interface Module" name on the same or related products. "Courts have recognized that there are basically three categories of cases: (1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners Grp.*, 931 F.2d at 1108. Because Ford does not address the second factor, and this case in any event clearly falls in the first category, the Court deems Ford to have conceded as a basic fact of this case that Ford used an identical mark on nearly identical products. Accordingly, the Court finds that there was substantial evidence for the jury to reasonably find that the second factor weighs in favor of a determination that a likelihood of confusion exists.

### 3.   Similarity of The Marks

The third factor that the Court must consider in determining whether a likelihood of confusion exists is the similarity of the marks used by InterMotive and Ford. "Similarity of marks is a factor of

considerable weight." *Daddy's Junky Music Stores*, 109 F.3d at 283. Here, Ford does not address the third factor. As with the second factor, the Court deems Ford to have conceded as a basic fact of this case that Ford used an identical mark on nearly identical products. Accordingly, the Court finds that there was substantial evidence for the jury to reasonably find that the third factor weighs in favor of a determination that a likelihood of confusion exists.

### 4.    Evidence of Actual Confusion

The fourth factor that the Court must consider in determining whether a likelihood of confusion exists is evidence of actual confusion. "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil*, 839 F.2d at 1188. "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Daddy's Junky Music Stores*, 109 F.3d at 284 (quotation omitted).

Having considered the evidence presented at trial, the Court finds that there was substantial evidence for the jury to reasonably find that the fourth factor weighs in favor of a determination that a likelihood of confusion exists. As InterMotive points out, in addition to immediate instances of actual confusion, Schafer and Ellison testified about continuing instances of actual confusion, including an instance in 2023

which resulted in InterMotive losing sales to Ford. Specifically, Schafer testified that multiple people approached him at the 2016 NTEA as soon as Ford announced its module to offer congratulations on InterMotive selling its module through Ford. ECF No. 252, PageID.9852–9853. Similarly, Ellison testified that multiple people gave him the same congratulations at another trade show in 2017. ECF No. 255, PageID.10253. As well, Ellison testified that InterMotive lost sales to Ford in 2023 because a customer was confused that it could get InterMotive's module from Ford. *Id.*, PageID.10298–10299. Moreover, Schafer testified that InterMotive received a call in 2023 asking for help with programming Ford's module. ECF No. 252, PageID.10011.

The Court notes that Ford acknowledges that InterMotive presented evidence of actual confusion, but only indirectly by asserting that the evidence is "minimal," "weak," and "hearsay" evidence of "isolated" instances. On the assumption that InterMotive presented "*de minimus*" evidence of actual confusion, Ford cites the Sixth Circuit's *Therma-Scan* decision to argue that InterMotive "cannot succeed" on the issue of infringement. ECF No. 286, PageID.11853. However, initially, Ford conflates the determination of whether a likelihood of confusion exists with the weight of the fourth factor in the balancing. In *Therma-Scan*, while the Sixth Circuit concluded that the plaintiff "offered only a modicum of evidence of actual confusion," it went on to explain that the evidence "therefore does not tilt the balance of determining whether a

likelihood of confusion exists to a significant degree in either direction." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623 (6th Cir. 2002). Here, while the evidence is limited with respect to specific instances, the fact that actual confusion was immediate lends support to the ultimate determination that Ford's use of the same name as InterMotive created a likelihood of confusion as to the origin of Ford's module.

### 5.    Marketing Channels Used

The fifth factor that the Court must consider in determining whether a likelihood of confusion exists is whether InterMotive's and Ford's modules are likely to be sold in the same or similar outlets or advertised in similar media. In the written briefs, the parties do not direct the Court to any particular evidence concerning the fifth factor. InterMotive asserts that it presented evidence "throughout" trial that demonstrates that "Ford used the same mark in the same specialty vehicle market, and for the same customers." ECF No. 289, PageID.12501. While InterMotive does not provide a citation for its assertion, Ford does not address the fifth factor, and concedes that InterMotive presented "some evidence" on the likelihood of confusion factors that Ford does not address. ECF No. 286, PageID.11852. In the absence of an argument to the contrary, the Court deems Ford to have conceded as a basic fact of this case that InterMotive's and Ford's modules are sold to the same customers in the same specialty vehicle marketplace. Accordingly, the Court finds that there was substantial

evidence for the jury to reasonably find that the fifth factor weighs in favor of a determination that a likelihood of confusion exists.

### 6.    Likely Degree of Purchaser Care

The sixth factor that the Court must consider in determining whether a likelihood of confusion exists is the degree of care that purchasers or potential purchasers are likely to exercise in buying or considering whether to buy InterMotive's and Ford's modules. "Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper." *Homeowners Grp.*, 931 F.2d at 1111. "When services are sold to such buyers, other things being equal, there is less likelihood of confusion." *Id.*

Without further elaboration, Ford argues that the sixth factor favors Ford because upfitters are sophisticated customers who use engineers to make purchasing decisions. However, the Sixth Circuit has cautioned against according buyer sophistication "disproportionate significance" without regard to the particular facts of the case. *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir. 1996). "The expertise of purchasers does not necessarily preclude a finding that confusion is likely, and where the products are identical and the marks are identical, the sophistication of buyers cannot

be relied on to prevent confusion." *Id.* (quotations, alteration, and citations omitted). In the absence of any explanation as to why engineers are unlikely to be confused by Ford's use of an identical mark on nearly identical products, the Court finds that there was substantial evidence for the jury to reasonably find that the seventh factor weighs in favor of a determination that a likelihood of confusion exists.

### 7.   The Intent of Defendant in Selecting The Mark

The seventh factor that the Court must consider in determining whether a likelihood of confusion exists is Ford's intent in selecting the "Upfitter Interface Module" name. "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Grp.*, 931 F.2d at 1111. "An intent to infringe can be shown by circumstantial evidence." *Champions Golf Club*, 78 F.3d at 1121 (quotation omitted). "Thus, use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement." *Id.* (quotation omitted). With respect to the seventh factor of the likelihood of confusion test, both Ford and InterMotive repeat their above arguments for the seventh factor of intentional copying in the context of secondary meaning. Accordingly, for the reasons set forth above, the Court finds that there was substantial evidence for the jury to reasonably find that the seventh factor weighs in favor of a determination that a likelihood of confusion exists.

## 8.   Likelihood of Expansion of The Product Lines

The eighth factor that the Court must consider in determining whether a likelihood of confusion exists is whether InterMotive's and Ford's product lines will expand into each other's marketplaces. However, neither Ford nor InterMotive explicitly addresses the eighth factor. Accordingly, the Court presumes that the eighth factor is not applicable.

## 9.   Balancing and Conclusion

As set forth above, the Court finds that there was substantial evidence for the jury to reasonably find that several factors weigh in favor of a determination that a likelihood of confusion exists. Initially, given that Ford used an identical mark on nearly identical products sold to the same customers in the same specialty vehicle marketplace, the second factor of the relatedness of the goods or services, the third factor of the similarity of the marks, and the fifth factor of the marketing channels used, all strongly favor InterMotive. Moreover, other factors that favor InterMotive include: the fourth factor of evidence of actual confusion; and the seventh factor of Ford's intent in selecting the mark. With respect to the sixth factor of the degree of purchaser care, although upfitters are sophisticated customers who use engineers to make purchasing decisions, Ford offers no explanation as to why engineers would be unlikely to be confused by Ford's use of an identical mark on nearly

identical products. Accordingly, this factor either favors InterMotive or does not favor either party. Although the remaining factor, the first factor regarding the strength of the mark, favors Ford, this factor does not outweigh the factors that favor InterMotive.

After considering and balancing the factors in light of the evidence presented at trial, the Court concludes that the factors support the jury's finding that Ford's use of the "Upfitter Interface Module" name created a likelihood of confusion as to the origin of Ford's module. Accordingly, the Court will **DENY** Ford's motion for judgment as a matter of law on InterMotive's Lanham Act counterclaims as to non-infringement.

## VIII. CONCLUSION

For the reasons stated in this Order, Ford's motions for judgment as a matter of law and for a new trial are **HEREBY DENIED**.

**IT IS SO ORDERED.**

Dated: September 30, 2025    /s/Terrence G. Berg
                             HON. TERRENCE G. BERG
                             UNITED STATES DISTRICT