UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **FORD MOTOR COMPANY and FORD GLOBAL TECHNOLOGIES, LLC,** | **4:17-CV-11584-TGB-APP** |
| Plaintiffs/Counter-Defendants, | HON. TERRENCE G. BERG |
| vs. | **ORDER GRANTING IN PART INTERMOTIVE'S MOTION FOR ATTORNEY FEES (ECF NO. 284)** |
| **INTERMOTIVE, INC. and GREGORY E. SCHAFFER,** | |
| Defendants/Counter-Plaintiffs. | |

After nearly seven years of litigation between Ford Motor Company and InterMotive, Inc., a case that started with Ford suing InterMotive for allegedly using the Ford blue oval without permission in connection with its device called the "Upfitter Interface Module" (a claim that Ford dropped before the jury could decide it), and in which InterMotive countersued that Ford stole its trade secrets connected to its Upfitter Interface Module, and violated its trademark, the jury rendered a verdict for InterMotive on several of its counterclaims and awarded InterMotive over $13 million in damages.

InterMotive now moves for an award of attorney fees in this matter. ECF No. 284. InterMotive asserts that this is an exceptional case under the Lanham Act, that Ford's trade secret misappropriation was willful and malicious, and that an award of attorney fees is appropriate under

1

the Court's inherent authority. This motion has been fully briefed. ECF Nos. 284, 290, 292. The Court will decide InterMotive's motion for attorney fees without a hearing. E.D. Mich. LR 7.1(f)(2). For the reasons stated below, the Court will **GRANT IN PART** InterMotive's motion for attorney fees. The Court will further order additional briefing regarding the reasonableness or amount of the award.

## I.    BACKGROUND

### A. Procedural History

The Court has previously set forth an extensive background of the facts of this case between Ford Motor Company and Ford Global Technologies, LLC (together, "Ford") against InterMotive, Inc. and Gregory E. Schafer (together, "InterMotive") on summary judgment, ECF No. 65, and also in its Order Denying Defendant's Motion to Amend the Judgment, ECF No. 295, and so will not repeat that background at length again. InterMotive and Ford had a relationship dating back to 2011 and early 2012 where InterMotive would design an Upfitter Interface Module for Ford to offer on its vehicles for the upfit marketplace as a factory-installed option. ECF No. 251, PageID.9805–07, 9813–18; ECF No. 252, PageID.9844–45. The preliminary discussions between Ford and InterMotive were governed by a Confidential Disclosure Agreement (the "CDA"). Trial Ex. 20. InterMotive developed a Ford-specific Phase 1 module for the March 2012 National Truck Equipment Association ("NTEA") Work Truck Show, and InterMotive and Ford jointly made a

video and a brochure for the Show, to jointly promote the Upfitter Interface Module. ECF No. 252, PageID.9890–98; ECF No. 251, PageID.9799–9802; ECF No. 255, PageID.10211–21, 10249–53; Trial Exs. 82, 83. At this show, a Ford engineer played the video during Ford's scheduled presentation before about 400 people. During this time period, Ford gave InterMotive permission to use Ford logos and led InterMotive to believe they were partners. ECF No. 253, PageID.10026–28. InterMotive continued to develop a Phase-2 module, and later delivered a "confidential-marked" prototype at a demonstration at Ford in December 2012. *Id.*; Trial Ex. 44.

In early 2013, Ford informed InterMotive that Ford was not moving forward with developing its own Upfitter Interface Module. However, unbeknownst to InterMotive, Ford sent specifications to other potential suppliers, and at the 2016 NTEA show, Ford announced that several of its 2017 vehicles would include an "Upfitter Interface Module" that would better enable upfitters to interact with the electrical system of Ford vehicles for upfitting modification. ECF No. 253, PageID.10028–29, 10034–35. InterMotive states that it was apparent that Ford had taken InterMotive's confidential information from the Phase 2 specification. *Id.* PageID.10036. InterMotive attempted to resolve its issues with Ford, but Ford instead responded by bringing the instant lawsuit against InterMotive. *Id.* PageID.10037.

3

Specifically, Ford brought this lawsuit against InterMotive on May 17, 2017, alleging: (1) Trademark Infringement pursuant to 15 U.S.C. § 1114, (2) False Designation of Origin pursuant to 15 U.S.C. § 1125(a), (3) Unfair Competition, (4) Trademark Dilution, (5) Cancelation of Trademark Registration pursuant to 15 U.S.C. § 1064, and (6) declaratory judgment. ECF Nos. 1, 26. Thereafter, InterMotive answered and brought six counterclaims against Ford, alleging (1) Infringement of a Registered Trademark, (2) Unfair Competition under § 43(a) of the Lanham Act, (3) Breach of Contract, (4) Unfair Competition under state law, (5) Trade Secret Misappropriation under the Michigan Uniform Trade Secrets Act, and (6) False Advertising. ECF No. 42. The Court dismissed with prejudice Ford's Count V for Trademark Cancelation relatively early in this litigation. See ECF No. 35.

Following years of contentious discovery and motion practice, a jury trial was ultimately held in this case from October 18, 2023 to November 1, 2023. With respect to InterMotive's present motion for attorney fees, Ford dismissed its trademark claims against InterMotive during trial, but only after it presented its case-in-chief, so only InterMotive's counterclaims were presented to the jury. The jury ultimately found for InterMotive on two of its Lanham Act counterclaims: (1) trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; and (2) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a). As set forth in the verdict form, the jury found that InterMotive owns a valid trademark in the product name "Upfitter Interface Module." ECF No. 247, PageID.9408. The Court instructed the jury to find for InterMotive on validity if it proved that InterMotive's registered "Upfitter Interface Module" trademark is not generic (i.e., is, at least, descriptive) and has acquired distinctiveness through secondary meaning. ECF No. 266, PageID.11142–45. Furthermore, the jury found that Ford's use of the "Upfitter Interface Module" name created a likelihood of confusion as to the origin of Ford's module and, therefore, constituted trademark infringement and unfair competition under the Lanham Act. ECF No. 247, PageID.9408, 9413. Additionally, the jury determined that Ford's infringement was willful, deliberate, and intentional. *Id.* at PageID.9408. Based on its assessment of the amount of Ford's profits caused by Ford's Lanham Act violations, the jury awarded InterMotive $0.00 for trademark infringement and $349,867 for unfair competition. *Id.* at PageID.9408, 9413.

The jury also found for InterMotive on its counterclaim for trade secret misappropriation under the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901, *et seq*. At trial, InterMotive defined the trade secret as "the use of programmable inputs in a device like the Upfitter Interface Module." ECF No. 266, PageID.11154. In other words, the trade secret is a combination of two elements: (1) a device like the Upfitter Interface Module; and (2) programmable inputs. As set forth in

the verdict form, the jury found that "the use of programmable inputs in a device like the Upfitter Interface Module" was InterMotive's trade secret, and that Ford misappropriated InterMotive's trade secret. *Id.* at PageID.9411. Based on its assessment of the amount of Ford's profits that were caused by Ford's use of the trade secret, the jury awarded InterMotive $13,209,300 for trade secret misappropriation. *Id.*[1]

On September 25, 2024, the Court entered final judgment on the jury verdict. ECF No. 282. After concluding that allowing InterMotive to separately recover the smaller amount the jury awarded for unfair competition would constitute a double recovery of Ford's profits, the Court ordered that InterMotive shall be allowed to recover only the larger amount the jury awarded for trade secret misappropriation. *Id.* at PageID.11652.

**B. InterMotive's Motion for Attorney Fees (ECF No. 284)**

InterMotive has now moved for attorney fees as permitted by the Lanham Act, the MUTSA, and the Court's inherent authority. ECF No. 284. InterMotive asserts that both its and Ford's Lanham Act claims are "exceptional cases" justifying an award of attorney fees. InterMotive argues that Ford's trademark claims against it were frivolous, and superficially litigated mainly to allow Ford to claim the right to present

---

[1]      The jury also found for InterMotive on its breach of contract claim, but found that InterMotive failed to prove its false advertising claim by a preponderance of the evidence. ECF No. 247, PageID.9409–10.

its case first at trial, and thus were brought and maintained in bad faith. InterMotive further argues that the evidence established, and the jury found, that Ford's defense of InterMotive's trademark-based claims was unreasonable and that Ford's infringement of InterMotive's trademark was "willful, deliberate, and intentional." Further, the evidence at trial established that Ford's misappropriation of InterMotive's trade secret— by gaining access to InterMotive's trade secret-protected technology through a confidentiality agreement, and then immediately sharing that technology with other suppliers and copying the technology into its own product—was willful and malicious. Finally, InterMotive asserts that Ford's litigation conduct was vexatious and improper, justifying an award of fees under the Court's inherent authority.

Ford filed a response in opposition to InterMotive's motion. ECF No. 290. Ford argues that this is not an exceptional case because InterMotive prevailed on only some of its claims and received only a fraction of the award it sought, and thus InterMotive is not entitled to attorney fees with respect to the Lanham Act claims. Ford further argues that there was no factual finding by the jury of "willful and malicious appropriation" to support an award of fees on InterMotive's MUTSA claim, and that the litigation conduct in this case does not support an award of attorney fees under the Court's inherent authority.

## II.   DISCUSSION

### A. Ford's Trademark Claims Against InterMotive

InterMotive first contends that it is entitled to an award of its attorney fees in this case because Ford's trademark claims against it, which Ford dropped during the trial, were brought and maintained in bad faith. Ford responds that its trademark claims were meritorious and required.

Under the general American rule, unless Congress provides otherwise, parties to litigation are to bear their own attorney fees. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533 (1994). The Lanham Act provides such an exception. "Where a plaintiff fails to establish a claim for trademark or trade dress infringement under the Lanham Act, a court may award attorney's fees to the defendant in 'exceptional cases.'" *Bliss Collection, LLC v. Latham Cos., LLC*, 82 F.4th 499, 516 (6th Cir. 2023) (quoting 15 U.S.C. § 1117(a)). "An 'exceptional' case is 'one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) *or* the unreasonable manner in which the case was litigated.'" *Id.* (emphasis added) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). "In particular, 'exceptionally meritless claims' or claims brought in 'bad faith' warrant an award of attorney's fees." *Id.* (quoting *Octane Fitness*, 572 U.S. at 555). However, fees generally are awarded against a plaintiff under the Lanham Act

8

"only in rare circumstances" after the court considers "the totality of the circumstances." *Id.* (citing *Octane Fitness*, 572 U.S. at 554–55; *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 235 (6th Cir. 2019)). That means that a prevailing defendant is not entitled to attorney's fees under § 1117(a) as a matter of course. *Id.* (quoting *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004)). Instead, the defendant must demonstrate that the case is "exceptional."

As discussed above, InterMotive and Ford had a relationship dating back to 2011 and early 2012 where InterMotive would design an Upfitter Interface Module for Ford to offer on its vehicles for the upfit marketplace as a factory-installed option. The parties' preliminary discussions were governed by a Confidential Disclosure Agreement (the "CDA"). Trial Ex. 20. InterMotive first developed a Ford-specific Phase 1 module for the March 2012 NTEA Work Truck Show, and InterMotive and Ford jointly made a video and a brochure for the NTEA Show, to jointly promote the Upfitter Interface Module. During this time period, Ford gave InterMotive permission to use Ford logos and led InterMotive to believe they were partners.

In early 2013, Ford informed InterMotive that Ford was not moving forward with developing its own Upfitter Interface Module. Then, unbeknownst to InterMotive, Ford sent specifications to other potential suppliers, and at the 2016 NTEA show, Ford announced that several of its 2017 vehicles would include an "Upfitter Interface Module" that would

9

better enable upfitters to interact with the electrical system of Ford vehicles for upfitting modification. InterMotive states that it was apparent that Ford had taken InterMotive's confidential information from the Phase 2 specification. InterMotive attempted to resolve its issues with Ford, but Ford instead responded by bringing the instant lawsuit against InterMotive, alleging that InterMotive infringed on Ford's trademark rights by using Ford's mark on InterMotive products and marketing materials without Ford's consent. After years of litigation that included complex discovery disputes, sanctions, and weeks of trial before a jury, Ford simply dropped this claim after presenting its case-in-chief, so its merits were never tested.

InterMotive argues that Ford's trademark claims were frivolous and asserted in bad faith, rendering this an "exceptional case" under the Lanham Act. InterMotive states that Ford sued InterMotive here for trademark infringement—alleged improper use of the Ford Blue Oval logo—after previously giving InterMotive permission to use Ford logos and leading InterMotive to believe they were "partners."

Referring to Ford's Count V for Trademark Cancelation, InterMotive first argues that Ford asserted the frivolous claim that InterMotive's brand should not be on the Supplemental Register because it is allegedly "merely descriptive." ECF No. 284, PageID.11667. The Court readily dismissed that claim at the motion to dismiss stage as "not cognizable" because "[t]he Supplemental Register is specifically for

10

marks that, in the opinion of the Trademark Office, are merely descriptive and have not yet acquired secondary meaning." ECF No. 25, PageID.281–82. Ford responds by first making the same arguments as it did in its initial motion to dismiss, which this Court has already addressed and rejected. ECF No. 290, PageID.12513–14. Ford then contends that the fact that its legal theory was not ultimately successful does not mean it was objectively unreasonable. *Id.* at PageID.12514. The Court agrees that "a party's arguments are not objectively unreasonable simply because they did not carry the day." *See SFP Works v. Buffalo Armory, LLC*, No. 14-13575, 2017 WL 9474212, at *2 (E.D. Mich. Apr. 18, 2017) (Grand, M.J.), *report and recommendation adopted*, 2017 WL 4051564 (E.D. Mich. Sept. 13, 2017) (Hood, J.).

InterMotive also asserts that Ford repeatedly alleged that *it* was the first to use the brand Upfitter Interface Module, when it knew it was not. *See* ECF No. 28, PageID.513–15; ECF No. 25, PageID.26–71; ECF No. 26, PageID.315–16. As discussed above, Ford and InterMotive had a relationship dating back to 2011 where InterMotive was developing the Upfitter Interface Module, years before Ford announced its Upfitter Interface Module in 2016. Ford's continued assertions that *it* was the first to use the Upfitter Interface Module brand were unsupported by the evidence and InterMotive therefore contends they were  asserted in bad faith.

11

InterMotive next argues that Ford's litigation of its trademark infringement claims against InterMotive shows that Ford's claim was not brought for a proper purpose, but instead was asserted only to harass InterMotive and prevent InterMotive from presenting its case first at trial. As stated above, Ford had previously given InterMotive permission to use Ford logos for the presentation in 2012. InterMotive ceased using a Ford logo on the "splash screen" of its Upfitter Interface Module and in its promotional materials in 2016, when Ford so requested, and informed Ford of this fact, ECF No. 47-16, PageID.1293–94, yet Ford nevertheless brought this lawsuit in 2017 alleging trademark infringement. InterMotive asserts that Ford then engaged in only limited discovery on its trademark claims. The Court imposed sanctions against Ford— twice—for violation of the Court's order compelling discovery and for violation of that sanctions order. ECF No. 128. In the Court's subsequent clarification order, the Court, noting that "InterMotive's point about further discovery delays is well-taken," ruled that "experts on both sides will need to base their opinions on evidence already produced in discovery or otherwise available to both parties in the public sphere." ECF No. 142, PageID.3782. The Court ultimately barred Ford's damages evidence at trial—Ford disclosed that it was seeking $49,000 in lost royalties for its trademark claims for the first time through its expert report on damages —because of Ford's failure to produce materials its expert relied on to support her damages theory during fact discovery. ECF No. 218,

PageID.8183–84. Ford then sought in the days leading up to trial to assert yet a different damages remedy—disgorgement of InterMotive's profits under an unjust enrichment theory—which the Court struck down because Ford and its expert had never disclosed an unjust enrichment theory of damages. ECF No. 227, PageID.8299 ("Ford is barred from introducing damages evidence on its trademark claims. It may not now switch to an unjust enrichment theory.").

At the Final Pretrial Conference, InterMotive argued that the Court should bar Ford's trademark claims to simplify trial and realign the parties, because InterMotive stopped using Ford's trademarks in 2016, and thus an infringement determination would be academic and only useful toward an injunction against future uses. ECF No. 218, PageID.8184. The Court declined to so rule at that time, but "encourage[d] the parties to meet and confer about the usefulness of an infringement determination and the likelihood of injunctive relief." *Id.* Ford nevertheless persisted to trial on its trademark infringement claim, rebuffing InterMotive's request to go first as the natural plaintiff, but InterMotive asserts Ford failed to call any witness to testify to infringement or dilution. It came to light that Ford's sole claim for infringement at trial rested on the existence of an active link in a court filing (in Mr. Schafer's declarations) directed to a *private* YouTube video. InterMotive states that the link could not be accessed via a public YouTube search, but instead could *only* be accessed by knowing and

typing in the exact link. ECF No. 250, PageID.9616. InterMotive put the link in certain court filings in this case to defend itself to show the Court that its video was fair use, and because the link Ford submitted in its court filings did not work. *Id.* at PageID.9615–16, 9619–20.[2]

As stated, Ford eventually dropped its trademark claims at trial, but only after it presented its case-in-chief. Ford called several witness, whose testimony lasted for five days of the trial, through which Ford predominantly presented rebuttals and defenses to InterMotive's counterclaims against Ford. When Ford briefly turned to *its* claims, trial testimony confirmed that Ford's claims were based only on a non-public link included in a court document:

> A.   Well, you're—you're making it sound like anyone can go and—and type in InterMotive, Ford, UIM and pull up this video, and that's not true.
>
> Q.   I've actually never said that, Mr. Schafer.
>
> A.   But that's what you're implying to this jury.

---

[2]   The Court notes that InterMotive's inclusion of this link in court documents filed in this case is privileged use. *See Fisher v. Perron*, No. 20-12403, 2021 WL 103633, at \*5–6 (E.D. Mich. Jan. 12, 2021) (Cleland, J.) ("In Michigan, the concept of absolute privilege is also well established, covering 'testimony or other communications or disclosures made in the court or judicial proceedings.'") (citing *Ellis v. Kay-Kibbey*, 581 F. Supp. 2d 861, 878 (W.D. Mich. 2008)), *aff'd*, 30 F.4th 289 (6th Cir. 2022); *see also Oesterle v. Wallace*, 725 N.W.2d 470, 474 (2006) ("Immunity extends to every step in the proceeding and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits.").

Q.    No, I'm implying that Ford—all Ford really wants you to do is just stopping use the Ford Blue Oval.

A.    And we're not.

Q.    Will you do the jury, the judge and Ford Motor Company a favor and just take down the Ford Blue Oval and end Ford's trademark claim? Just take that down. Will you please do that?

A.    We can do that.

Q.    Thank you.

Mr. Leroy: It's all Ford's [sic] wants, Your Honor. That's all it ever wanted. I'll pass the witness.

ECF No. 250, PageID.9622–23. Ford then withdrew its trademark infringement claims. ECF No. 251, PageID.9654.[3]

InterMotive contends that Ford put it through the unnecessary expense of challenging claims Ford knew it could not ultimately maintain, and that there is no evidence that Ford would have dropped its trademark infringement claim earlier if InterMotive had agreed to remove a link to a private YouTube video from a court filing, or that this private link in a court filing justifies the years of federal litigation on this

---

[3]    While Ford argues in its response that there was something more than this privileged use of a video, the record Ford cites in support belies this. That record, Mr. Schafer's Declaration, discusses a promotional video InterMotive made *jointly with Ford* promoting the use of the Upfitter Interface Module product in Ford vehicles for the 2012 NTEA trade show which *Ford itself* played during its scheduled presentation before about 400 people. ECF No. 46-3, PageID.1125–26. However, Mr. Schafer plainly states in his declaration that InterMotive had discontinued all instances of alleged infringement in 2016 or 2017. *Id.* at PageID.1125.

claim. InterMotive asserts that Ford dismissed its trademark infringement claim when it did both because InterMotive would move for judgment and likely win, and because it wanted to deprive InterMotive of the chance to present an unclean hands defense against Ford's claim. InterMotive wished to raise an unclean hands defense based on evidence it wanted to present concerning Ford's behavior relating to the Police Surveillance Mode Module that InterMotive created. ECF No. 284, PageID.11671. InterMotive asserts that this evidence would have shown that Ford stole credit for the Police Surveillance Mode Module, tried to file a patent application on it behind InterMotive's back, and would have used any patent issuing from the application to prevent others from using the technology, including InterMotive. ECF No. 250, PageID.9635–37; ECF No. 251, PageID.9657.

Taken as a whole, the Court finds InterMotive's arguments persuasive. After reviewing the totality of the circumstances in this case, the Court finds that the strength of the litigating positions and the manner in which the case was litigated weigh in favor of InterMotive's entitlement to fees on Ford's trademark claims under 15 U.S.C. § 1117(a). In making this determination, courts consider several factors, which include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 572 U.S. at 554 n.6 (quoting *Fogerty*, 510

U.S. at 534 n.19). "No one factor is determinative, and an infringement suit could be 'exceptional' for a prevailing defendant because of (1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well." *Eagles, Ltd.*, 356 F.3d at 729 (citing *National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1146-47 (10th Cir. 2000)). "Awarding attorney's fees to a prevailing defendant is meant to 'provide protection against *unfounded* suits brought by trademark owners for *harassment* and the like." *Id.* (quoting S. Rep. No. 93-1400 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7136 (emphases added)).

This is not a "run-of-the-mill" trademark infringement case. Ford's trademark claim ultimately pursued at trial—based solely on a link to a private video listed in a declaration filed in this case—is exceedingly weak. The parties litigated for almost seven years, with Ford pursuing this flimsy trademark infringement claim against a much smaller company that Ford had previously given permission to use its logo, all the way to the threshold of a jury verdict, when it unceremoniously withdrew the claim. The Court questioned the continued vitality of Ford's trademark claims at the Final Pretrial Conference, given that InterMotive had stopped using Ford's trademarks in 2016 and "an infringement determination would be academic because it would only be useful toward an injunction against future loss," ECF No. 218,

PageID.8184, but Ford nevertheless persisted with this claim at trial, a stratagem which allowed it to present its case-in-chief in advance of InterMotive, and unnecessarily extended this litigation.

Accordingly, the Court finds that this litigation qualifies as an "exceptional case" warranting an award of fees under 15 U.S.C. § 1117(a). *See, e.g., RJ Control Consultants, Inc. v. MultiJect, LLC*, No. 16-10728, 2024 WL 166000, at *5 (E.D. Mich. Jan. 16, 2024) (Lawson, J.) ("Although lack of success in itself may not render this case 'exceptional,' the repeated advancement of defunct legal theories, along with the total failure to plead or sustain a bedrock element of the trademark claim, certainly sets it apart from the mine run of trademark cases involving at least minimally plausible causes of action. That places the suit in the 'exceptional' category where fee shifting is justified."); *Leapers, Inc. v. SMTS, LLC*, No. 14-12290, 2017 WL 3084370, at *6 (E.D. Mich. July 20, 2017) (Cleland, J.) ("In light of, among other things, the objective weakness of Leapers' position, the improper motive implied by the campaign of asymmetrical warfare of which this case is a single front, and the need to deter such troubling uses of the judicial process in the future, the court finds this case to have been exceptional within the meaning of the Lanham Act, 15 U.S.C. § 1117(a).").

InterMotive's motion for attorney fees as to Ford's trademark claims is therefore will be **GRANTED**. The amount of those damages,

however, must be determined at a later date, for the reasons discussed below.

## B. InterMotive's Trademark Claims Against Ford

Turning next to InterMotive's trademark claims against Ford, the Lanham Act permits a court to award reasonable attorney fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). InterMotive argues that it is entitled to an award of attorney fees for prevailing on its trademark claims against Ford.

InterMotive is unquestionably the prevailing party in this action. The jury found for InterMotive on its claims for trademark infringement and unfair competition under the Lanham Act, as well as on its breach of contract and trade secret claims, and found that Ford's infringement of InterMotive's trademarks was willful, deliberate, and intentional. ECF No. 247, PageID.9408, 9413.[4] As the Supreme Court held in *Octane*, an "exceptional" case is one that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the

---

[4]    That InterMotive did not prevail on its false advertising claim does not change InterMotive's prevailing party status because a party need not prevail on every claim to be considered a prevailing party. *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 425 (6th Cir. 2012). As the Sixth Circuit has noted, a plaintiff "crosses the threshold to 'prevailing party' status by succeeding on a single claim, even if he loses on several others and even if that limited success does not grant him the 'primary relief' he sought." *McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010) (explaining that the magnitude of the relief goes only to the amount of fees awarded).

19

governing law and the facts of the case) *or* the unreasonable manner in which the case was litigated." *Octane*, 572 U.S. at 554 (emphasis added). InterMotive, as the party seeking attorneys' fees, must prove exceptionality by "a preponderance of the evidence." *See id.* at 557. The Sixth Circuit has recognized that "[b]latant trademark infringement might justify an award for the plaintiff, whereas a frivolous infringement claim might justify one for the defendant." *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 478 (6th Cir. 2022). Based on the totality of the circumstances here, the Court finds that this is such a case.

First, evidence of Ford's infringement of InterMotive's marks was clear and the jury's finding of willfulness is well supported in the record. The Sixth Circuit has recognized that it has "adopted no authoritative definition" of willful, *La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 612 (6th Cir. 2023), although the Supreme Court noted that "[c]ourts of equity ... defined 'willfulness' to encompass a range of culpable mental states—including the equivalent of recklessness, but excluding 'good faith' or negligence." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 220 (2020) (Sotomayor, J., concurring in the judgment); *see also Quick Techs., Inc. v. The Sage Grp., PLC*, 313 F.3d 338, 349 n.9 (5th Cir. 2002) (stating that trademark infringement is willful "if it is done voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion and with the intent to cause confusion, to cause mistake, or to deceive.")

20

(cleaned up). InterMotive presented evidence at trial that Ford knew that InterMotive used "Upfitter Interface Module" as a brand since 2010 or 2011 and that Ford intentionally copied it for its own version of the same product. ECF No. 252, PageID.9986–87; ECF No. 255, PageID.10211–22, 10229–30; Trial Exs. 137, 138. Indeed, in its motion for judgment as a matter of law, Ford essentially concedes that it used an identical mark on nearly identical products sold to the same customers in the same specialty vehicle marketplace. *See* ECF No. 286, PageID.11845–53. InterMotive began selling its products under the Upfitter Interface Module brand in 2010 or 2011, including advertising in magazines and brochures. ECF No. 252, PageID.9986–89; Trial Exs. 137, 138. Ford and InterMotive worked together to promote InterMotive's brand in starting in 2012 at various trade shows. ECF No. 252, PageID.9890–98; ECF No. 251, PageID.9799–9802; ECF No. 255, PageID.10211–21, 10249–53; Trial Exs. 82, 83. The evidence showed that Ford knew that customers in the market recognized InterMotive's brand as early as 2012. Trial Exs. 24, 26. Then, after parting ways with InterMotive with respect to InterMotive's module, Ford introduced *its* module (which InterMotive asserts was "clearly" its Phase 2 product), first as a "CAN Interface Module," and then as the "Upfitter Interface Module" in 2016. ECF No. 242, PageID.9850–51; ECF No. 255, PageID.100247–48.

Evidence at trial supported the jury's finding that Ford intentionally copied InterMotive's brand with the intent to benefit from

21

InterMotive's reputation. InterMotive presented an August 2014 email from Ford engineer Syed Monnan to other Ford employees recommending changing the name of Ford's module. In his email entitled "Upfitter Module Name Change," Monnan advised:

> It appears the Upfitter Interface Module (UIM) name may be used by an existing aftermarket Supplier. To ensure we don't run into any issues with another potential company that has the same name as UIM, I recommend we change the name to Programmable Upfitter Interface Module (PUIM) or Programmable Interface Module (PIM), or Programmable Upfitter Module (PUM).

ECF No. 286-3, PageID.11866. Although Monnan disputed at trial that he was referring specifically to InterMotive as the "aftermarket Supplier" in that email, and claimed he was concerned instead simply about Ford using a generic term, ECF No. 238, PageID.8842–43, the Court finds that there was substantial evidence for the jury to evaluate Monnan's credibility and reasonably find that Monnan's email demonstrates Ford's knowledge that using the same name as InterMotive would cause confusion. In addition, Chris Danowski of Ford Global Technologies said: "This is—this is embarrassing, this is terrible. You gotta go in there and kind of let the guy know exactly what happened here" when discussing Ford's naming of its module as the Upfitter Interface Module. ECF No. 252, PageID.9855. Ford copied the Upfitter Interface Module brand anyway. The preponderance of the evidence establishes an intentional and willful case of copying with an intent to confuse potential customers,

supports the jury's finding of willful infringement, and demonstrates that this is an "exceptional" case justifying an attorney fees award to InterMotive.

The Court also looks back at the history and finds that the manner in which Ford litigated this case makes it exceptional. In addition to Ford unreasonably pressing its trademark claims against InterMotive, knowing that InterMotive had ceased any use of Ford's marks before the lawsuit was even filed, with the sole claim at trial based only on a private link to a jointly made video contained in a court document filed in this case, as discussed above, there is more. InterMotive presented evidence that before the suit was even brought, Ford invited InterMotive to meet with a person who Ford represented was an independent, unbiased investigator in order to evaluate InterMotive's complaint. This person was actually an attorney who was Ford's litigation counsel. When InterMotive first brought its concerns regarding Ford's infringement to Ford, Ford's in-house counsel responded:

> I took your concerns very seriously, and rather than have it investigated internally with the risk that the determination would be biased in any way, I chose to pay a firm that I have the utmost confidence in to provide a clear picture of what occurred, regardless of what their investigation showed.

Trial Ex. 323. This investigator turned out to be Jared Cherry, counsel for Ford and who in fact represented Ford in this case. That fact was not disclosed to InterMotive at the time of the claimed "independent,"

"unbiased" investigation. Whether or not Mr. Schafer was aware that Mr. Cherry was attorney, Ford represented that he was a neutral investigator, which he most certainly was not. The Court addressed this issue multiple times during the trial, outside the presence of the jury, and stated that this behavior was "very disturbing and inappropriate," that the behavior could be an ethical violation, and that "[i]t's reprehensible that a company of Ford's experience and standing in the community would do what Mr. Schafer has suggested was done here, and I condemn it wholeheartedly." ECF No. 255, PageID.10356–57; ECF No. 264, PageID.10721–22. And aside from requesting a curative instruction of some sort with respect to Mr. Schafer's testimony about this issue, which the Court denied, ECF No. 264, PageID.10721–22, Ford did not otherwise present any evidence challenging Mr. Schafer's testimony.

The Court also recalls that it was necessary to apply sanctions to Ford during discovery due to their dilatory tactics and insufficient disclosure of requested and relevant information. ECF No. 128, PageID.3422–23; ECF No. 142; ECF No. 150. This is relatively rare, and the fact that such disciplinary action was required for the Court to enforce compliance with basic discovery obligations is another point weighing if favor of a finding that this was an exceptional case.

Ford cites to cases stating that a jury's finding of willfulness is necessary for an "exceptionality" finding but does not itself necessitate a fee award. ECF No. 290, PageID.12519–20 (citing *Coty Inc. v. Excell*

*Brands, LLC*, 277 F. Supp. 3d 425, 469 (S.D.N.Y. 2017); *Idenix Pharm. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 704–05 (D. Del. 2017)).[5] That is true, but, for all the reasons stated above, the Court here does not rely solely on the jury's willfulness finding to find this case exceptional. In addition, the caselaw also explains that the Court must take as true the jury's finding that Ford committed willful, deliberate, and intentional infringement when considering if the case is exceptional. *Idenix Pharm.*, 271 F. Supp. 3d at 697; s*ee also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1310 (Fed. Cir. 2001) ("[C]ertainly a judge cannot substitute his or her factual determination for a jury's willfulness finding."). And Ford's attacks on the jury's finding of willfulness in its response brief do not change this. Finally, Ford's argument that it was somehow justified in using the Upfitter Interface Module name in 2017 because InterMotive's mark was registered on the supplemental register instead of the principal register does not carry any traction. According to Ford, it was "more than justified to proceed with the understanding (acknowledged by InterMotive) that InterMotive did not have rights in the term 'UPFITTER INTERFACE MODULE.'" ECF No. 290,

---

[5]    Ford also challenges the jury's finding of willfulness. Without further elaboration, Ford argues in passing that the jury should have been instructed on "the standard for willful infringement under [*sic*] Lanham Act." ECF No. 290, PageID.12521. However, that challenge is not proper here and should have been made in Ford's motion for new trial/judgment as a matter of law, but was not. *See* ECF No. 286.

PageID.12519. While "[u]nregistered trademarks do not enjoy the same presumption of validity as registered marks, … they still may receive protection under section 43(a) of the Lanham Act if the plaintiff demonstrates 'continuous commercial utilization.'" *RJ Control Consultants*, 2024 WL 166000, at *5 (citing *Bliss Collection*, 82 F.4th at 506); *see also USPTO v. Booking.com B.V.*, 591 U.S. 549, 552–53 (2020) ("Even without a federal registration, a mark may be eligible for protections against infringement under both the Lanham Act and other sources of law.") (citation omitted). And, the jury found here that InterMotive established that it owns a valid trademark in the product name Upfitter Interface Module, including that the name is not generic and had acquired distinctiveness through secondary meaning before Ford began using the same name in 2016. ECF No. 247, PageID.9408; ECF No. 266, PageID.11142–11145. Ford has not cited to any case finding that registration of a mark on the supplemental register, and the consequent showing that the mark is descriptive, defeats a finding that the case is exceptional. Particularly given that Ford is a sophisticated company who presumably endeavors to choose distinctive names for its products, including here when adopting the already-familiar Upfitter Interface Module ("UIM") name over other descriptive terms,[6] the Court declines

---

[6]    *See*, *e.g.*, ECF No. 286-3, PageID.11866 (August 2014 email in which Ford engineer Syed Monnan recommended "we change the name to Programmable Upfitter Interface Module (PUIM) or Programmable Interface Module (PIM), or Programmable Upfitter Module (PUM)");

to deem an otherwise exceptional case unexceptional based solely on Ford's after-the-fact, litigation-driven position that InterMotive's product lacked sufficient evidence of secondary meaning.

Courts in this Circuit and elsewhere have exercised their discretion and found, based on a totality of the circumstances, that an award of attorney fees is warranted based on facts similar to those here. *See La Bamba Licensing, LLC*, 75 F.4th at 614–15 (affirming award of attorney fees, finding defendant's conduct "was sufficiently 'willful' to constitute 'an exceptional case that warrants the award of attorneys' fees'" in part based on the strong public interest in making the defendant's willful "misconduct unprofitable"); *Systematic Power Sols., LLC v. Fullriver Battery Manufacture Co., LTD*, No. 3:19-CV-277, 2023 WL 6518861, at *23 (E.D. Tenn. Aug. 18, 2023) (finding case to be exceptional where plaintiff "provided credible testimony and exhibits showing the deterioration of the parties' relationship, Defendants' introduction of the Full Throttle lineup, the similarities of the parties' productions, the market confusion, and the loss of customers given Defendants' cheaper products" and that "Defendants failed to rebut this testimony," in addition to unreasonable litigation tactics), *report and recommendation adopted*, 2023 WL 5938187 (E.D. Tenn. Sept. 12, 2023); *Ohio State Univ.*

---

Trial Ex. 17 (April 2016 email chain in which a Ford marketing person identified Ford's module as the "F-Series Interface Module" and as the "CAN interface module").

*v. Skreened Ltd.*, 16 F. Supp.3d 905, 921 (S.D. Ohio 2014) ("This is an exceptional case that warrants attorneys' fees. Plaintiff provided Defendants repeated actual notice of much of the infringement involved, and even if they had not received such notice, no reasonable person would have thought that selling t-shirts with identical marks to those licensed and held by Plaintiff was reasonable."); *see also Alliance for Good Gov't v. Coal. for Better Gov't*, 919 F.3d 291, 296 (5th Cir. 2019) (affirming grant of attorney fees to plaintiff where "Alliance adopted its logo at least 15 years before Coalition began using its similar logo; Alliance's composite mark was strong; the marks were very similar; and both parties provided the same 'product,' used the same advertising channels, and targeted the same 'customers,'" concluding that "[t]he likelihood of confusion [was] so great that it would appear that customer confusion was Coalition's motivation for adopting the Coalition Mark," and defendant litigated in an unreasonable manner); *FabriClear, LLC v. Harvest Direct, LLC*, No. 20-10580, 2024 WL 1886032, at *1–2 (D. Mass. Apr. 29, 2024) (finding an exceptional case based on defendant's intentional acts, the jury's finding of willful and knowing violations of the Lanham Act, and plaintiff's success on its remaining claims).

The Court finds, based on the totality of the circumstances, which includes the Court's recollection of the over six years of pretrial proceedings, the 11-day trial, and the jury's finding of willfulness, that this is an exceptional case under the Lanham Act, entitling InterMotive

to attorney fees on its Lanham Act claims. Because the parties provide insufficient support regarding how to determine the amount of those fees, however, they will be assessed at a later date, as will be discussed below.

## C. Misappropriation of Trade Secrets

InterMotive also seeks attorney fees related to its trade secret misappropriation claim under the MUTSA. It argues that the evidence at trial established that Ford wanted InterMotive's technology to enhance its own bottom line, that Ford gained access to InterMotive's trade secret protected technology through a confidentiality agreement, and then immediately shared that technology with other suppliers and copied the technology into its own product. ECF No. 284, PageID.11675–78.

Ford argues in response that InterMotive is not entitled to attorney fees for its trade secret misappropriation claim because it neither pled nor sought relief based on "willful and malicious misappropriation" and it did not submit the question of willful and malicious misappropriation to the jury. ECF No. 290, PageID.12521–23.

The MUTSA, MCL § 445.1901, *et seq.* provides, in relevant part, that a court "may award reasonable attorney's fees to the prevailing party" "if willful or malicious misappropriation [of a trade secret] exists." M.C.L. § 445.1905. The MUTSA defines "misappropriation" as either:

(i)    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii)    Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

M.C.L. § 445.1902(b). "Improper" includes: "theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." M.C.L. § 445.1902(a).

The statute, however, does not define what constitutes "willful and malicious misappropriation" and Michigan courts have provided little guidance on what those terms mean for purposes of the statute. However, the MUTSA states that courts should look to other UTSA jurisdictions

for interpretive law, M.C.L. § 445.1909, and the leading trade secrets treatise states:

> Under the UTSA, exemplary damages and attorneys' fees are available where the misappropriation was "willful," i.e., *done with actual or constructive knowledge of its probable consequences*, and "malicious," i.e., *done with intent to cause injury*.

1 Milgrim on Trade Secrets § 1.01[2][c][iv][C] (emphases added and citations omitted); *see KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 105–06 (D. Mass. 2024) (collecting cases adopting a similar "willful and malicious" standard); *see also Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 395 (6th Cir. 2022) (defining "willful and malicious" under the Kentucky UTSA as "behavior motivated by spite or ill will and a disregard for the rights of another with knowledge of probable injury.");[7] *Highland Consulting Grp., Inc. v. Minjares*, No. 19-CV-81636, 2024 WL 776792, at *10 (S.D Fla. Feb. 8, 2024) (stating if a person "uses the trade secret intending or recklessly disregarding that it will cause economic harm to the trade secret owner,

---

[7]    A Michigan state court similarly looked to the definitions of "malicious" and "willful" in Black's Law Dictionary to define those terms with respect to a criminal statute. *See People v. Mathes*, No. 347873, 2020 WL 5495189, at *2 (Mich. Ct. App. Sept. 10, 2020) (defining "malicious" as "[s]ubstantially certain to cause injury" or "[w]ithout just cause or excuse," and "willful" as "[v]oluntary and intentional, but not necessarily malicious.").

it crosses the line into willful and malicious behavior"), *report and recommendation adopted*, 2024 WL 776057 (S.D. Fla. Feb. 26, 2024); *Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, No. H-20-2543, 2021 WL 4710813, at *7 (S.D. Tex. Oct. 7, 2021) (applying the Texas UTSA definition of "willful and malicious misappropriation" as an "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret") (citing Tex. Civ. Prac. & Rem. Code § 134A.002(7)). The Court will adopt the definitions set forth in Milgrim.

There is also a dearth of caselaw as to whether a jury must make a finding of willfulness and  maliciousness to support an award of fees, or whether the court can make that determination on its own. However, M.C.L. § 445.1905 does not expressly require a finding by the factfinder of willful or malicious misappropriation before the Court may award attorney fees under the statute, and courts have held that the judge is "the factfinder in the attorney-fee context" under the MUTSA and "is permitted to make factual findings in accordance with his or her own view of the evidence." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 536 (6th Cir. 2008); *Radiant Global Logistics, Inc. v. Furstenau*, No. 18-cv-12783, 2024 WL 280643, at *2 (E.D. Mich. Jan. 25, 2024) (Friedman, J.) ("When considering a motion for attorney's fees under [the MUTSA], the Court acts as the factfinder and is not required to draw all inferences in favor of the non-moving party."); *see also Knox Trailers, Inc.*

*v. Maples*, No. 3:20-cv-137, 2023 WL 2570970, at *5 (E.D. Tenn. Feb. 14, 2023) (referring to jury's finding that defendant did not willfully and maliciously misappropriate plaintiff's trade secret as "advisory" only); *In re Matter of Ridgeway*, 973 F.3d 421, 426 (5th Cir. 2020) (noting that M.C.L. § 445.1905 contains "[n]o mention of a jury requirement," and that "[e]ven if willfulness and maliciousness must be found by a jury … [the] MUTSA leaves it to 'the court' to award attorney's fees" and "[t]he term court is synonymous with the judge or judges who sit on a tribunal"); *KPM Analytics*, 729 F. Supp. 3d. at 103 (stating only that a jury's finding of trade secret *misappropriation* is "a predicate for any factfinder—the Court or otherwise—being able to find that any such misappropriation was willful and malicious"); *but see Caudill Seed*, 53 F.4th at 395 (finding "sufficient evidence to support the jury's finding of willful and malicious misappropriation"  under the Kentucky UTSA).

Similarly, when deciding under M.C.L. § 445.1905 whether a trade secret claim was brought it "bad faith," entitling the defendant to attorney fees, the courts, not a jury, have generally made that "bad faith" factual finding when deciding whether to award fees. *See, e.g., Jadian, Inc. v. Nat'l Quality Assurance USA, Inc.*, No. 1:17-cv-907, 2020 13527935, at *2 (W.D. Mich. Nov. 30, 2020) (court finding no bad faith following rejection of trade secret claim at summary judgment); *Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 857–58 (W.D. Mich. 2007) (court finding plaintiff brought trade secret claims in bad faith and

awarding attorney fees to defendants), *aff'd*, 277 F. App'x 530 (6th Cir. 2008); *Radiant Global Logistics*, 2024 WL 280643, at *3 (court finding no "bad faith" sufficient to support an award of attorney fees where "[a]lthough the jury ultimately determined that Radiant had not identified any protectable trade secrets, … this Court has, on multiple occasions, specifically found that Radiant's claim for misappropriation had at least some merit.").

The Court therefore finds that it can make the determination here whether Ford's misappropriation of InterMotive's trade secrets, as found by the jury, was willful and malicious for purposes of M.C.L. § 445.1905.[8]

---

[8]    The two out-of-circuit cases Ford cites in a footnote in its response brief are distinguishable because they either do not address the finding of "willful and malicious misappropriation" after a jury trial or address exemplary damages and therefore do not compel a different result. In *Nephron Pharmaceuticals Corporation v. Hulsey*, No. 6:18-CV-1573, 2020 WL 7137992 (M.D. Fla. Dec. 7, 2020), the court denied defendant's motion for summary judgment because the plaintiff "has presented sufficient evidence to establish disputed issues of material fact with respect to whether Defendants misappropriated its trade secrets by acquisition or use" and then noted that "[t]hese issues of fact encompass whether Defendants engaged in 'willful and malicious' misappropriation and fall within the province of the jury." *Id.* at *2. In *Mattel, Inc. v. MGA Entertainment, Inc.*, 801 F. Supp. 2d 950 (C.D. Cal. 2011), the court addressed an award of exemplary damages under the California UTSA and recognized that "the existence of willful and malicious misappropriation is *ordinarily* considered a fact that a jury must find by clear and convincing evidence, [but] the court calculates the amount of exemplary damages," and that the court has an "independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award." *Id.* at 952–53.

*See also Cypress Advisors, Inc. v. Davis*, No. 16-cv-01935, 2022 WL 959775, at *4 (D. Colo. Mar. 30, 2022) (finding it appropriate for the court to make a willfulness finding on plaintiff's trade secret claim where that issue was not submitted to the jury, citing Fed. R. Civ. P. 49(a)(3)); *Seo v. Oh*, No. 18-cv-785, 2023 WL 143910, at *4 (D.D.C. Jan. 10, 2023) (finding that the court could determine the employee's start date of employment, for damages purposes, where the parties did not include that issue on the verdict form, recognizing that Fed. R. Civ. P. 49(a)(3) "'puts the burden of securing a jury verdict on all of the meaningful issues in the case squarely on the parties,' and, '[i]f the right to [a] jury trial has been waived on an issue by a failure to demand its submission, the trial judge should make his or her own finding of fact on that issue.'") (quoting 9B Wright & Miller, *Federal Practice and Procedure* § 2507 (3d ed. 2022)); *see also* Fed. R. Civ. P. 49(a)(3) ("A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless, before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue….").

Here, InterMotive submitted evidence that it shared its trade secret—the addition of programmable inputs in a device like the Upfitter Interface Module—with Ford in 2012 under the Confidential Disclosure Agreement, through the Specification of InterMotive's product, by telephone, and through the Confidential prototype module it supplied to

35

Ford. ECF No. 251, PageID.9805–07, 9813–18; ECF No. 252, PageID.9844–45; Trial Exs. 20, 30, 44, 329. Ford signed the Confidential Disclosure Agreement, and accepted the confidential Specification and prototype, thus agreeing to keep confidential InterMotive's trade secret and other protected information. Trial Ex. 20; ECF No. 242, PageID.9845; ECF No. 255, PageID.10209; ECF No. 265, PageID.10925. InterMotive presented evidence that its trade secret was not known outside of InterMotive's business, ECF No. 252, PageID.9905–06; ECF No. 242, PageID.8996, and that no other company else had anything like it. ECF No. 252, PageID.9870–77. InterMotive took measures to safeguard the secrecy of this information, which had value to InterMotive and its competitors. ECF No. 252, PageID.9906, 9909; ECF No. 255, PageID.10290; Trial Exs. 44, 329.

InterMotive contended at trial that Ford was worried about falling behind the competition and losing vehicle sales to Dodge and others. A March 2013 report on the 2013 NTEA show summarized the presentations by the other automakers, including Chrysler's module for Dodge Ram trucks, the Vehicle System Interface Module ("VSIM"), and identified the "Risk Level to Super Duty" as "High" because customers "require access to vehicle information in order to even be considered for a bid" and Ford offered "only limited vehicle communication." Trial Ex. 214. In a March 2013 email chain, when discussing whether Ford should continue developing its own Upfitter Interface Module, a Ford engineer

insisted that Ford move forward because "Ram is chipping away at Super Duty" and "will continue to make inroads into our fleet business unless we provide high impact fleet content." Trial Ex. 315. InterMotive introduced evidence that Ford wanted a module that would "leapfrog the competition" to give Ford a competitive advantage and enable Ford to make more vehicle sales. *See* Trial Ex. 317; ECF No. 255, PageID.10272–80.

InterMotive presented evidence at trial that Ford then shared InterMotive's trade secret with its suppliers, including Magna, in the summer of 2013, in violation of the Confidential Disclosure Agreement. ECF No. 242, PageID.8962–63, PageID.8986–87; ECF No. 252, PageID.9963–77; Trial Exs. 2, 4, 6, 13, 67. Magna then made the module with the trade secret (programmable inputs in a device like the Upfitter Interface Module), and Ford sold it as its own. ECF No. 252, PageID.9951–54; Trial Exs. 324, 543, 867. Ford "touted" the use of programmable inputs in advertising for its Upfitter Interface Module. *See* Trial Ex. 111, 124, 225, 308. The parties stipulated that Ford sold approximately 100,000 modules incorporating the programmable inputs. ECF No. 265, PageID.10924.

InterMotive asserts this evidence demonstrates that Ford willfully and maliciously stole InterMotive's trade secret because it needed to compete and felt at risk of falling behind. The Court finds that the sum of this evidence is sufficient to demonstrate that Ford's behavior was

"motivated by spite or ill will and a disregard for the rights of another with knowledge of probable injury," *Caudill Seed*, 53 F.3d at 393, and that it was "done with actual or constructive knowledge of its probable consequences" and "done with intent to cause injury" to InterMotive. 1 Milgrim on Trade Secrets § 1.01[2][c][iv][C].

Another court found willful and malicious misappropriation sufficient to support an award of attorney fees under facts quite similar to these. In *I/O Test, Inc. v. Smiths Aerospace, Inc.*, No. 1:06-CV-117, 2007 WL 1238895 (W.D. Mich. Apr. 27, 2007), the defendant filed a counterclaim alleging that the plaintiff misappropriated defendant's trade secret/confidential information. *Id.* at *3. The defendant alleged that it provided confidential information to the plaintiff related to a project the two companies were working on together, but that the plaintiff then "unilaterally stopped performance on the project, failed to deliver a finished product, and divulged [defendant's] confidential information to a third party." *Id.* The court found that "[plaintiff] misappropriated [defendant's] confidential information, in violation of … [the MUTSA] by blocking [defendant's] access to its own Japanese Project Software and by divulging [defendant's] confidential information regarding the [project] to [a third-party competitor]." *Id.* The court then went on to find that "[b]ased on the circumstances of this case, … [plaintiff's] misappropriation of [defendant's] software and confidential information and disclosure of such information to a third party was

38

willful and malicious," and that an award of attorney's fees was appropriate *Id*.

The evidence here supports a similar finding: Ford willfully and maliciously misappropriation InterMotive's trade secret, supporting an award of attorney fees to InterMotive on its trade secret claim.[9] The amount of those damages, however, will be determined at a later date, for the reasons discussed next.

## D. InterMotive's Attorney Fees Request

As to the amount of fees being sought, in two short paragraphs InterMotive asks the Court to award attorney fees in the amount of $2,442,970.27 for its Lanham Act and trade secret claims. This figure represents InterMotive's total attorney fees of $2,729,186.00, less the amount Ford has paid for sanctions in relation to expert discovery ($286,215.73). ECF No. 284, PageID.11688; ECF No. 284-1, Declaration of Gerald E. McGlynn in Support of Fee Award.

Ford argues that InterMotive's request for essentially their entire attorney fees are unreasonable and that InterMotive fails to apportion its attorney fees between Ford's trademark infringement claim, InterMotive's trademark infringement claim, and InterMotive's unfair competition claim under the Lanham Act, and InterMotive's trade secret

---

[9]     Because the Court finds that Ford is liable for InterMotive's attorney fees under the Lanham Act and the MUTSA, it will not address InterMotive's separate request for fees pursuant to the Court's inherent authority.

claim under the MUTSA. InterMotive also failed to apportion fees to any claims which do not allow for attorney fees, such as InterMotive's breach of contract claim. ECF No. 290, PageID.12532–34.

The Court finds that while it has determined InterMotive is entitled to attorney fees on certain claims, that it cannot determine, based on the record before it, the reasonableness of the amount of those fees to award InterMotive. The prevailing party under the Lanham Act is entitled to attorney's fees "only for work expended in prosecuting or defending the Lanham Act counts" and the district court must articulate a clear explanation for the amount of the apportion. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1193 (6th Cir. 1997) ("[U]nder 15 U.S.C. § 1117(a), attorneys' fees are recoverable only for work performed in connection with claims filed under the Lanham Act."); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 531, 533 n.9 (2d Cir. 2018) (same and stating "[i]t is not at all clear to us why the district court found seventy-five percent of the fees to be reasonable"). And "[i]t is proper for a court to grant an award of attorney's fees apportioned between work done related to Lanham Act claims and work done on state law claims for which state law authorizes or mandates recovery of attorney's fees," such as the MUTSA. 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:103 (5th ed. 2024).

Accordingly, the Court will order InterMotive to file a supplemental motion in support of its fee request for the Lanham Act claims and the

MUTSA claim, addressing the apportionment of its requested fees as to (1) Ford's trademark infringement claims against InterMotive, (2) InterMotive's trademark infringement claims against Ford, and (3) InterMotive's trade secret misappropriation claim, and excluding time related to claims which do not allow for attorney fees.

## III.   CONCLUSION

For the reasons set forth above, InterMotive's Motion for Attorney Fees, ECF No. 284, is **GRANTED IN PART**.

The Court **GRANTS** InterMotive's motion for an award of fees with respect to (1) Ford's trademark infringement claims against InterMotive, (2) InterMotive's trademark infringement claims against Ford, and (3) InterMotive's trade secret misappropriation claim under the MUTSA. InterMotive has not established that it is entitled to attorney fees on its remaining claims.

However, the Court **DENIES without prejudice** InterMotive's request for attorney fees in the specific amount of $2,442,970.27.

InterMotive is **ORDERED** to file a motion **within 30 days** of this Order reasonably addressing the apportionment of its requested fees as to (1) Ford's trademark infringement claims against InterMotive, (2) InterMotive's trademark infringement claims against Ford, and (3) InterMotive's trade secret misappropriation claim, and excluding time related to claims which do not allow for attorney fees. Such motion and brief shall not exceed 15 pages.

Ford is then **ORDERED** to file a response to InterMotive's motion **within 21 days** of InterMotive's motion, specifically challenging any time or time entries it contends are not recoverable for the Lanham Act and MUTSA claims, which is also limited to 15 pages. InterMotive may then file a reply brief, not to exceed 7 pages, **within 14 days**.

       **IT IS SO ORDERED.**

Dated: September 30, 2025    /s/Terrence G. Berg
                                  HON. TERRENCE G. BERG
                                  UNITED STATES DISTRICT JUDGE